IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| MATRA AMERICAS, LLC and, <br> MATRA ATLANTIC GmbH <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Court No. 21-00632 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT

Plaintiffs Matra Americas, LLC and Matra Atlantic GmbH (collectively, "Matra"), by and though its counsel, hereby allege and state as follows:

## JURISDICTION

1. Plaintiffs bring this actual pursuant to Sections 516A(a)(2)(A)(i)(II) and 516A(a)(2)(B)(i) of the Tariff Act of 1930, *as amended* ("the Act"), 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i). This action is an appeal of the U.S. Department of Commerce's ("Commerce") *Final Results* in the antidumping investigation of thermal paper from Germany and the final antidumping duty order issued by Commerce on thermal paper from Germany. *See Thermal Paper from Germany: Final Affirmative Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 86 Fed. Reg. 54,152 (Dep't Commerce Sept. 30, 2021) (the "*Final Results*"); *Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Antidumping Duty Orders*, 86 Fed. Reg. 66,284 (Dep't Commerce Nov. 22, 2021) (the "Order").

2. This Court has jurisdiction under 28 U.S.C. § 1581(c).

1

## STANDING

3.  Plaintiff Matra Americas, LLC is a U.S. importer and distributor of thermal paper from Germany, and Plaintiff Matra Atlantic GmbH is a foreign exporter of thermal paper from Germany. Plaintiffs participated in the antidumping investigation before Commerce and are interested parties under 19 U.S.C. § 1677(9)(a). Plaintiffs have standing to commence this action under 28 U.S.C. § 2631(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(II).

## TIMELINESS OF THE ACTION

4.  Commerce published the Order in the Federal Register on November 22, 2021. Plaintiffs filed a summons initiating this appeal on December 22, 2021, which was within thirty (30) days of the publication of the Order. This action was therefore timely filed pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II). This complaint is being filed on January 21, 2022, which is within 30 days of the filing of the summons and is thus timely filed under Court of International Trade Rule 3(a)(2).

## STATEMENT OF FACTS

5.  On October 7, 2020, petitioners Appvion Operations, Inc. ("Appvion") and Domtar Corporation ("Domtar,") (collectively, the "Petitioners"), filed a petition (the "Petition") with Commerce alleging that imports of thermal paper from Germany (as well as Japan, Korea, and Spain) were being, or were likely to be, sold in the United States at less than fair value.

6.  Commerce requested additional information pertaining to the Petition through supplemental questionnaires issued on October 13, 2020, and October 20, 2020. Petitioners responded to these supplemental questionnaires on October 16, 2020, and October 21, 2020, respectively.

7.  On October 27, 2020, Commerce issued a notice of the initiation of a less than fair value investigation, with a period of investigation of October 1, 2019, through September 30,

2020.  *See Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Initiation of Less-Than-Fair Value Investigations*, 85 Fed. Reg. 69,580 (Dep't of Commerce Nov. 3, 2020).  Commerce defined the scope of the investigation as covering "thermal paper from Germany, Japan, Korea, and Spain . . . in the form of 'jumbo rolls' and certain 'converted rolls.'"  *Id.* at 69,584.  Commerce further specified that the scope of the investigation would cover "thermal paper with or without a base coat (typically made of clay, latex, and/or plastic pigments, and/or like materials) on one or both sides; *with thermal active coating(s) (typically made of sensitizer, dye, and co-reactant, and/or like materials)* on one or both sides; with or without a top coat (typically made of pigments, polyvinyl alcohol, and/or like materials), and without an adhesive backing."  *Id.* (emphasis added).

8. On November 27, 2020, Commerce limited the number of respondents to the largest producer or exporter of subject merchandise by volume, and selected Koehler Oberkirch GmbH (then known as as Papierfabrik August Koehler SE) ("Koehler") for individual examination in the investigation.  Plaintiff Matra Americas, LLC was Koehler's exclusive U.S. importer and distributor of thermal paper during the period of investigation.

9. On December 16, 2020, Koehler submitted a letter to Commerce explaining that Koehler and Matra are affiliated within the meaning of 19 U.S.C. § 1677(33)(G) by virtue of their "close supplier relationship."  Commerce preliminarily determined that Koehler and Matra are affiliated parties on March 16, 2021.  This determination remained unchanged in the *Final Results*.

10. Early in the investigation, Koehler presented evidence that one of Koehler's thermal paper products imported by Matra, Blue4est chemical-free paper, was not within the scope of the investigation.  On December 16, 2020, following Koehler's request concerning cost

3

reporting for Blue4est paper, Commerce granted Koehler a cost reporting exemption for Blue4est paper.

11. The evidence offered by Koehler provided extensive detail about the unique and patented physical process used in Blue4est paper, how that process makes that product substantially different from traditional thermal paper, and why it falls outside of the scope of investigation as defined by Petitioners. Koehler further noted that environmental protection authorities in the United States and Germany had specifically recognized that the lack of a thermal active coating in Blue4est paper gives that product substantial distinguishable environmental benefits. Moreover, Koehler offered evidence that, unlike traditional thermal paper, Blue4est paper has been independently certified for direct food contact because of its lack of chemical processes. Koehler explained that these distinguishing features are entirely dependent on the use of a physical process, rather than a chemical process as in traditional thermal paper.

12. Petitioners argued in response that the physical process used in Blue4est paper was functionally equivalent to the "thermal active coating" described in the Petition as a physical characteristic of in-scope merchandise. However, Petitioners offered no evidence to support its argument or to contradict Koehler's position.

13. On May 6, 2021, Commerce released its preliminary determination in the investigation and announced a preliminary estimated weighted-average dumping margin of 2.78%. *See Thermal Paper From Germany: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 26,001 (Dep't Commerce May 12, 2021) ("Preliminary Determination"), and accompanying

Issue and Decision Memorandum ("Preliminary IDM"); *see also* "Preliminary Determination Margin Calculation for Papierfabrik August Koehler SE", dated May 5, 2021 (the "Preliminary Calculation Memo").

14. In the Preliminary Determination, Commerce agreed with Koehler's position that Blue4est paper was outside the scope of investigation and took the position that Blue4est paper does not use a thermal active coating. *See* Preliminary Calculation Memo at 1–2. Commerce thus rejected the Petitioners' argument that the definition of subject merchandise in the Petition included Blue4est paper and that the use of a physical rather than a chemical process in Blue4est paper was a "distinction without a difference."

15. In the Preliminary Determination, Commerce applied its "differential pricing analysis" to determine whether the "Average-to-Average" ( "A-A"), "Average-to-Transaction" ("A-T"), or mixed method should be applied when calculating the dumping margin. *See* Preliminary IDM at 7–8. As the first step in its "differential pricing analysis," Commerce employed the Cohen's *d* test, which is a statistical measure of the significance of the difference between the mean of a test group and the mean of a comparison group. Commerce calculates the Cohen's *d* test for each test group within region, purchaser, and time-period categories. As applied by Commerce, a Cohen's *d* equal to or greater than 0.8 for any test group indicates that the U.S. sales prices in the test group for a given product are significantly different from the U.S. sales prices for the same product in the comparison group. Commerce calculates the Cohen's *d* statistic across all possible test group versus control group comparisons with each of the three identified categories, and then tentatively applies a "ratio test." Under the ratio test, if the total percentage of transactions with a Cohen's *d* result at or above 0.8 is 33% or less, Commerce applies the A-A method. If the total percentage of transactions at or above 0.8 is 66% or more,

Commerce applies the A-T method. Finally, if the total percentage of transactions at or above 0.8 is between 33% and 66%, Commerce applies a hybrid approach through which the results of the application of the A-A method for transactions with a Cohen's *d* below 0.8 and the A-T method for transactions with a Cohen's *d* at or above 0.8 are combined to arrive at a single final dumping margin. Preliminary IDM at 8.

16. In the Preliminary Determination, Commerce determined that between 33% and 66% of Matra's U.S. sales passed the Cohen's *d* tests, and that there was a "pattern of prices that differ significantly among purchasers, regions, or time periods." Preliminary Calculation Memo at 3. Accordingly, Commerce applied zeroing, thereby finding an antidumping duty margin that would not exist absent application of Commerce's Cohen's *d* test.

17. Commerce's differential pricing analysis is reliant on the proper application of the Cohen's *d* test. However, as recognized by the United States Court of Appeals for the Federal Circuit, the Cohen's *d* test generally requires that the test groups and the comparison groups be "normally distributed, of sufficient size, and of roughly equal variances." *Stupp Corp. v. United States*, 5 F.4th 1341, 1344, 1360 (Fed. Cir. 2021). On its own terms, the Cohen's *d* test is *not* a useful and meaningful measure of the difference between two groups unless these requirements of normality, size, and equal variance are satisfied. The Cohen's *d* test can only be used to determine whether "there is a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time," *see* 19 U.S.C. § 1677f-1(d)(1)(B)(i), such that the alternative A-T method is legally permissible, if all three requirements of normality, size, and equal variance are satisfied.

18. Prior to finding that there was a "pattern of prices that differ significantly . . . among purchasers, regions, or periods of time" in reliance on the Cohen's *d* statistic, Commerce

did not conduct an analysis to determine whether the U.S. sales data, as grouped within regional, purchaser, and time-period categories for use in Commerce's application of the test, satisfied the requirements of normality, size, and equal variance. Commerce's failure to make a threshold finding that the application of the Cohen's *d* test to the relevant sales data satisfies these requirements raises "significant concerns" about (i) the appropriateness of the "interpretive cutoffs" it has selected; (ii) whether the failure to show normality in particular could cause "serious flaws in interpreting" the result of the test; (iii) whether the failure to show adequate size could produce "an upward bias in the calculated effect size"; and (iv) whether the failure to show equal variance between the data sets being compared may "artificially inflate the dumping margins for a set of export sales prices that has minimal variance," such that "[a]n objective examiner inspecting those export sales prices would be unlikely to conclude that they embody a 'pattern' of prices that 'differ significantly.'" 5 F.4th at 1357–59.

20. As Matra explained in a joint case brief submitted together with Koehler on August 16, 2021, the application of the Cohen's *d* analysis by Commerce in the Preliminary Determination was legally and factually erroneous because, when Commerce issued the Preliminary Determination, it had not considered whether the threshold requirements for application of the Cohen's *d* statistic were satisfied. Moreover, Matra demonstrated in that case brief the record data showed that the test groups Commerce used in its differential pricing analysis failed all three requirements of normality, size, and variance. To demonstrate the problems with Commerce's analysis, Matra submitted an analysis of the computer data supporting Commerce's Cohen's *d* test, which had not been provided to either Koehler or Matra until after the Preliminary Determination was issued. Matra showed that the core statistical assumptions of the Cohen's *d* test were not satisfied, and argued that, because Commerce failed

7

to explain why the application of Cohen's *d* was appropriate notwithstanding the failure to satisfy these statistical assumptions, Commerce's differential price analysis to apply the A-T method to a portion of Koehler's sales was fatally flawed and contrary to law. As such, Matra argued that Commerce should have applied the A-A method and determined that the weighted average dumping margin was below the *de minimis* threshold.

20. Commerce rejected Matra and Koehler's joint submission on Commerce's improper application of the Cohen's *d* test for its differential price analysis because it supposedly contained "new" information. By rejecting this submission, Commerce compounded its legal error and deprived Matra of any meaningful opportunity to comment on this important legal and factual issue.

21. On September 27, 2021, Commerce released the final results to Plaintiffs and other parties in the proceeding, and announced a final estimated weighted-average dumping margin of 2.90%. *See Final Results* at 66,286. As noted above, the *Final Results* were published in the Federal Register on September 30, 2021.

22. In the Final Determination, Commerce erroneously determined to include Koehler's Blue4est paper as "subject merchandise" within the scope of its investigation, despite its prior findings that Blue4est paper was *not* within scope. In making this new finding, Commerce did not base its decision on the submission of new evidence or legal authority. Rather, Commerce changed its position based on Petitioners' argument that, notwithstanding the carefully defined scope of the Petition, any paper that can be used to create an image on the paper through a thermal process qualifies as "thermal paper," even though it had rejected this precise argument when it issued the Preliminary Determination and even though it did not identify any record evidence to support this position.

23. In the *Final Results*, Commerce largely adhered to its prior erroneous application of the Cohen's *d* test.

24. Based on the *Final Results*, Commerce issued the Order on November 22, 2021. The Order, like the *Final Results*, announced a weighted-average dumping margin of 2.90%.

## STATEMENT OF CLAIMS

### Count One

25. Paragraphs 1 through 24 are incorporated by reference.

26. Commerce's decision to include Blue4est sales within the scope of the investigation when it issued the *Final Results* and the Order — a reversal of its position in the Preliminary Determination — is unsupported by substantial evidence and otherwise not in accordance with law.

27. The record before Commerce established that Blue4est paper imported by Matra and produced by Koehler does not use a "sensitizer, dye, and coreactant, and/or like materials." Whereas traditional thermal papers that use a "thermal active coating," as defined by Petitioners, Blue4est paper uses a purely physical process — no chemical reaction or dye activation is involved in the image generation process.

28. In its Preliminary Determination, Commerce correctly rejected Petitioners' argument that Koehler's patented Blue4est process fell within the definition of "thermal active coating" and properly found that Blue4est paper was outside of the scope of the investigation.

29. Prior to the Preliminary Determination, Koehler stated its position that, consistent with the definitions in the Petition, Blue4est was outside of the scope of the investigation, and offered substantial evidence to support that position.

30. Commerce's decision to reverse course in the Final Results was not based on any new evidence or legal authority offered by Petitioners. Rather, it simply reflects a decision to ignore the limited scope of the term "thermal paper" as defined in the Petition. Commerce failed to explain the reasoning for the change in its position or even identify the arguments or evidence it considered that resulted in that change. By failing to explain the "factual and legal conclusions" that resulted in its reversed finding, Commerce violated 19 C.F.R § 351.225(f)(5).

31. As a result of its arbitrary scope determination, Commerce erroneously included Blue4est paper when calculating the weighted average dumping margin.

32. For the foregoing reasons, Commerce's determination that Blue4est paper "has a thermal active coating" and was thus in the scope of the investigation, was arbitrary and capricious, unsupported by substantial evidence, and contrary to law.

### Count Two

33. Paragraphs 1 through 32 are incorporated by reference.

34. Commerce erred in calculating the weighted-average dumping margin when it found that a pattern of targeted or "masked" dumping occurred based on the application of the Cohen's *d* test in the *Final Results*.

35. Specifically, by applying the A-T method to certain Matra sales data in reliance upon its application of the Cohen's *d* statistical test, without first assuring that the Cohen's *d* test requirements of normality, size, and equal variance were satisfied, Commerce acted arbitrarily, capriciously, and contrary to law. Absent a substantial factual basis in the record to support the application of the A-T method for calculating the weighted average dumping margin, Commerce was legally required to apply the A-A method, according to which the weighted average dumping margin would have been below the *de minimis* threshold.

36. Commerce's rejection Matra and Koehler's joint brief on Commerce's application of the *Cohen's d* analysis because it purportedly contained "new information" was arbitrary and capacious. As Commerce provided its Cohen's *d* analysis for the first time with its Preliminary Determination, Matra could not have commented on the Cohen's *d* analysis prior to the Preliminary Determination. Thus, Commerce erroneously deprived Matra of a meaningful opportunity to comment on this issue. That deprivation was also arbitrary and capricious and contrary to law.

**DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court:

a. Hold Commerce's Final Results and the Order as unsupported by substantial evidence and not otherwise in accordance with law;

b. Remand this case to Commerce for a re-determination consistent with the judgment and findings of this Court; and

c. Grant such other relief as the Court shall deem just and proper.

Respectfully submitted,

/s/ R. Will Planert
R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins

MORRIS MANNING & MARTIN LLP
1401 Eye Street, NW, Suite 600
Washington, D.C. 20005
(202) 216-4819

*Counsel to Plaintiffs Matra Americas, LLC and Matra Atlantic GmbH*

Dated:  January 21, 2022