## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE**: **THE HONORABLE GARY S. KATZMANN, JUDGE**

| | | |
|---|---|---|
| MATRA AMERICAS LLC AND<br>MATRA ATLANTIC GMBH, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KOEHLER PAPER SE AND KOEHLER<br>OBERKIRCH GMBH, | ) | |
| | ) | |
| *Plaintiff-Intervenors*, | ) | Consol. Ct. No. 21-cv-00632 |
| | ) | **PUBLIC VERSION** |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| APPVION, LLC AND DOMTAR<br>CORPORATION, | ) | |
| | ) | |
| *Defendant-Intervenors*. | ) | |

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO
## RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD

Of Counsel:

W. MITCH PURDY
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20005

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

EMMA E. BOND
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
P.O. Box 480 | Ben Franklin Station
Washington, D.C. 20044
202-305-2034 | emma.e.bond@usdoj.gov

February 21, 2023

*Attorneys for Defendant*

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2(c)(1) ...................................................... 2

    I.     Administrative Determination Under Review ........................................ 2

    II.    Issues Presented For Review ................................................................ 3

STATEMENT OF FACTS ...................................................................................... 3

    I.     Preliminary Determination .................................................................. 4

    II.    Final Determination ............................................................................ 6

SUMMARY OF THE ARGUMENT ....................................................................... 9

ARGUMENT ....................................................................................................... 11

    I.     Standard Of Review ........................................................................... 11

    II.    Commerce's Application Of The Cohen's *d* Test As Part Of Its Differential Pricing Analysis Was Reasonable, Supported By Substantial Evidence, And In Accordance With Law ............................................................................ 13

        A.    Cohen's *d* Test Is One Part Of Commerce's Differential Pricing Analysis ..................................................................... 14

        B.    Commerce's Use Of The Cohen's *d* Test Is Reasonable ....................... 18

        C.    Koehler's Arguments Are Unpersuasive ................................................ 22

            1. Koehler Failed To Exhaust Administrative Remedies ........................... 22

            2. *Stupp* Does Not Support Koehler's Arguments ..................................... 25

    III.   Commerce Reasonably Exercised Its Discretion In Rejecting Koehler's Submission Of New Factual Information Relating To Differential Pricing ........ 29

    IV.   Commerce's Decision That Blue4est Paper Is Included In The Scope Of The Investigation Is Supported By Substantial Evidence And In Accordance With Law ...................................................................................................... 32

        A.    Commerce Reasonably Determined That The "Opaque Thermal Sensitive Coat" In Blue4est Paper Qualifies As A "Thermal Active Coating" Within The Scope Of The Investigation ........................................................... 32

        B.    Commerce's Interpretation of "Thermal Active Coating" To Include The "Thermal Sensitive Coat" In Blue4est Paper Does Not Modify The Scope Of The Investigation ........................................................................... 36

V.      Commerce's Determination With Respect To Koehler's Reporting Of The Dynamic Sensitivity Product Characteristic Is Supported By Substantial Evidence ........................................................................................................... 40

        A.      Background Relating To Koehler's Reporting Of Static Sensitivity And Dynamic Sensitivity ............................................................................. 40

        B.      Substantial Evidence Supports Commerce's Acceptance of Koehler's Reporting For Dynamic Sensitivity Coding For Products A And B ........ 42

VI.     Substantial Evidence Supports Commerce's Decision Not To Apply Adverse Facts Available When Determining The Static Sensitivity Product Characteristic ........................................................................................................... 44

VII.    Commerce's Acceptance Of Koehler's Home Market Post-Sale Price Adjustments Is Supported By Substantial Evidence And In Accordance With Law ............... 48

VIII.   Commerce's Inclusion Of Koehler's Accrued Interest On Unpaid Antidumping Duties In The Cost Of Production Calculation Is Supported By Substantial Evidence And In Accordance With Law ........................................................... 55

CONCLUSION ................................................................................................................. 57

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Advanced Tech. & Materials Co. v. United States*,
    34 C.I.T. 598 (2010) ...................................................................................28

*Agilent Techs. v. United States*,
    256 F. Supp. 3d 1338 (Ct. Int'l Trade 2017) ...................................................38

*A.L. Patterson, Inc. v. United States*,
    36 C.I.T. 1132 (August 6, 2012) .......................................................................38

*Allegheny Bradford v. United States*,
    342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) ............................................. 38, 39

*Apex Frozen Foods Priv. Ltd. v. United States*,
    862 F.3d 1337 (Fed. Cir. 2017) .............................................................14, 15, 18

*ArcelorMittal Stainless Belgium N.V. v. United States*,
    694 F.3d 82 (Fed. Cir. 2012) ............................................................................38

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) .......................................................................12

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974) .................................................................................. 56, 57

*Canadian Solar Int'l Ltd. et al. v. United States*,
    399 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ............................................. 27, 28

*Ceramark Tech., Inc. v. United States*,
    11 F.Supp.3d 1317 (Ct. Int'l Trade 2014) .......................................................38

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) .........................................................................................36

*CS Wind Vietnam Co. v. United States*,
    971 F. Supp. 2d 1271 (Ct. Int'l Trade 2014) ...................................................26

*Deacero S.A.P.I. de C.V. v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021) ................................................................. 27, 45

*Dillinger France S.A. v. United States*,
    350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ............................................. 23, 24

*Dillinger France S.A. v. United States,*
   981 F.3d 1318 (Fed. Cir. 2020) ........................................................................ 15

*Dorbest Ltd. v. United States,*
   30 CIT 1671,
   462 F. Supp. 2d 1262 (2006) ........................................................................... 26

*Duferco Steel, Inc. v. United States,*
   296 F.3d 1087 (Fed. Cir. 2002) ................................................................. 33, 38

*Ericsson GE Mobile Commc'ns, Inc. v. United States,*
   60 F.3d 778 (Fed. Cir. 1995) ........................................................................... 32

*Essar Steel, Ltd. v. United States,*
   753 F.3d 1368 (Fed. Cir. 2014) ....................................................................... 23

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) ......................................................................... 13

*Goodluck India Ltd. v. United States,*
   11 F.4th 1335 (Fed. Cir. 2021) ........................................................................ 11

*Gulf States Tube Div. of Quanex Corp. v. United States,*
   981 F. Supp. 630 (Ct. Int'l Trade 1997) .................................................... 32, 33

*Hyundai Steel Co. v. United States,*
   518 F. Supp.3d 1309 (Ct. Int'l Trade 2021) .................................................... 46

*INS v. Elias-Zacarias,*
   502 U.S. 478 (1992) ......................................................................................... 12

*JBF RAK LLC v. United States,*
   790 F.3d 1358 (Fed. Cir. 2015) ....................................................................... 13

*Kyocera Solar, Inc. v. United States,*
   253 F. Supp. 3d 1294 (Ct. Int'l Trade 2017) ................................................... 33

*M S Int'l, Inc. v. United States,*
   32 F.4th 1145 (Fed. Cir. 2022) ................................................................ passim

*Matsushita Elec. Indus. Co. v. United States,*
   750 F.2d 927 (Fed. Cir. 1984) ......................................................................... 11

*Mid Continent Steel & Wire v. United States,*
   940 F.3d 662 (Fed. Cir. 2019) .................................................................. 12, 16

*Minebea Co. v. United States,*
  782 F. Supp. 117 (1992) .......................................................................................... 33

*Mitsubishi Heavy Indus., Ltd. v. United States,*
  986 F. Supp. 1428 (1997) ....................................................................................... 33

*Nippon Steel Corp. v. United States,*
  337 F.3d 1373 (Fed. Cir. 2003) ............................................................................. 45

*Nippon Steel Corp. v. United States,*
  458 F.3d 1345 (Fed. Cir. 2006) ............................................................................. 12

*PAM, S.p.A. v. United States,*
  582 F.3d 1336 (Fed. Cir. 2009) ....................................................................12, 43, 44

*PSC VSMPO-Avisma Corp. v. United States,*
  688 F.3d 751 (Fed. Cir. 2012) ............................................................................... 29

*QVD Food Co. v. United States,*
  658 F.3d 1318 (Fed. Cir. 2011) ............................................................................. 27

*Shandong Huarong Gen. Corp. v. United States,*
  159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) ......................................................... 12

*Smith Corona v. United States,*
  796 F. Supp. 1532 (Ct. Int'l Trade 1992) ............................................................. 39

*Stanley Works (Langfang) Fastening Sys. Co. v. United States,*
  279 F. Supp. 3d 1172 (Fed. Cir. 2017) ................................................................. 24

*Stanley Works Langfang Fastening Sys. Co. v. United States,*
  333 F. Supp. 3d 1329 (Ct. Int'l Trade 2018) ....................................................... 19

*Stupp Construction v. United States,*
  359 F. Supp. 3d 1293 (Ct. Int'l Trade 2018) ....................................................... 31

*Stupp v. United States,*
  5 F.4th 1341 (Fed. Cir. 2021) ...................................................................... passim

*Ta Chen Stainless Steel Pipe, Inc. v. United States,*
  298 F.3d 1330 (Fed. Cir. 2002) ............................................................................. 28

*Timken Co. v. United States,*
  354 F.3d 1334 (Fed. Cir. 2004) ............................................................................. 12

*Tri Union Frozen Prod., Inc. v. United States*,
   161 F. Supp. 3d 1333 (Ct. Int'l Trade 2016) ................................................... 28

*U.S. Steel Grp. v. United States*,
   96 F.3d 1352 (Fed. Cir. 1996) ...................................................................... 13

*Union Steel v. United States*,
   713 F.3d 1101 (Fed. Cir. 2013) ............................................................... 14, 15

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ..................................................................................... 12

*Xi'an Metals & Materials Imp. & Exp. Co. v. United States*,
   256 F. Supp. 3d 1346 (Ct. Int'l Trade 2017) ............................................... 19, 21

*Whirlpool Corp. v. United States*,
   890 F.3d 1302 (Fed. Cir. 2018) ...................................................................... 38

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013) ...................................................................... 56

**Statutes**

19 U.S.C. § 1516a ............................................................................................ 27

19 U.S.C. § 1677a ............................................................................................ 56

19 U.S.C. § 1677b ............................................................................................ 56

19 U.S.C. § 1677e(a) ................................................................................... 45, 47

19 U.S.C. § 1677f-1 .................................................................................... 4, 5, 8

19 U.S.C. § 1677m ........................................................................................... 46

19 U.S.C. § 1677m ..................................................................................... passim

28 U.S.C. § 2637 ............................................................................................. 23

**Regulations**

19 C.F.R. § 104 ............................................................................................... 31

19 C.F.R. § 302 ............................................................................................... 31

19 C.F.R. § 351.102 ........................................................................................... 7

19 C.F.R. § 351.102 ......................................................................................... 48

19 C.F.R. § 351.104 ......................................................................................... 28

19 C.F.R. § 351.104 ......................................................................................... 29

19 C.F.R. § 351.301 ......................................................................................... 30

19 C.F.R. § 351.301 ......................................................................................... 29

19 C.F.R. § 351.302 ..................................................................................... 29, 31

19 C.F.R. § 351.308 ......................................................................................... 45

19 C.F.R. § 351.401 .................................................................................... passim

19 C.F.R. § 351.402 ......................................................................................... 56

19 C.F.R. § 351.414 ..................................................................................... 4, 15

**Administrative Determinations**

*Certain Orange Juice from Brazil,*
    71 Fed. Reg. 2,183 (Dep't of Commerce Jan. 13, 2006) ...................................... 39

*Sodium Hexamataphosphate from China,*
    73 Fed. Reg. 6,479 (Dep't of Commerce Feb. 4, 2008) ...................................... 39

*Certain New Pneumatic Off-The-Road Tires from China,*
    73 Fed. Reg. 40,485 (July 15, 2008) ............................................................. 39

*Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair Value,*
    78 Fed. Reg. 33,351 (Dep't of Commerce June 4, 2013) ...................................... 26

*Modification Regarding Price Adjustments in Antidumping Duty Proceedings,*
    81 Fed. Reg. 15,641, 15,644-45 (Dep't of Commerce Mar. 24, 2016) ...................... 8

*Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review,*
    *2014-2015,* 81 Fed. Reg. 62,717 (Dep't of Commerce, Sept. 12, 2016) .................. 20

*Certain Carbon and Alloy Steel Cut-To-Length Plate From Taiwan (Plate from Taiwan),*
    82 Fed. Reg. 16,372 (April 4, 2017) .......................................................... 51, 53

*Tapered Roller Bearings from Korea,*
    83 Fed. Reg. 29,092 (Dep't of Commerce June 6, 2018) ...................................... 52

*Certain Tapered Roller Bearings From the Republic of Korea (Tapered Roller Bearings from Korea)*,
    83 Fed. Reg. 29,092 (June 22, 2018)................................................................51

*Certain Uncoated Paper From Portugal 2017-2018*,
    84 Fed. Reg. 64,040 (November 20, 2019).......................................................51

*Aluminum Sheet from India*,
    86 Fed. Reg. 13,282 (Dep't of Commerce Mar. 8, 2021)..................................53

*Common Alloy Aluminum Sheet from India*,
    86 Fed. Reg. 13,282 (March 8, 2021)..............................................................51

*Certain Uncoated Paper from Portugal 2018-2019*,
    86 Fed. Reg. 7,269 (Dep't of Commerce Jan. 27, 2021) ..............................49, 52

*Hot-Rolled Steel Flat Products from Australia*,
    86 Fed. Reg. 47,054 (August 23, 2021).............................................................52

*Certain Aluminum Foil from Turkey*,
    86 Fed. Reg. 52,880 (Dep't of Commerce Sept. 23, 2021)...........................51, 53

*Thermal Paper from Germany: Final Affirmative Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances*,
    86 Fed. Reg. 54,152 (Dep't of Commerce Sept. 30, 2021).....................................2

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| MATRA AMERICAS LLC AND<br>MATRA ATLANTIC GMBH, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| KOEHLER PAPER SE AND KOEHLER<br>OBERKIRCH GMBH, | ) | |
| | ) | |
| *Plaintiff-Intervenors*, | ) | Consol. Ct. No. 21-cv-00632 |
| | ) | **PUBLIC VERSION** |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| *Defendant*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| APPVION, LLC AND DOMTAR<br>CORPORATION, | ) | |
| | ) | |
| *Defendant-Intervenors*. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

defendant, the United States, respectfully submits this response in support of the final

determination by the U.S. Department of Commerce (Commerce) in its antidumping duty

investigation of thermal paper from Germany.

Plaintiffs, Matra Americas, LLC and Matra Atlantic GmbH (collectively, Matra), and

plaintiff-intervenors, Koehler Paper SE and Koehler Oberkirch GmbH (collectively, Koehler)

filed a motion for judgment, challenging Commerce's (1) application of its differential pricing

analysis, (2) decision to reject new factual matter in Koehler's case brief relating to differential pricing, and (3) determination that Blue4est paper is covered by the scope of the investigation.[1]

Defendant-intervenors, Appvion, LLC and Domtar Corporation (Petitioners), in turn, jointly challenge Commerce's (4) determination with respect to Koehler's reporting of certain product characteristics, (5) decision not to apply facts available with an adverse inference with respect to Koehler's reporting of the static sensitivity product characteristic, (6) determination regarding Koehler's home market post-sale price adjustments, and (7) inclusion of accrued interest on unpaid antidumping duties in Koehler's costs of production.

As demonstrated below, Commerce's final determination is supported by substantial evidence and is otherwise in accordance with law. Accordingly, the United States respectfully requests that the Court sustain Commerce's determination, deny Koehler's and Petitioners' motions for judgment on the agency record, and enter judgment in favor of the United States.

**STATEMENT PURSUANT TO RULE 56.2(c)(1)**

I.      Administrative Determination Under Review

Koehler and Petitioners challenge various aspects of the final determination of the less-than-fair-value investigation of thermal paper from Germany, published as *Thermal Paper from Germany: Final Affirmative Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical Circumstances*, 86 Fed. Reg. 54,152 (Dep't of Commerce Sept. 30, 2021) (P.R. 299), and accompanying Issues and Decision Memorandum dated

---

[1] Koehler Oberkirch GmbH (formerly known as Papierfabrik August Koehler SE, *see* Mot. at 1, ECF No. 19 (Feb. 22, 2022)), was the only mandatory respondent in the underlying investigation, and its affiliate plaintiff Matra Americas, LLC was Koehler's U.S. importer and distributor of thermal paper during the period of investigation. *See* Preliminary Decision Memorandum (PDM) at 1-3 (P.R. 205). When referring to arguments by Matra and Koehler in their Rule 56.2 motion for judgment, this filing will refer to both Matra and Koehler jointly as "Koehler."

September 24, 2021 (IDM) (P.R. 291).  The period of investigation is October 1, 2019, through

September 30, 2020.  *Id.*

II.    Issues Presented For Review

1.    Whether Commerce's application of its differential pricing analysis is

reasonable, based on substantial evidence, and in accordance with law.

2.    Whether Commerce reasonably exercised its broad discretion to administer the

compilation of the record in an antidumping duty investigation, by rejecting new factual matter

relating to differential pricing in Koehler's case brief.

3.    Whether Commerce's decision that Blue4est paper is covered by the scope of the

investigation is supported by substantial evidence and in accordance with law.

4.    Whether Commerce's determination with respect to Koehler's reporting of the

dynamic sensitivity product characteristic, related to the classification of certain products, is

supported by substantial evidence and in accordance with law.

5.    Whether Commerce's determination not to apply adverse facts available with

respect to Koehler's reporting of the static sensitivity product characteristic is supported by

substantial evidence and in accordance with law.

6.    Whether Commerce's acceptance of Koehler's home market post-sale price

adjustments is supported by substantial evidence and in accordance with law.

7.    Whether Commerce's inclusion of Koehler's accrued interest on unpaid

antidumping duties in the cost of production is supported by substantial evidence and in

accordance with law.

**STATEMENT OF FACTS**

On October 7, 2020, Petitioners filed an antidumping duty petition alleging that imports

of thermal paper from Germany were being sold in the United States at less than normal value.

3

*Thermal Paper From Germany: Preliminary Affirmative Determination*, 86 Fed. Reg. 26,001

(Dep't of Commerce May 12, 2021) (P.R. 216) (Preliminary Determination), and accompanying

Preliminary Decision Memorandum (PDM) at 1 (P.R. 205); *see also* Petition, Vol. I, Pt. 1, at 1

(P.R. 2).  Commerce initiated an antidumping duty investigation into thermal paper from

Germany on October 27, 2020.  PDM at 1.  On November 27, 2020, Commerce selected

Papierfabrik August Koehler SE, now participating in this litigation as plaintiff Koehler

Oberkirch GmbH (Papierfabrik Koehler) as the only mandatory respondent in the investigation.

PDM at 1; *see also* Respondent Selection Mem. (P.R. 80).

In January 2021, Papierfabrik Koehler and Matra Americas, LLC submitted timely

responses to Commerce's antidumping duty questionnaire, on topics relating to general

information, comparison market sales, U.S. sales, cost of production, and constructed value.

PDM at 2.  From January through April 2021, Commerce issued supplemental questionnaires to

Papierfabrik Koehler and Matra Americas, LLC, and both Papierfabrik Koehler and Matra

Americas, LLC submitted timely responses.  *Id.* at 3.

I.      Preliminary Determination

On May 12, 2021, Commerce issued its preliminary affirmative determination.  Prelim.

Determ. (P.R. 216).  Commerce applied its differential pricing analysis in determining which

method to use in comparing the normal value to the expert price or constructed export price.

PDM at 7-9.  Commerce's default methodology is to determine whether merchandise is being

sold at less than fair value by comparing the weighted average normal values to the weighted

average export price, that is, using the average-to-average (A-A) method.  19 U.S.C. § 1677f-

1(d)(1); 19 C.F.R. § 351.414(c)(1).  However, in certain circumstances, Commerce may apply

the average-to-transaction (A-T) method, by comparing the weighted average normal value with

the export price or constructed export price for an individual sale.  PDM at 7-9.  The A-T method

may be appropriate when "(i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and (ii) Commerce "explains why such differences cannot be taken into account" using the average-to-average methodology. *See* 19 U.S.C. § 1677f-1(d)(B).

In the preliminary determination, Commerce applied the Cohen's *d* test as the first step in assessing whether a pattern of prices for comparable merchandise differs significantly among purchasers, regions, or time periods. PDM at 7-8. Commerce explained that sales "pass" the Cohen's *d* test if the calculated Cohen's *d* coefficient is equal to or larger than the "large," 0.8 threshold. PDM at 8. Commerce next applied the ratio test to determine whether the value of sales that passed the Cohen's *d* test supports the consideration of the A-T method for some or all of the sales. PDM at 8. Based on the results from these tests, Commerce preliminarily found "that 54.17 percent of the value of U.S. sales passes the Cohen's *d* test and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods," and that using the A-A method could not "account for such differences." PDM at 9 (citing Prelim. Determ. Margin Calc. Mem. (C.R. 296, P.R. 209)). This was because the weighted-average dumping margin "crosse{d} the *de minimis* threshold" when "applying the A-T method to those U.S. sales which passed the Cohen's *d* test," but not when using A-A to compare all sales. PDM at 9. Accordingly, based on its differential pricing analysis, Commerce used the A-T method to compare the normal value and constructed export price for the 54.17 percent of sales that passed the Cohen's *d* test. PDM at 9.

Based on its determinations of normal value and constructed export price, Commerce preliminarily calculated a dumping margin of 2.78 percent for Papierfabrik Koehler and for the "all others" rate. Prelim. Determ. (P.R. 216).

On August 16, 2021, Commerce received case briefs from the Petitioners and Papierfabrik Koehler.  IDM at 2; *see also* Petitioners Case Br. (C.R. 350, P.R. 271).  Koehler's case brief, however, contained new factual information regarding differential pricing, after the deadline for submitting such information.  Accordingly, Commerce rejected the brief, but allowed Koehler to resubmit its case brief without the new factual information.  Ltr. Rejecting Case Br. (P.R. 278); *see also* Koehler Case Br. (Resubmission) (C.R. 354, P.R. 280-281).  On August 23, 2021, Commerce received rebuttal briefs from Petitioners and Papierfabrik Koehler. IDM at 2.

II.      Final Determination

After considering the arguments made by interested parties, Commerce made several changes to the preliminary determination.  IDM at 2-3.  As an initial matter, Commerce determined that sales of Koehler's Blue4est products were included in the scope of the investigation.  IDM at 3; *see also* Final Gen. Scope Mem. (P.R. 292); Germany Scope Mem. (C.R. 363, P.R. 297).  Considering "the language of the scope of the investigation and the description of subject merchandise" (among other things), Commerce determined that the "thermal sensitive layer" in Koehler's Blu4est paper qualified as a "thermal active coating" within the meaning of the scope of the investigation.  Germany Scope Mem. at 5, 7 (C.R. 363, P.R. 297).  Accordingly, Commerce "included sales of Blu4est products" in the margin calculation.  IDM at 2.

Commerce also revised the reported static sensitivity product characteristic for one reported product control number (CONNUM).[2]  IDM at 3.  Commerce explained that it had instructed Koehler to report static sensitivity based on the temperature required to produce the maximum optical density unit.  IDM at 14.  Although Koehler had reported different static sensitivity codes for Products A and B, Commerce ultimately determined that Koehler's "most frequent test result" showed that Products A and B should be classified with the same static sensitivity code.  IDM at 14; Further Analysis Mem. at 3-4 (C.R. 359, P.R 294).  Commerce thus revised Product B's static sensitivity code in the final determination.  IDM at 14.  However, Commerce continued to accept Koehler's reporting of the dynamic sensitivity codes for Products A and B.  IDM at 14; Further Analysis Mem. at 4-6 (C.R. 359, P.R 294).

Relatedly, Commerce rejected Petitioners' request to apply facts available with an adverse inference based on the allegation that Koehler had provided "incomplete" documentation regarding the static sensitivity product characteristic.  IDM at 14-16.  Instead, Commerce determined that Koehler's reporting was not "incomplete," and that "Koehler acted in accordance with Commerce's instructions in reporting the static sensitivity product characteristic{.}"  IDM at 16.  Thus, Commerce found "no basis to apply {adverse facts available.}"  IDM at 16.

Commerce also addressed an issue raised by Petitioners relating to interest accrued on assessed antidumping duties that Koehler had "not paid to date."  IDM at 18.  Because Koehler had failed to account for this interest expense for fiscal year 2020, Commerce "added this

---

[2]  In making product comparisons between U.S. sales and foreign like product in the preliminary determination, Commerce matched products according to the "physical characteristics reported by Koehler," including (in order of importance):  "roll form, thermal active coating, top coating, developer type, basis weight, maximum optical density units, static sensitivity, dynamic sensitivity, coating color, printing, width, length, and core material."  PDM at 10.

expense to Koehler's consolidated total financial interest expense" in recalculating Koehler's financial interest expense ratio.  IDM at 19; *see also* Final Calc. Mem. at Att. 3 (C.R. 360, P.R. 295).

Relating to the determination of the normal value, Commerce continued to include certain home market post-sale price adjustments based on rebates reported in the field REBATE2H.  IDM at 19-22 (citing 19 C.F.R. § 351.102(b); 19 C.F.R. § 351.401(c); *Final Modification Regarding Price Adjustments in Antidumping Duty Proceedings*, 81 Fed. Reg. 15,641, 15,644-45 (Dep't of Commerce Mar. 24, 2016) (*Final Modification*)).  Finding (among other things) that the adjustments from the challenged rebates were "not uncommon for Koehler" and were "limited" in number, Commerce determined that the adjustment was "appropriate."  IDM at 22; *see also* Further Analysis Mem. at 6-7 (C.R. 359, P.R 294).  Commerce thus "continued to adjust Koehler's home market price for REBATE2H in {the} calculations for the final determination."  IDM at 22.

Finally, in the final determination, Commerce continued to apply the Cohen's *d* test as a part of its differential pricing analysis.  IDM at 4.  Commerce explained that the Cohen's *d* coefficient is a recognized measure that gauges the extent, or "effect size," of the difference between the means of two groups and provides "a simple way of quantifying the difference between two groups.  IDM at 5 (citation omitted).  As Commerce explained, this analysis "has many advantages over the use of tests of statistical significance alone."  *Id.* (citation omitted).  After making adjustments to various inputs in the final determination, Commerce again applied Cohen's *d* to determine whether there existed "a pattern of prices that differ{ed} significantly among purchasers, regions, or time periods."  Final Calc. Mem. at 6 (C.R. 360, P.R. 295); *see also* 19 U.S.C. § 1677f-1(d)(1).  Because the value of sales passing Cohen's *d* test in the final

determination was greater than 66 percent—with 73.7 percent of sales by value passing the Cohen's *d* test—Commerce considered the A-T method of comparison for *all* sales. Final Calc. Mem. at 6 (C.R. 360, P.R. 295). Commerce found that the A-A method could not account for the identified differences in pricing "because the weighted-average dumping margin crosses the *de minimis* threshold" when calculated using the A-T method, but not when using the A-A method. *Id.*

After resolving each of these issues, Commerce determined that thermal paper from Germany was being, or was likely to be, sold at less than fair value, and assigned Papierfabrik Koehler a dumping margin of 2.9%. Final Determ. at 54,153 (P.R. 216).

## SUMMARY OF THE ARGUMENT

*First*, Commerce reasonably used the Cohen's *d* test as one step of its differential pricing analysis to determine whether "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." *See* 19 U.S.C. § 1677f-1(d)(1)(B). Commerce declined to adopt Koehler's arguments seeking to limit the Cohen's *d* test to comparison groups presenting normal distribution and equal variance (among other limitations). Instead, Commerce explained that principles of statistical significance—such as sample size and sample distribution—are not relevant when assessing the practical "effect size" of real-world differences in a complete population.

Koehler is incorrect, moreover, that Commerce's analysis conflicts with *Stupp v. United States*, 5 F.4th 1341 (Fed. Cir. 2021), which specifically invited Commerce to clarify its position that having the entire universe of data (rather than a sample) makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test. In the underlying investigation, Commerce explained the difference between statistical significance and practical significance in the context of the Cohen's *d* test. For example, Commerce differentiated between

a t-test, which is relevant when considering statistical significance, versus effect size, which is measured by the Cohen's *d* coefficient and reflects practical significance. *See* IDM at 6. Only the latter concept is relevant in this case, Commerce explained, because the differential pricing analysis considers the practical significance of *all* of Koehler's U.S. sales, not only a sample. IDM at 6-7.

*Second*, Commerce is entitled to broad discretion in administering the compilation of the record in antidumping investigations, and reasonably exercised that discretion in rejecting the new information related to differential pricing contained in Koehler's case brief.

*Third*, Commerce's decision that Koehler's Blue4est paper is within the scope of the investigation is supported by substantial evidence and in accordance with law. From the outset, the scope of the investigation covered thermal paper "with thermal active coating(s) (typically made of sensitizer, dye, and co-reactant, and/or like materials)." In the final determination, Commerce determined that the thermal sensitive layer of Koehler's Blue4est paper is a form of thermal coating that permits a thermal image to appear on the paper. Substantial evidence supports Commerce's determination that the "thermal sensitive layer" in Blue4est paper qualifies as "thermal active coating" within the meaning of the scope.

*Fourth*, Commerce's determination with respect to the dynamic sensitivity product characteristic is supported by substantial evidence. Based on the questionnaire responses submitted by Koehler, Commerce determined that Koehler accurately reported the dynamic sensitivity product characteristic. Commerce's resulting classification of Products A and B into separate CONNUMs was, therefore, supported by substantial evidence and in accordance with law.

*Fifth*, Koehler timely responded to all of Commerce's requests for information regarding the static sensitivity product characteristic. Commerce reasonably determined that, because Koehler complied with Commerce's instructions, there was no basis to apply adverse facts available with respect to Koehler's static sensitivity reporting.

*Sixth*, Commerce's acceptance of Koehler's home market rebates in the field REBATE2H is supported by substantial evidence and in accordance with law. In reaching this finding, Commerce complied with the applicable regulation, 19 C.F.R. § 351.401(c), and applied all of the factors set forth in the regulatory preamble in the *Final Modification*. Although the terms and conditions of the post-sale rebate were not known to the customer at the time of sale, Commerce reasonably determined that the other factors in the *Final Modification* supported a finding that Koehler was eligible for the price adjustment.

*Finally*, Commerce's inclusion of Koehler's accrued interest on unpaid antidumping duties in the cost of production is supported by substantial evidence and in accordance with law. As explained in the IDM and the Further Analysis Memorandum, Commerce reasonably included the accrued interest expenses on unpaid antidumping duties as part of Koehler's cost of production, rather than as an adjustment to the constructed export price.

Accordingly, the Court should sustain Commerce's final determination because it is based on substantial evidence and is in accordance with law.

## **ARGUMENT**

### I.  Standard Of Review

In reviewing the final determination in an antidumping duty investigation, this Court sustains any determination, finding, or conclusion found by Commerce unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1341 (Fed. Cir. 2021) (quoting 19 U.S.C.

§ 1516a(b)(1)(B).  In conducting this analysis, courts "consider whether 'the administrative record contain{s} substantial evidence to support' Commerce's decision and whether that decision was 'rational.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).

"The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009).  When Congress has entrusted an agency to administer a statute in fact-intensive inquiries, the agency's conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).  A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted).  The Court will sustain Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them.  *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001).

Moreover, "{i}n carrying out its statutorily assigned tasks, Commerce has discretion to make reasonable choices within statutory constraints." *Mid Continent Steel & Wire v. United States*, 940 F.3d 662, 667 (Fed. Cir. 2019).  In such cases, "{a}ny reasonable construction of the statute is a permissible construction," *Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (citation and quotation marks omitted), and Commerce's "interpretation governs in

the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *Eurodif*, 555 U.S. at 316 (citation omitted).

The Court affords Commerce an especially great deal of deference "when a statute fails to make clear 'any Congressionally mandated procedure or methodology for assessment of the statutory tests.'" *JBF RAK LLC v. United States*, 790 F.3d 1358, 1363 (Fed. Cir. 2015) (quoting *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996)). In that circumstance, "Commerce 'may perform its duties in the way it believes most suitable.'" *Id*. Consequently, Commerce receives "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when it exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996).

II.  **Commerce's Application Of The Cohen's *d* Test As Part Of Its Differential Pricing Analysis Was Reasonable, Supported By Substantial Evidence, And In Accordance With Law**

Commerce reasonably applied its differential pricing methodology to determine the appropriate comparison methodology to calculate Koehler's weighted-average dumping margin. Applying the Cohen's *d* test, Commerce identified a pattern of export prices that differed significantly among purchasers, regions, or time periods. IDM at 4-8. Based on the results of the ratio test and meaningful differences test, Commerce did not use the A-to-A method, but instead relied on the A-to-T method in calculating Koehler's weighted-average dumping margin.

As discussed in greater detail below, Commerce's application of the Cohen's *d* test as part of its differential pricing methodology is reasonable and consistent with applicable law. *First*, Commerce's overall differential pricing methodology is a reasonable implementation of the statute authorizing use of the A-T methodology to compare the normal value to the export

price in antidumping duty investigations.  *Second*, Commerce reasonably used the Cohen's *d* test as part of the first step in this methodology.  In doing so, Commerce explained why it was appropriate to rely on Cohen's *d* to assess the effect size—not a statistical sample—of price differences between purchasers, regions, or periods of time within the total universe of U.S. sales.  *Third*, Koehler's challenges to Commerce's reliance on Cohen's *d* are unpersuasive. Contrary to Koehler's arguments, *Stupp* did not hold that Commerce's application of Cohen's *d* was unlawful, but rather gave Commerce the opportunity to provide further explanation.

A.     Cohen's *d* Test Is One Part Of Commerce's Differential Pricing Analysis

In an antidumping investigation, the statute directs Commerce to determine whether subject merchandise is being, or is likely to be, sold at less than fair value in the United States. "Sales at less than fair value are those sales for which the 'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the price of the product in the United States){.}"  *Apex Frozen Foods Priv. Ltd. v. United States*, 862 F.3d 1337, 1340 (Fed. Cir. 2017) (quoting *Union Steel v. United States*, 713 F.3d 1101, 1103 (Fed. Cir. 2013)).  To perform this pricing comparison, Commerce may use one of three methodologies:

> (1) Average-to-transaction (A-T), in which Commerce compares the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions.
>
> (2) Average-to-average (A-A), in which Commerce compares the weighted average of the normal values to the weighted average of the export prices (or constructed export prices).
>
> (3) Transaction-to-transaction (T-T), in which Commerce compares the normal value of an individual transaction to the export price (or constructed export price) of an individual transaction.

*Id.* at 1340-41 (citing *Union Steel*, 713 F.3d at 1103).

14

In general, a weighted-average dumping margin is calculated using the A-to-A method by "comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise."  19 U.S.C. § 1677f-1(d)(1)(A)(i).  By regulation, "the Secretary will use the average-to-average method unless the Secretary determines another method is appropriate in a particular case."  19 C.F.R. § 351.414(c)(1).

However, the governing statute allows Commerce to apply the A–T method when "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and Commerce explains why such differences cannot be taken into account using another method.  19 U.S.C. § 1677f-1(d)(1)(B).  This statutory language exists "to address 'targeted' or 'masked' dumping."  *Apex Frozen Foods*, 862 F.3d at 1327 (citing *Union Steel*, 713 F.3d at 1104 n.3); *see also* Statement of Administrative Action Accompanying the Uruguay Rounds Agreement Act in 1995, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 842-843.  As described in the SAA, targeted dumping is more likely to occur "where there is a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time."  *Apex Frozen Foods*, 862 F.3d at 1341-42 (citing, *e.g.*, 19 U.S.C. § 1677f-1(d)(1)(B)) (cleaned up); *see also* SAA, H.R. Doc. 103-316, vol. 1 (1994) at 842-843.  As the Federal agency charged with administering the antidumping duty statute, including 19 U.S.C. § 1677f-1(d)(1)(B), Commerce possesses "discretionary power" to "consider applying the average-to-transaction method" in an antidumping duty investigation.  *Stupp*, 5 F.4th at 1351-52.

"The statute is silent as to how Commerce must determine a 'pattern'" of differing export prices pursuant to 19 U.S.C. § 1677f-1(d)(1)(B). *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1325 (Fed. Cir. 2020). "{T}here is no statutory language telling Commerce how to detect patterns of significantly differing export prices, much less how to aggregate and quantify pricing comparisons across product groups in order to select a statutorily defined comparison method." *Stupp*, 5 F.4th at 1354 (citing 19 U.S.C. § 1677f-1(d)(1)(A)–(B)). "Commerce therefore has discretion to determine a reasonable methodology to implement the statutory directive." *Id.* "Commerce's differential pricing analysis is an interpretation of that statutory language and thus constitutes an interpretive rule," which must be upheld so long as it is reasonable. *Id.* at 1352-53.

In exercising this discretion, Commerce uses its differential pricing analysis to determine whether the A-to-A method is adequate to address the potential for masked, or "targeted," dumping, or whether Commerce may resort to an alternative comparison method based on the A-to-T method. PDM at 7. In the first stage of the differential pricing analysis, Commerce applies Cohen's *d* test to determine whether the respondent's pricing behavior exhibits a "pattern of export prices" that differed significantly between purchasers, regions, or time periods. PDM at 7-8 (citing 19 U.S.C. § 1677f-1(d)(1)(B)).

To determine whether sales "pass" the Cohen's *d* test, Commerce applies the Cohen's *d* coefficient of 0.8—the largest of the three thresholds defined by the Cohen's *d* test—which "provides the strongest indication" of a significant difference between the means of the "test and comparison groups." PDM at 8. Challenges to Commerce's reliance on the threshold of 0.8 have been rejected in other cases. *See, e.g.*, *Mid Continent Steel & Wire, Inc. v. United States*, 940 F.3d 662, 673 (Fed. Cir. 2019). As the court of appeals explained in *Mid Continent*, "the 0.8

16

standard is 'widely adopted' as part of a 'commonly used measure' of the difference relative to
such overall price dispersion; and it is reasonable to adopt that measure where there is no better,
objective measure of effect size." *Id.* (citation omitted). The Federal Circuit "agree{d} with the
Trade Court that this rationale adequately supports Commerce's exercise of the wide discretion
left to it under 19 U.S.C. § 1677f-1(d)(1)(B)." *Id.*; *see also Stupp*, 5 F.4th at 1356-58 (adopting
the reasoning from *Mid Continent*, though addressing related concerns regarding assumptions
that "may undermine the usefulness of the interpretive cutoffs").

Next, the ratio test assesses the extent of the price differences for all sales. PDM at 8. If
66 percent or more of the value of total sales pass the Cohen's *d* test, Commerce will consider
the A-T method for all sales; if 33 to 66 percent of the value of total sales pass the Cohen's *d*
test, Commerce will consider using the A-T method for the sales that passed the Cohen's *d*; and
if fewer than 33 percent of the value of total sales pass the Cohen's *d*, then Commerce will not
consider an alternative to the A-A method. PDM at 8. The Federal Circuit has held that this
"general approach" is "reasonable" and that "Commerce's selection of the 33% and 66% cutoffs
is a reasonable choice." *Stupp*, 5 F.4th at 1354.

In the second stage of the differential pricing analysis, Commerce examines whether
using only the A-to-A method can appropriately account for the differences identified in step
one. PDM at 8. In considering this question, Commerce tests whether using the A-T method
yields a "meaningful difference" in the weighted-average dumping margin when compared to the
margin resulting from the use of the A-A method only. PDM at 8-9. A difference in the
weighted-average dumping margins is considered meaningful if (1) there is a 25 percent relative
change in the weighted-average dumping margins between the A-A and A-T methods when both
rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins

17

between the A-A and A-T methods move across the *de minimis* threshold.  PDM at 8.  If

Commerce finds that a pattern exists, and that the A-to-A method cannot account for such

differences, then Commerce may resort to an alternative comparison methodology based on the

A-to-T method.  19 U.S.C. § 1677f-1(d)(1)(B).  The Federal Circuit has repeatedly rejected

challenges to Commerce's "meaningful difference" test.  *See, e.g.*, *Apex*, 862 F.3d at 1347;

*Stupp*, 5 F.4th 1356.

       B.     <u>Commerce's Use Of The Cohen's *d* Test Is Reasonable</u>

Commerce's use of the Cohen's *d* test is in accordance with law and reasonably carries

out the purpose of 19 U.S.C. § 1677f-1(d)(1)(B).  As an initial matter, at the "highest level of

abstraction," the Federal Circuit has upheld the reasonableness of Commerce's method of

comparison.  *Stupp*, 5 F.4th at 1354.  "Commerce is using a conventional method for quantifying

comparisons across discrete groups: counting the number of divergent sales prices, as identified

by an effect-size test, and calculating the population percentage of those divergent sales prices."

*Id*.  The Federal Circuit has held this "general approach to be reasonable."  *Id*.

More specifically, the Cohen's *d* coefficient is a reasonable method for Commerce to

measure the "effect size" of the difference in U.S. prices across different groups of purchasers,

regions, or periods of time.  PDM at 5, 7-9; *see also* 19 U.S.C. § 1677f-1(d)(1)(B).  Consistent

with the Court's general approval of Commerce conducting an "effect-size test" in its differential

pricing analysis, *Stupp*, 5 F.4th at 1354, "{t}he Cohen's *d* coefficient is a recognized measure

which gauges the extent (or 'effect size') of the difference between the means of two groups and

provides 'a simple way of quantifying the difference between two groups{.}'"  IDM at 5

(quoting *Certain Oil Country Tubular Goods from the Republic of Korea*, 83 Fed. Reg. 17,146

(Dep't of Commerce Apr. 18, 2018), and accompanying IDM at Comment 8 (*OCTG from*

*Korea*)).  "'Effect size quantifies the size of the difference between two groups, and may therefore be said to be a true measure of the significance of the difference.'"  IDM at 5 (quoting *OCTG from Korea* at Comment 8).

To be sure, the Federal Circuit's recent decision in *Stupp* addressed concerns with "Commerce's application of the Cohen's *d* test . . . in adjudications in which the data groups being compared are small, are not normally distributed, and have disparate variances."  *Stupp*, 5 F.4th at 1357.  These concerns, the Court stated, "raise questions about the reasonableness of Commerce's use of the Cohen's *d* test in less-than-fair-value adjudications, warranting further supporting explanation from the Department."  *Id.*  The Court thus "remand{ed} to give Commerce an opportunity to explain whether the limits on the use of the Cohen's *d* test prescribed by Professor Cohen and other authorities were satisfied in this case *or* whether those limits need not be observed when Commerce uses the Cohen's d test in less-than-fair-value adjudications."  *Id.* at 1360 (emphasis added).  The Court "invite{d} Commerce to clarify its argument that having the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's d test."  *Id.*

Although the Federal Circuit issued these remand instructions in *Stupp*—a different case, on a different record—Commerce's explanation in this investigation clarifies the same issues.  Specifically, in the final determination, Commerce clarified its reasoning that "sample size, sample distribution, and the statistical significance of the sample are not relevant to Commerce's analysis."  IDM at 8 (citing *Xi'an Metals & Materials Imp. & Exp. Co. v. United States*, 256 F. Supp. 3d 1346, 1364-1365 (Ct. Int'l Trade 2017); *Stanley Works Langfang Fastening Sys. Co. v. United States*, 333 F. Supp. 3d 1329, 1346 (Ct. Int'l Trade 2018)).  This is because Commerce does not apply the Cohen's *d* test by comparing simple random samples of the U.S. sales prices.

In other words, Commerce does not apply the Cohen's *d* test to assess statistical significance. IDM at 6. Rather, by measuring the "effect size," Commerce seeks to assess the practical significance of differences between real-world data points in the U.S. prices for subject merchandise. IDM at 6.

Commerce provided further explanation for this distinction. Commerce detailed the difference between statistical significance and "practical significance," explaining that only the latter is important in antidumping duty investigations, which consider the complete universe of pricing data rather than a statistical sample. IDM at 5-6 (citing, *e.g.*, *Certain Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Results of Antidumping Duty Administrative Review, 2014-2015*, 81 Fed. Reg. 62,717 (Dep't of Commerce, Sept. 12, 2016) (*Shrimp from Vietnam*), and accompanying IDM at Comment 1 (quoting Ellis, Paul D., THE ESSENTIAL GUIDE TO EFFECT SIZES; Cambridge University Press (2010) (Ellis) at 3-5)). In detailing this distinction, Commerce explained that "{a} statistically significant result is one that is unlikely to be the result of chance," whereas "a practically significant result is meaningful in the real world." IDM at 5 (quoting *Shrimp from Vietnam* at Comment 1 (quoting Ellis at 3-5)).

Evaluating whether a practically significant result is meaningful "implies an estimation of one or more effect sizes." IDM at 5 (quoting *Shrimp from Vietnam* at Comment 1 (quoting Ellis at 3-5)). "An effect size refers to the magnitude of the result as it occurs, or would be found, in the population. Although effects can be observed in the artificial setting of a laboratory or sample, effect sizes exist in the real world." IDM at 5 (quoting *Shrimp from Vietnam* at Comment 1 (citing Ellis at 3-5)). The Cohen's *d* coefficient, as a measure of effect size, determines whether the observed price differences are practically significant. IDM at 5-7.

Commerce further illustrated the point by distinguishing between the "t-test" and "effect size." IDM at 6-7. "There are two separate concepts and measurements at issue when analyzing whether the means of two sets of data are different." IDM at 6. The first measurement—the t-test—applies when comparing "two sets of data" that "are samples of a larger population." IDM at 6. The inquiry is whether the difference between these two sets of data "is statistically significant, as measured by a t-test." IDM at 6. "This will determine whether this difference rises above the sampling error . . . in selecting the sample," and whether the result is "statistically significant." IDM at 6. The second measurement "is whether there is a practical significance of the difference between the means of the two sets of data," *i.e.*, measuring the "effect size." IDM at 6. The Cohen's *d* coefficient is one example of such a measure of "effect size." IDM at 6.

As Commerce explained, concerns regarding statistical significance do not apply when measuring an entire population rather than a sample size. *See* IDM at 5-6 (quoting *Shrimp from Vietnam* IDM at Comment 1). "{T}he 'best way to measure an effect is to conduct a census of an entire population,'" even though "'this is seldom feasible in practice.'" IDM at 5 (*See Shrimp from Vietnam* IDM at Comment 1 (quoting Ellis at 3-5)). Commerce's "differential pricing analysis, including the Cohen's *d* test, includes *all U.S. sales* which are used to calculate a respondent's weighted-average dumping margin." IDM at 6 (quoting *Shrimp from Vietnam* IDM at Comment 1) (emphasis added). "The question is whether there is a practical significance in the differences found to exist in the exporter's U.S. prices among purchasers, regions or time periods. Such practical significance is quantified by the measure of 'effect size.'" IDM at 6 (quoting *Shrimp from Vietnam* IDM at Comment 1).

Commerce's explanation is reasonable. As this Court has recognized, "'statistical significance' is irrelevant where . . . the agency has a complete set of data to consider{.}" IDM

at 8 (quoting *Xi'an Metals & Materials Imp. & Exp. Co.*, 256 F. Supp. 3d at 1364-1365).  In this investigation, Commerce reasonably applied the Cohen's *d* test to measure the "effect size" of differences within "the U.S. sales data which Koehler reported to Commerce," which "constitutes a complete population."  IDM at 8.

Finally, it is important to bear in mind the role of the Cohen's *d* test within Commerce's overall differential pricing analysis.  Specifically, Cohen's *d* does not constitute a given respondent's dumping margin, but rather serves only as the method by which Commerce meets the first prong of the statutory standard to assess whether to consider the A-T comparison method.  *See* PDM at 7-9.  The differential pricing analysis also includes the ratio test and the meaningful differences test, both of which have been sustained by the Federal Circuit.  *See* Section II.A.  Only once the entire analysis is complete does Commerce calculate the dumping margin.  It is reasonable for Commerce to use the Cohen's *d* test as one part in its analysis to assess the practical significance of any differences among the "entire population" of U.S. sales. *See* IDM At 6 (quoting *Shrimp from Vietnam* IDM at Comment 1 (quoting Ellis)).

C.     Koehler's Arguments Are Unpersuasive

Koehler's arguments regarding "normality, size, and equal variance" are unpersuasive. *See* Koehler Br. at 16-34 (capitalization altered).  As an initial matter, Koehler failed to exhaust administrative remedies with respect to its arguments based on percentage differences between hypothetical groups.  Furthermore, Koehler's arguments based on *Stupp* are unpersuasive.

1.     Koehler Failed To Exhaust Administrative Remedies

Koehler begins its argument with nine pages of mathematical analysis, equations, and graphs, arguing that the percentages of difference associated with various hypotheticals undermine Commerce's reliance on the Cohen's *d* test.  Koehler Br. at 16-24.  Koehler offers

this lengthy argument largely without citations, and one of the few citations that it does provide references an external website that was not cited in the underlying proceeding. *See, e.g.*, Koehler Br. at 18 (citing Scientifically Sound, *available at* https://scientificallysound.org/2017/07/27/cohens-d-how-interpretation/).

Koehler failed to exhaust administrative remedies for its argument regarding the percentage difference between two distributions. This Court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). "The doctrine of exhaustion provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349, 1371 (Ct. Int'l Trade 2018) (quoting *Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014)) (internal quotation marks omitted), *aff'd in part, vacated in part on other grounds*, 981 F.3d 1318 (Fed. Cir. 2020).

In its brief to this Court, Koehler makes detailed arguments regarding the percentage differences associated with the Cohen's *d* coefficient under various assumptions of normality, variance, and numerosity. Koehler Br. at 19-24. Koehler contends that the 0.8 or "large" effect "indicates that 78.81% of the observations of one distribution fall below the mean of the second distribution"; that 0.5 or a "medium" effect "indicates that 69.15% of the observations of one distribution fall below the mean of the second distribution"; and that 0.2, or a "small" effect, "indicates that 57.93% of the observations of one distribution fall below the mean of the second distribution." Koehler Br. at 18-19. Koehler offers no citation for these detailed percentages, but uses them as the foundation for its arguments regarding the importance of "equal variances" and normal distribution. *Id.* at 18-24. Specifically, Koehler offers hypothetical examples assuming unequal variances and "uniform" (not normal) distribution, and contends that, in these

hypothetical situations, the 0.8 coefficient would be achieved with 74 percent and 72 percent (rather than 78.81 percent), respectively, of the observations of one distribution falling below the mean of the second distribution. *See id* at 21-23. On this basis, Koehler claims that conclusions drawn from the 0.8 threshold "are invalid" if the assumptions of equal variability or normality are not present. *Id*. at 21, 23.

During the underlying investigation, however, Koehler failed to raise this argument regarding percentage differences associated with the 0.8 Cohen's *d* coefficient. *See* Koehler Case Br. (C.R. 354, P.R. 280-281); Koehler Rebuttal Br. (C.R. 352, P.R. 277). Koehler has, thus, failed to exhaust its administrative remedies. "Exhaustion serves two main purposes: to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors, and to promote judicial efficiency by enabling an agency to correct its own errors so as to moot judicial controversies." *Dillinger*, 350 F. Supp. 3d at 1372 (quoting *Stanley Works (Langfang) Fastening Sys. Co. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017)) (cleaned up). Koehler's failure to raise its current argument regarding percentages associated with the Cohens *d* test implicates both concerns. If Koehler had raised this argument at the administrative level, "Commerce would have had the opportunity to better develop the record and apply its expertise" to assess the issue. *Id.* (quoting *Stanley Works*, 279 F. Supp. 3d at 1189). Moreover, to the extent Koehler contends that its overall challenge to Commerce's differential pricing analysis somehow incorporates the current argument regarding percentages, it its incorrect. "A challenge to one aspect of § 1677f-1(d)(1)(B)'s application 'do{es} not incorporate any conceivable challenge to elements of that analysis.'" *Id.* (quoting *Stanley Works*, 279 F. Supp. 3d at 1189).

Additionally, the near-complete absence of citations is fatal to Koehler's argument

regarding percentage differences.  Briefs filed pursuant to Rule 56.2 must "include the

authorities relied on" and must further include references and citations to relevant portions of the

administrative record.  R. Ct. Int'l Trade 56.2(c)(2).  Without referring to specific sources of

authority to support these points—and without showing that Commerce had the opportunity to

review and to evaluate those authorities—Koehler cannot demonstrate that Commerce's decision

is unreasonable based on the record in the underlying investigation.  *See* Koehler Br. at 16-24.

To the extent the Court reaches the merits of Koehler's mathematical calculations

(despite the absence of citation, and the lack of opportunity for Commerce to consider them),

Koehler's hypotheticals offer no support for its ultimate conclusion that data sets without equal

variance or normal distribution are "invalid" in the context of Cohen's *d*.  *See* Koehler Br. at 23.

To the extent Koehler has devised hypotheticals to distinguish between 78 percent, 74 percent,

and 72 percent, Koehler offers no authority demonstrating that the difference between these

percentages is meaningful for purposes of assessing practical effect size differences between two

groups.  *See* Koehler Br. at 19-24.  Nor does Koehler explain its position that there is no "large"

difference between two data groups, in which the 72 or 74 percent of the data points in the first

group fall below the mean in the second group.  *See* Koehler Br. at 17, 19-24.

2.      *Stupp* Does Not Support Koehler's Arguments

Koehler next claims that the Federal Circuit's decision in *Stupp v. United States* requires

Commerce to limit its use of the Cohen's *d* test to situations that satisfy assumptions relating to

"normality, variance and size."  Koehler Br. at 2-3, 25-30, 33-34 (citing *Stupp*, 5 F.4th 1341).

Koehler suggests that the *Stupp* Court held that, absent these assumptions, "a *d* static results

{sic} of 0.8 cannot be used to indicate 'large' effect size, and any conclusion based on such

indication is invalid." Koehler Br. at 34.  Citing *Stupp*, Koehler further contends that

"Professor Cohen's entire test became invalid once Commerce ignored all of the underlying

statistical assumptions required, and thus any conclusions drawn by Commerce based on these

tests are invalid." *Id.*

However, that is not an accurate portrayal of the Court's holding in *Stupp*.  Although the

Court in *Stupp* raised concerns with elements of Commerce's Cohen's *d* analysis, it remanded

the differential pricing issue to (among other things) "give Commerce an opportunity to

explain" whether the "concerns" the Court had identified "need not be observed when

Commerce uses the Cohen's *d* test in less-than-fair-value adjudications."  *Stupp*, 5 F.th at 1360.

The *Stupp* Court did not reject Commerce's use of Cohen's *d*.  Instead, the Court invited

"Commerce to clarify its argument that having the entire universe of data rather than a sample

makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's

*d* test."  *Id.*

Koehler nonetheless repeats its argument that reliance on the 0.8 coefficient "is

misplaced" when considering data sets without normal distribution, equal variance, or equal

numerosity.  Koehler Br. at 30-32.  In the IDM, however, Commerce reasonably responded to

Koehler's criticism regarding Commerce's consideration of small, medium, and large "effect

sizes" (including the "large" 0.8 threshold) for Cohen's *d*.  *See* IDM at 7.  Commerce explained

that even critics of these "effect sizes" have acknowledged that "although the Cohen's *d* test is

not perfect, it has been widely adopted."  IDM at 7 (citing *Gum from the People's Republic of

China: Final Determination of Sales at Less Than Fair Value*, 78 Fed. Reg. 33,351 (Dep't of

Commerce June 4, 2013), and accompanying IDM at Comment 3 (quoting Dave Lane, *et al.*,

Chapter 19 "Effect Size," Section 2 "Difference Between Two Means")).  Choosing among

various methodological options for assessing differences in pricing patterns—even imperfect options—is precisely the role of Commerce, as the expert agency administering the applicable statute. *See CS Wind Vietnam Co. v. United States*, 971 F. Supp. 2d 1271, 1288 (Ct. Int'l Trade 2014) (quoting *Dorbest Ltd. v. United States*, 30 CIT 1671, 1687, 462 F. Supp. 2d 1262, 1277 (2006)) ("Generally, when 'faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information.'").

None of the academic articles discussed in *Stupp* have been placed on the record in this case, and, as such, the critiques in these articles may not be used to undermine Commerce's determination. Judicial review of a final determination in an antidumping duty investigation is based on the administrative record of the proceeding. 19 U.S.C. § 1516a(b)(2)(A). "That record consists of, inter alia, 'a copy of all information presented . . . or obtained . . . during the course of the administrative proceeding.'" *Canadian Solar Int'l Ltd. et al. v. United States*, 399 F. Supp. 3d 1379, 1382 (Ct. Int'l Trade 2019) (quoting 19 U.S.C. § 1516a(b)(2)(A)(i)). "In the course of an investigation or review, 'the burden of creating an adequate record lies with interested parties.'" *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1295 (Fed. Cir. 2021) (quoting *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011)).

Koehler cites numerous articles and reference materials in an attempt to undermine the reasonableness of Commerce's application of its differential pricing methodology in this investigation. *See, e.g.*, Koehler Br. at 26-27 (citing, *e.g.*, James Algina et al., *An Alternative to Cohen's Standardized Mean Difference Effect Size: A Robust Parameter and Confidence Interval in the Two Independent Groups Case*, 10 Psychological Methods 317, 318 (2005); David M. Lane et al., *Introduction to Statistics*, Online Edition, 645; Johnson Ching-Hong Li, *Effect sizes measures in a two independent-samples case with non-normal and non-*

*homogeneous data*, 48 Behavioral Research 1560 (2015)).  However, Koehler has not placed

any of these resources on the record in this proceeding.

There is no legal basis for the Court to consider these scholarly articles.  Judicial notice

does not apply because the content of these articles is not "generally known," nor do the articles

qualify as "sources whose accuracy cannot reasonably be questioned."  *Tri Union Frozen*

*Prod., Inc. v. United States*, 161 F. Supp. 3d 1333, 1337 (Ct. Int'l Trade 2016) (quoting Fed. R.

Evid. 201).  Indeed, this Court has previously declined to take judicial notice of certain

"academic materials," finding that they were "not the proper subject of judicial notice." *Id.*

Nor has Koehler made any effort to demonstrate any of the exceedingly narrow "exceptions" to

the general rule that courts reviewing agency action may not consider extra-record evidence.

*See, e.g.*, *Advanced Tech. & Materials Co. v. United States*, 34 C.I.T. 598, 603–05 (2010)

(listing the few "compelling, narrowly defined circumstances" that can allow for "consideration

of extra-record evidence," and finding none of them applied). [3]

Finally, although the relevant articles were discussed by *Stupp*, 5 F.4th at 1359, the

*Stupp* decision arose from a different administrative record.  Each proceeding before Commerce

is decided on its own administrative record.  19 C.F.R. § 351.104 (stating that "{f}or purposes

of section 516A(b)(2) of the Act, the record is the official record of each segment of the

proceeding.").  If Koehler wanted Commerce to consider the information in these scholarly

articles, it bore the burden to submit the relevant materials on the record, consistent with

Commerce's rules.  *Canadian Solar*, 399 F. Supp. 3d at 1383 (citing *Ta Chen Stainless Steel*

---

[3]  Commerce's citation to its own prior administrative decisions discussing its differential pricing methodology is consistent with these principles. *See Tri Union Frozen Prod., Inc.*, 161 F. Supp. 3d at 1339 (noting that "Commerce relied on a prior determination that was reached after considering similar" academic materials).  It is appropriate for Commerce to rely on its own prior decisions and reasoning in explaining its rationale in a particular proceeding.

*Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002)) (stating that if the plaintiff "wishe{d} to submit information in the administrative proceeding, it must do so in that proceeding."). Accordingly, Koehler's reference to this new information, which is not contained within the administrative record of the underlying proceeding, should not be considered by the Court.

III.    **Commerce Reasonably Exercised Its Discretion In Rejecting Koehler's Submission Of New Factual Information Relating To Differential Pricing**

Commerce reasonably exercised its discretion in rejecting Koehler's submission of new information regarding differential pricing, and Koehler's arguments to the contrary are inconsistent with the Federal Circuit's analysis of the nearly identical issue in *Stupp*. *See* Koehler Br. at 34-37. Specifically, Commerce determined that Exhibits 4.1.1, 4.1.2, 4.2, and 4.3, which were submitted as part of Koehler's case brief, constituted untimely filed "new factual information." Rejection Ltr. (P.R. 278) (citing 19 C.F.R. § 351.102(b)(21)). These exhibits included a "revised SAS program, log, and resulting data." *Id.* Commerce explained that the deadline for submitting new factual information was April 5, 2021, "30 days before the scheduled date of the preliminary determination." *Id.* (citing 19 C.F.R. § 351.301(c)(5)). Koehler, however, did not submit the contested new information until August 16, 2021, more than four months after the deadline. *Id.* Thus, in accordance with 19 C.F.R. § 351.302(d) and 19 C.F.R. § 351.104(a)(2), Commerce rejected Koehler's administrative case brief, provided an opportunity for Koehler to refile without the untimely information, and did not consider the untimely new factual information in making its determination. *Id.*

Commerce reasonably rejected Koehler's submission of new factual information. Commerce is entitled to broad discretion regarding the manner in which it administers the compilation of the record in an antidumping investigation. *See PSC VSMPO-Avisma Corp. v.*

*United States*, 688 F.3d 751, 760 (Fed. Cir. 2012).  Absent "constitutional constraints" or

"extremely compelling circumstances," "courts will defer to the judgment of an agency

regarding the development of the agency record." *Id.* (citations omitted).  "Short of a showing

that Commerce's enforcement of its procedural rules is so haphazard or unreasonable as to be

arbitrary or capricious," Commerce's application of its statutory discretion must be sustained as

reasonable. *See Stupp*, 5 F.4th at 1351.

Applying this deferential standard, courts have routinely upheld Commerce's decisions

administering its own deadlines relating to submission of factual information during antidumping

duty proceedings.  In *Stupp*, for example, the Federal Circuit sustained Commerce's rejection of

a case brief under circumstances nearly identical to this case.  In *Stupp*, an interested party

submitted a case brief containing "results from a statistical analysis" purporting to show "that its

U.S. sales data were not normally distributed." *Stupp*, 5 F.4th at 1348.  Commerce rejected the

case brief, finding that it contained new "factual information" as defined in Commerce

regulations. *Id.* at 1348-49 (citing 19 C.F.R. § 351.102(b)(21)(iv), (v)).  Commerce determined

that the submission of such new factual information was "untimely under the deadlines set out in

19 C.F.R. § 351.301(c)." *Id.*  In reviewing a challenge to that decision, the court held that

Commerce did not abuse its discretion in rejecting the new factual information. *Id.* at 1349-51.

Mindful of the deferential standard for reviewing Commerce's administration of its own factual

record, the Court explained that it would "not second-guess Commerce's application of the

procedural requirements governing the submission of factual information in case briefs." *Id.* at

1350.  Just as Commerce did not abuse its discretion when rejecting the case brief in *Stupp*,

Commerce did not abuse its discretion when rejecting similar new factual matter from Koehler's

case brief.

Koehler makes two primary arguments seeking to demonstrate an abuse of discretion, each of which is unpersuasive.  Koehler Br. at 34-37.  First, Koehler argues that the rejected exhibits "only included a printout of Commerce's own data subjected to a basic algebraic manipulation" and thus should not have been considered new "factual information."  Koehler Br. at 35.  But the same argument was rejected in *Stupp*, in which the information rejected by Commerce was created by the plaintiff "manipulat{ing} existing record evidence" and creating new databases.  *See Stupp Corp. v. United States*, 359 F. Supp. 3d 1293, 1301 (Ct. Int'l Trade 2019), *aff'd in relevant part, rev'd in part*, 5 F.4th at 1351.  That manipulation of existing data "yield{ed} new outputs," so it was "logical for Commerce to consider these new outputs as data intended to rebut existing record evidence."  *Id.*; *see also* 19 C.F.R. § 351.102(b)(21)(iv), (v).  The Federal Circuit similarly treated the new outputs as the "submission of factual information."  *Stupp*, 5 F.4th at 1350.  Likewise, Koehler's manipulation of data previously on the record constituted the submission of new factual information in the form of the new output data.  In this case, as in *Stupp*, "{i}t was logical for Commerce to consider these new outputs as" new factual information.  *See Stupp* 359 F. Supp. 3d at 1301.

Second, Koehler contends that, even if its exhibits qualified as "new factual information," Commerce should have "permitted the exhibits to remain on the record."  Koehler Br. at 35-36.  This argument is contrary to Commerce's regulations, which prohibit the retention or consideration of untimely new factual information.  *See* 19 C.F.R. § 351.302(d); 19 C.F.R. § 104(a)(2).  In its preliminary determination, Commerce stated:  "Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in this preliminary determination, including arguments for modifying the group definitions used in this proceeding."  PDM at 9.  Koehler confuses Commerce's request for comments including

"arguments and justifications" for a request for new factual information. However, factual information is a distinct type of information with its own definition that is different than written arguments. *See, e.g.,* 19 C.F.R. § 302(d)(1)(i); *id.* § 351.104(a)(2)(ii)(A); *id.* § 351.102(b)(21). Nowhere in its request for comments did Commerce allow parties to submit untimely new factual information outside of the usual deadlines. Accordingly, Commerce acted within its discretion by rejecting Koehler's administrative case brief on the basis of Koehler's inclusion of untimely new factual information.

IV. **Commerce's Decision That Blue4est Paper Is Included In The Scope Of The Investigation Is Supported By Substantial Evidence And In Accordance With Law**

In the final determination, Commerce determined that Koehler's Blue4est paper is included in the scope of the investigation because the "opaque thermal sensitive coat" in Blue4est paper qualifies as a "thermal active coating" within the scope of the investigation. IDM at 2; Germany Scope Mem. at 7 (C.R. 363, P.R. 297). Koehler contends that Commerce's scope ruling was unsupported by the record and constituted an unlawful expansion of the scope. Koehler Br. at 37-50. As discussed below, however, Commerce's determination is a reasonable interpretation of the scope language and supported by substantial evidence in the record.

A. **Commerce Reasonably Determined That The "Opaque Thermal Sensitive Coat" In Blue4est Paper Qualifies As A "Thermal Active Coating" Within The Scope Of The Investigation**

As Commerce explained in its final scope memorandum, Blue4est paper satisfies all elements of the scope, including the requirement of having a "thermal active coating." Germany Scope Mem. at 5-6 (C.R. 363, P.R. 297). Commerce reasonably determined that the "opaque thermal sensitive coat" in Blue4est paper qualified as a "thermal active coating" within the meaning of the scope of the investigation. *Id.* at 7.

Commerce's interpretation of the scope is entitled to discretion.  Commerce's role in interpreting scope language can arise both before and after the issuance of an antidumping duty order.  *Gulf States Tube Div. of Quanex Corp. v. United States*., 981 F. Supp. 630, 636-37 (Ct. Int'l Trade 1997) (citing *Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 783 (Fed. Cir. 1995)).  The final order in an antidumping duty investigation "determines the merchandise that is within scope."  *Kyocera Solar, Inc. v. United States*, 253 F. Supp. 3d 1294, 1315–16 (Ct. Int'l Trade 2017) (citing *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002)).  Commerce "has inherent power to establish the parameters of the investigation" throughout the proceedings.  *Duferco Steel*, 296 F.3d at 1096 (citation omitted).  Commerce further "has the authority to initially determine the scope of the investigation, as well as the authority to modify the scope language until the final order is issued, based on the agency's findings during the course of the investigation."  *Kyocera Solar*, 253 F. Supp. 3d at 1315–16 (citing *Duferco Steel, Inc.*, 296 F.3d at 1096).  "Commerce's final determination reflects the decision that has been made as to which merchandise is within the final scope of the investigation and is subject to the order."  *Duferco Steel, Inc.*, 296 F.3d at 1096.

Commerce possesses "broad discretion to define and clarify the scope of an antidumping investigation in a manner which reflects the intent of the petition."  *See Mitsubishi Heavy Indus., Ltd. v. United States*, 986 F. Supp. 1428, 1432 (1997) (quoting *Minebea Co. v. United States*, 782 F. Supp. 117, 120 (1992)).  "In accordance with Commerce's freedom to interpret an antidumping duty order, the Court views Commerce's interpretation of its scope description with deference."  *Gulf States Tube Div. of Quanex Corp.*, 981 F. Supp. at 636-637.  Commerce enjoys even "greater discretion" when modifying "the scope *before* any final determination or order issued," as distinguished from deciding whether merchandise is included in an already-issued

order.  *M S Int'l, Inc. v. United States*, 32 F.4th 1145, 1151–52 (Fed. Cir. 2022) (emphasis added).

Commerce reasonably interpreted the scope language before issuing the antidumping duty order by determining, in the final scope memorandum, that "thermal active coating" includes the "opaque thermal sensitive coat" in Blue4est paper.  Germany Scope Mem. at 5-6 (C.R. 363, P.R. 297).  According to Koehler, however, unlike the thermal paper subject to this investigation, Blue4est paper does not have a "thermal active coating" because there is no chemical activation.  Koehler Br. at 39-44.

Contrary to Koehler's claims, the record supports Commerce's determination that the "opaque thermal sensitive coat" in Blue4est paper qualifies as a "thermal active coating" within the meaning of the scope.  As Commerce explained, "the thermal sensitive layer of Koehler's Blue4est paper is a form of thermal coating that serves the same function as thermal coatings that are used to print through a chemical reaction, namely, to permit a thermal image to appear on the paper."  Germany Scope Mem. at 7 (C.R. 363, P.R. 292).  The petitions support Commerce's finding.  For example, the petitions explain that thermal paper is produced by "applying different coating layers to the functional (imaging) sides of the sheet."  *Id.* at 5 (quoting P.R. 2).  "When exposed to heated printer heads, the thermal developer in the coating is activated *allowing the image to appear on the paper*."  *Id.* at 5 (quoting P.R. 2) (emphasis added).

Moreover, the phrase "thermal active coating" is described in the scope language as being typically made of "sensitizer, dye, and co-reactant, and/or like materials."  Final Scope Mem. at 2 (P.R. 292); *see also* Germany Scope Mem. at 5, 7 (C.R. 363, P.R. 297).  Before the final determination, Commerce requested clarification regarding the meaning of "like materials."  In response, Petitioners clarified that "{a} 'like material' would be any other form of thermal

coating that serves the same function" as sensitizer, dye, and co-reactant, "namely, to permit a thermal image to appear on the paper." Germany Scope Mem. at 7 (C.R. 363, P.R. 297).

Koehler admits that Blue4est paper changes as a result of the application of heat to an opaque thermal sensitive layer to create a thermal image, and that this thermal process permits an image to appear on the paper. *See* Germany Scope Mem. at 7 (C.R. 363, P.R. 297) (citing Koehler's Supplemental A Questionnaire at Exhibit A-22 (C.R. 43, P.R. 106)). Moreover, the image referenced in Koehler's brief confirms that Blue4ests paper uses the application of heat to change the top layer to produce an image. *See* Koehler Br. at 43; Germany Scope Mem. at 7 (C.R. 363, P.R. 297) (comparing images of Blue4est paper and "traditional" thermal paper). The thermal sensitive layer of Koehler's Blue4est paper is thus a form of thermal active coating that serves the same function as thermal coatings that are used to print through a chemical reaction (namely, to permit a thermal image to appear on the paper). Germany Scope Mem. at 7 (C.R. 363, P.R. 297).

In challenging Commerce's scope decision, Koehler highlights portions in the record relating to chemical coating in thermal paper. Koehler Br. at 40-46. For example, Koehler argues that the petitions referenced "paper coated with chemicals that react," and that the description in the International Trade Commission's preliminary determination referenced "paper coated with chemicals." *Id.* at 40-41 (citing Germany Scope Mem. at 5 (C.R. 363, P.R. 297)). This language, however, is merely descriptive of the majority of thermal paper products and does not limit the scope of the investigations to thermal paper coated with chemicals. *See* Germany Scope Mem. at 8 (C.R. 363, P.R. 297). Indeed, although the scope language indicates that a thermal coating is typically made with the key ingredients sensitizers, dyes, and co-reactants (chemicals), it also incorporates "like materials." *Id.* Commerce reasonably

interpreted this language to include any other type of thermal coating that permits a thermal image to appear on the paper. *Id.*

      B.      **Commerce's Interpretation of "Thermal Active Coating"' To Include The "Thermal Sensitive Coat" In Blue4est Paper Does Not Modify The Scope Of The Investigation**

Koehler further contends that Commerce's scope decision is arbitrary and capricious because Commerce reached a different result in the final determination than it did in the preliminary determination. Koehler Br. at 46-50. There is nothing suspect, however, in Commerce interpreting ambiguous language in the scope language. Nor is it impermissible for Commerce to reach one conclusion in the preliminary determination, and another in the final determination. To the extent that Commerce or the Court may be able to draw two, reasonable—yet inconsistent—conclusions from the record evidence, that "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Far from undermining Commerce's determination, the decisions cited by Koehler support Commerce's "discretion to set the scope of its investigations{.}" *MS Int'l, Inc. v. United States*, 32 F.4th 1145, 1148 (Fed. Cir. 2022). For example, Koehler cites *MS International* for the proposition that Commerce has a practice "against expanding or otherwise modifying the scope of an investigation following the preliminary determination." Koehler Br. at 47-48 (citing 32 F.4th at 1148). In *MS International*, however, the Federal Circuit unambiguously supported Commerce's discretion to assess and modify the scope throughout the course of the investigation. 32 F.4th at 1148, 1151-52.

Specifically, *MS International* involved an antidumping investigation of quartz surface products from China in which, over the course of the investigation, Commerce adopted scope

language relating to crushed glass. *Id.* at 1148-50. The scope language in the initial petition did not mention crushed glass, and the scope language in the initiation notice and preliminary determination was amended to exclude "crushed glass surface products." *Id.* at 1148-49. In the final scope determination, Commerce adopted additional scope language to clarify the meaning of "crushed glass surface products," and that new language was incorporated into the final order. *Id.* at 1150. Despite these numerous modifications, the Federal Circuit soundly rejected respondent's challenge to the scope in the final order, explaining that the original scope language was "ambiguous" and that, in adopting modifications to the scope language, "Commerce gave appropriate deference to the petitioner's intent." *Id.* at 1151. Importantly, the Court emphasized that Commerce "enjoyed greater discretion" when modifying "the scope before any final determination or order issued." *Id.* at 1152.

As in *MS International*, Commerce reasonably interpreted ambiguous language in the scope of the investigation, before the final determination. Indeed, sustaining Commerce's determination in this case is even easier than in *MS International*, because the scope language from the petition was the same as the scope that was ultimately issued in the antidumping duty order. The sole clarification required was whether a particular product—Blue4est paper—qualified as having a "thermal active coating." As discussed above, Commerce reasonably clarified that the "opaque thermal sensitive coat" in Blue4est paper fell within the scope. *See* Section III.A.

Many of the remaining cases cited by Koehler are distinguishable because they concern a post-order scope inquiry, rather than clarification of the scope during an ongoing investigation. *See* Koehler Br. at 37-38, 46-48 (citing *Whirlpool Corp. v. United States*, 890 F.3d 1302, 1307 (Fed. Cir. 2018); *Duferco Steel, Inc.*, 296 F.3d at 1096; *Ceramark Tech., Inc. v. United States*, 11

F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014); *A.L. Patterson, Inc. v. United States*, 36 C.I.T. 1132, 1141 (August 6, 2012); *Agilent Techs. v. United States*, 256 F. Supp. 3d 1338, 1342-1343 (Ct. Int'l Trade 2017); *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 90 (Fed. Cir. 2012)).  As discussed above, the standard for reviewing a scope ruling after the publication of an order is distinct from the standard applied when reviewing changes to the scope during an active investigation.  *See Duferco Steel, Inc.*, 296 F.3d at 1096.  Commerce's final determination, not the petition or the preliminary determination, reflects the final scope of the investigation and defines which merchandise is subject to the order.  *See, e.g., id.*; *MS Int'l*, 32 F.4th at 1148.  Koehler's attempt to apply post-order standards to Commerce's modification of the scope during the course of an investigation is therefore inapposite.

Furthermore, the cases cited by Koehler that do concern the modification of scope during an investigation are distinguishable because they feature scope modifications that are inconsistent with prior scope determinations, rather than clarifications of ambiguous language. *See* Koehler Br. at 46-47  In *Allegheny Bradford Corp. v. United States*, this Court reviewed a decision by Commerce to find certain non-beveled fittings to be within the scope of the investigation, despite a requirement for the edges of the fitting to be beveled.  *Allegheny Bradford*, 342 F. Supp. 2d 1172, 1185-86 (Ct. Int'l Trade 2004).  The Court held that the scope of the order's "use of unequivocal language to describe the edges of the subject merchandise" could not be reconciled with the finding that certain non-beveled fittings were within the scope of the investigation.  *Id.*  Likewise, in *Smith Corona Corp. v. United States*, the Court stated that it was "clear from Commerce's original decision on scope, contained in the initiation of investigation, that from the outset parts and subassemblies were not to be covered in the investigation{.}"  *Smith Corona*, 796 F. Supp. 1532, 1534 (Ct. Int'l Trade 1992).  In both

*Allegheny Bradford* and *Smith Corona*, the Court distinguished between when Commerce has

explicitly excluded certain products in early scope determinations, and when Commerce is

clarifying an ambiguity in the scope.  *See, e.g.*, *Allegheny Bradford Corp.*, 342 F. Supp. 2d at

1184 ("Commerce need only meet a low threshold to show that it justifiably found an ambiguity

in scope language") (citation omitted); *Smith Corona*, 796 F. Supp. at 1534 (distinguishing the

case from one in which "Commerce has exercised its discretion to clarify the scope of orders

which were ambiguous when issued").

Similarly, the administrative cases cited by Koehler present situations in which

Commerce declined to modify the scope to include products excluded (implicitly or explicitly)

from the original scope.  *See* Koehler Br. at 47-48 (citing *Certain Orange Juice from Brazil*, 71

Fed. Reg. 2,183 (Dep't of Commerce Jan. 13, 2006), and accompanying IDM at Comment 2

(declining to expand the scope to "include companies and products which are *explicitly not*

*covered* by the current scope." (emphasis added))); *Sodium Hexamataphosphate from China*, 73

Fed. Reg. 6,479 (Dep't of Commerce Feb. 4, 2008), and accompanying IDM at Comment 1

(denying a request to expand "the scope of this proceeding to include products which are

*explicitly not covered* by the current scope" (emphasis added)); *Certain New Pneumatic Off-The-*

*Road Tires from China*, 73 Fed. Reg. 40,485 (July 15, 2008), and accompanying IDM at

Comment 20 (denying a request to expand the scope to include "all agricultural tires" when there

was "no record evidence" to support that expansion).

Unlike *Allegheny Bradford*, *Smith Corona*, and the cited administrative decisions, this

case plainly qualifies as a clarification of existing scope, not a wholesale modification.  The

original scope language referencing "thermal active coating" was ambiguous, and Commerce

reasonably interpreted that language to include the "opaque thermal sensitive coat" in the

Blue4est paper.  *See* Germany Scope Mem. at 5-8 (C.R. 363, P.R. 297).  In both the initiation

notice and the preliminary determination, the scope of the investigation stated that the thermal

active coating is "*typically* made of sensitizer, dye, and co-reactant, *and/or like materials.*"

Initiation Notice, 85 Fed. Reg. 69,580, Appendix (Dep't of Commerce Nov. 3, 2020) (P.R. 44)

(emphasis added); *see also* Prelim. Determ., 86 Fed. Reg. at Appendix I (P.R. 216).  Nowhere

did the scope of either the initiation or the preliminary determination specifically exclude

thermal paper with a physical thermal active coating.  Accordingly, Commerce's reasonable

interpretation of "thermal active coating" and inclusion of Blue4est paper in the scope of the

investigation should be sustained.

V.     Commerce's Determination With Respect To Koehler's Reporting Of The Dynamic
       Sensitivity Product Characteristic Is Supported By Substantial Evidence

       In its final determination, Commerce resolved disputes relating to Koehler's reporting of

certain product characteristics, and "determined that Koehler properly reported {the dynamic

sensitivity} product characteristic."  IDM at 14.  In their motion for judgment, Petitioners argue

that Commerce erred by accepting Koehler's reporting with respect to dynamic sensitivity.

Petitioners Br. at 20-29.  This argument is unpersuasive.  As discussed below, Commerce

reasonably accepted Koehler's coding of Products A and B with respect to the dynamic

sensitivity product characteristic.  IDM at 14.

       A.     Background Relating To Koehler's Reporting Of Static Sensitivity And Dynamic
              Sensitivity

       In responding to Commerce's questionnaires, Koehler reported product characteristics for

two specific products, which Commerce referred to as "Product A" and "Product B."  *See*

Further Analysis Mem. at 1 (C.R. 359, P.R 294) (providing additional business proprietary

information regarding these products).  Koehler reported that Products A and B shared the same

product characteristics for model-matching purposes, except for two characteristics:  (1) static

40

sensitivity ; and (2) dynamic sensitivity.  *Id.*  In its questionnaire, Commerce instructed

respondents to report static sensitivity with a code according to a range "in degrees Celsius the

temperature required to produce the maximum ODU {Optical Density Unit}."  *Id.* at 1 (citing

Initial Questionnaire at B-10 and C-9 (P.R. 87)).  For dynamic sensitivity, Commerce instructed

respondents to report a code according to a range "in millijoules per square millimeter (mj/mm2)

the energy required to produce the maximum ODU {Optical Density Unit}."  *Id.* at 1-2 (citing

Initial Questionnaire at B-11 and C-9 (P.R. 87)).

In the questionnaire, Commerce did not instruct respondents to use a specific method for

measuring these characteristics, nor did Commerce prescribe the testing equipment or testing

procedures to determine these characteristics.  *See* Further Analysis Mem. at 2 (C.R. 359, P.R

294); *see also* Initial Questionnaire at B-10, B-11, C-9, and C-10 (P.R. 87).

In responding to the questionnaires for Product A, Koehler reported static sensitivity with

a code of [ █ ] (*i.e.*, [ ██████████ ]) and dynamic sensitivity with a code of [ █ ] (*i.e.*, [

██████ ].  Further Analysis Mem. at 2 (C.R. 359, P.R 294).  By contrast, for Product B, Koehler

reported static sensitivity with a code of [ █ ] (*i.e.*, [ ████████ ]) and dynamic sensitivity

with a code of [ █ ] (i.e., [ ████████ ]).  *Id.*  As a result of these product characteristic

differences, Koehler reported Product A and Product B with different product control numbers.

*Id.*

Koehler's questionnaire responses explained that it [ ██████████ ] for these

characteristics in the normal course of business.  Initial Questionnaire at B-13 and B-14 (C.R. 75,

P.R. 114).  However, to respond to Commerce's questionnaire, Koehler outlined the procedures

it took to report these product characteristics and provided additional product testing and results

to support its reporting.  Further Analysis Mem. at 2 (C.R. 359, P.R 294) (citing Koehler Section

B Supplemental Questionnaire Response Part Two, at 1-11, Exhibits SB-3.1-3.12 (P.R. 161, C.R. 195, 196); Koehler Second Supplemental Section B Questionnaire Response Pt. Two at 1-15, Ex. S2B-5.1-5.7 (P.R. 187, C.R. 256)).

In the final determination, Commerce determined that the static sensitivity product characteristic for Product B should be revised to reflect Koehler's most frequent test result for this product. IDM at 14. However, as to the dynamic sensitivity product characteristic, Commerce found that Koehler appropriately reported this product characteristic for Product B and that no change was warranted. *Id.*

B.  Substantial Evidence Supports Commerce's Acceptance of Koehler's Reporting For Dynamic Sensitivity Coding For Products A And B

Contrary to Petitioners' claims, substantial evidence supports Commerce's acceptance of Koehler's coding of Product A and B with respect to the dynamic sensitivity product characteristic. IDM at 14. Commerce's decision is supported by record evidence reflecting testing data submitted by Koehler. Specifically, Koehler reported that, according to its most recent testing, Product A reached maximum optical density unit at [ ▆▆▆ ] mj/mm$^2$, corresponding to a dynamic sensitivity code of [ ▆ ]. Further Analysis Mem. at 5 (C.R. 359, P.R 294) (citing Koehler's Section B Supplemental Questionnaire Response Part Two at 16-19, Exhibit S2B-5.1 (C.R. 256, P.R. 187)). Product B, in turn, reached maximum optical density unit at [ ▆▆▆ ] mj/mm$^2$, corresponding to a dynamic sensitivity code of [ ▆ ]. *Id.* The results Koehler reported for Product B reflected one of [ ▆▆ ] tests it performed since January 2019; [ ▆ ] of these tests showed that the maximum optical density unit was reached at [ ▆▆▆ ] mj/mm$^2$, while [ ▆▆▆ ] showed that the maximum optical density unit was reached at [ ▆▆▆ ] mj/mm$^2$. Further Analysis Mem. at 5 (C.R. 359, P.R 294) (citing Koehler Section B Supplemental Questionnaire Response Pt. Two at Exhibit SB-3.12 (P.R. 161, C.R. 195, 196));

*see also* Koehler's Section B Supplemental Questionnaire Response Pt. Two at 16-20, Exhibit S2B-5.1 (C.R. 256, P.R. 187).

Although recognizing that Koehler had submitted a variety of testing data, Commerce found it appropriate to rely on the most frequent test result observed for dynamic sensitivity in reporting this product characteristic for Product B.  Further Analysis Mem. at 5 (C.R. 359, P.R 294).  Because [█████████████] test results for Product B correspond to dynamic sensitivity code [██], Commerce found that Koehler appropriately reported this product characteristic for Product B and no change was warranted.  *Id.*

Petitioners dispute this finding.  Petitioners Br. at 26-29.  Petitioners maintain that Koehler's testing data "contradict{} the company's preexisting product specification sheets." *Id.* at 27.  Therefore, according to Petitioners, "the results of any testing performed by Koehler after the commencement of this antidumping litigation . . . should have been found by Commerce to have lacked credibility." *Id.* at 26-27.

These arguments do not undermine the substantial evidence supporting Commerce's findings.  Although Petitioners believe that the testing results relied upon by Commerce "were far less reliable than Koehler's product specification sheets that predated the initiation of this case," Petitioners Br. at 28, the test for substantial evidence does not depend on Petitioners' preferred weighing of the evidence.  Instead, Commerce's determination must be sustained so long as "a reasonable mind might accept" its weighing of the evidence. *PAM, S.p.A.*, 582 F.3d at 1339.

Commerce reasonably relied on Koehler's test results, not the specification sheets, for its product characteristic reporting.  As Commerce explained, Koehler reported that it [████████] during the normal course of business.  Further

Analysis Mem. at 2 (C.R. 359, P.R 294). Substantial evidence supports this finding. To respond to Commerce's questionnaire, Koehler outlined its procedures "to report these product characteristics," and "provided additional testing to support its coding." *Id.* (citing Koehler Section B Questionnaire Response at B-11-14 (C.R. 75, P.R. 114); Koehler Section B Supplemental Questionnaire Response Part Two at 1-11, Exhibits SB-3.1-3.12 (C.R. 195, 196, P.R. 161); Koehler Second Supplemental Section B Questionnaire Response Part Two at 1-15, Exhibits S2B- 5.1-5.7 (C.R. 256, P.R. 187). Thus, Commerce reasonably found that reliance on Koehler's test results, not the earlier specification sheets, was the most appropriate means of reviewing Koehler's reporting of dynamic sensitivity. *See* IDM at 14.

VI.   **Substantial Evidence Supports Commerce's Decision Not To Apply Adverse Facts Available When Determining The Static Sensitivity Product Characteristic**

Commerce reasonably declined to impose adverse facts available with respect to Koehler's reporting of the static sensitivity characteristic for certain product grades[4] because Koehler complied with Commerce's requests in reporting this item and because there was no gap in the record. IDM at 16.

Commerce is "permitted" to use "facts otherwise available" in making its determination if it "determines that 'necessary information is not available on the record,'" or if an "'interested party or any other person . . . withholds information that has been requested by {Commerce},' 'fails to provide such information by the deadlines . . . or in the form and manner requested,' 'significantly impedes a proceeding,' or 'provides such information but the information cannot be verified.'" *Deacero S.A.P.I. de C.V.*, 996 F.3d at 1288, 1295 (quoting 19 U.S.C. § 1677e(a));

---

[4] Petitioners' arguments regarding adverse facts available applied to [ ██████████ ] Products A and B discussed above. The product designated as Product A is [ ████ ], and the product designated as Product B is [ ██████ ]. Further Analysis Mem. at 1 (C.R. 359, P.R 294). By contrast, Petitioners' arguments regarding adverse facts available applied to products [ ████████████████████ ]. *Id.* at 6.

*see also* 19 C.F.R. § 351.308 (providing for "{d}eterminations on the basis

of facts available"). "Commerce uses facts otherwise available to fill in gaps in the

administrative record." *Deacero*, 996 F.3d at 1295 (quoting *Nippon Steel Corp. v. United States*,

337 F.3d 1373, 1381 (Fed. Cir. 2003)) (cleaned up). "Further, if an interested party 'fail{s} to

cooperate by not acting to the best of its ability to comply with a request for information,"

then Commerce "may use an inference that is adverse to the interests of that party in selecting

from among the facts otherwise available.'" *Id.* (quoting 19 U.S.C. § 1677e(b)); *see also* 19

C.F.R. § 351.308(c). This is commonly referred to as adverse facts available.

 In the final determination, Commerce declined to apply adverse facts available, or to

resort to facts otherwise available. IDM at 16. Commerce disagreed with Petitioners' claim that

Koehler's reporting of the static sensitivity product characteristic was "incomplete." *Id.* To the

contrary, "Koehler reported the static sensitivity product characteristic based on the temperature

required to produce the maximum {optical density unit} according to the instructions in

Commerce's questionnaire and Koehler's product testing in the normal course of business."

IDM at 16 (citing Koehler Section B Questionnaire Response at 13 (C.R. 75, P.R. 114), Koehler

Section B Supplemental Questionnaire Response Pt. Two, at 1 (C.R. 195, P.R. 161); Koehler

Second Supplemental Section B Questionnaire Response Pt. Two at 5 (C.R. 256, P.R. 187)).

This finding is supported by substantial evidence.

 Petitioners nonetheless argue that the record is incomplete because "Koehler *did not*

report 'static sensitivity product characteristic based on the temperature required to produce the

maximum {optical density unit}.'" Petitioners Br. at 32; *see also id.* at 29-34. According to

Petitioners, this qualifies as a "deficiency" pursuant to 19 U.S.C. § 1677m(d). *Id.* at 36-37

(discussing "deficiencies" in the context of Koehler's reporting of the static sensitivity product

characteristic).  However, Petitioners wrongly assume that they can substitute their own

judgment to determine whether a submission is "deficient."  Section 1677m(d) provides that it is

Commerce that "determine{s}" whether a submission is deficient:

> *If the administering authority . . . determines that a response to a request for information under this subtitle does not comply with the request*, the administering authority . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of investigations or reviews under this subtitle.

19 U.S.C. § 1677m(d) (emphasis added).  As this provision demonstrates, the "notice and

remedial requirements of § 1677m(d)"—which are required "{b}efore Commerce may use facts

available"—apply only if Commerce first "*finds a deficiency* in response to its request for

information."  *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1321-22, 1326 (Ct. Int'l

Trade 2021) (citing, *e.g.*, 19 U.S.C. §§ 1677e(a), 1677m(d)) (emphasis added).

In this case, Commerce did not find such a deficiency and, instead, found that the record

was not incomplete.  The fact that "Koehler did not provide the same amount of testing

documentation" for products other than Products A and B did not reflect a deficiency in

Koehler's responses.  IDM at 16.  Koehler provided additional testing documentation for

Products A and B "in response to Commerce's specific requests for further information

regarding these products."  IDM at 16 (citing Supplemental Section B Questionnaire at 5 (P.R.

128); Second Supplemental Section B Questionnaire at 4-5 (P.R. 168)).  "Commerce made no

such request for additional static sensitivity testing for Koehler's other products."  IDM at 16.

Instead, Commerce found that "Koehler acted in accordance with Commerce's instructions in

reporting the static sensitivity product characteristic for these products."  IDM at 16.

Petitioners also attempt—unsuccessfully—to undermine the factual findings in

Commerce's analysis of this issue.  Seizing on a single clause in the IDM, Petitioner claim that

Commerce made a finding that [███████████████████████████████████

██████████████].  Petitioner Br. at 31-34 (citing IDM at 16).[5]  On that basis, Petitioners claim

that "{c}ontrary to Commerce's finding, Koehler did not report static sensitivity based on its

'product testing in the normal course of business.'"  Petitioners Br. at 32.  This argument takes

Commerce's statements out of context.  The fact that [████████████████████████

████████████████████████████] is business proprietary information,

and, thus, could not be discussed in the public decision memorandum.  *See* Further Analysis

Mem at 2 (C.R. 359, P.R 294).  Commerce's full analysis, which was based on Koehler's

business proprietary information, is found in the Further Analysis Memorandum, and clearly

acknowledges that Koehler [████████████████████████████████] in the normal

course of business.  Further Analysis Mem. at 2 (C.R. 359, P.R 294).

Finally, based on the erroneous assumption that the record was incomplete, Petitioners

contend that Commerce was required to consider applying adverse facts available, even without

completing the notification procedures pursuant to 19 U.S.C. § 1677m(d).  Petitioners Br. at 34-

46; *see* 19 U.S.C. §§ 1677e(a), 1677m(d).  As discussed above, however, Commerce determined

that there was no basis to find the record incomplete because Koehler reported the product

characteristics in accordance with Commerce's instructions.  IDM at 16.  Accordingly,

---

[5] The relevant portion of the IDM states:

> Koehler reported the static sensitivity product characteristic based on the temperature required to produce the maximum {optical density unit} according to the instructions in Commerce's questionnaire and Koheler's product testing in the normal course of business.

IDM at 16.

Commerce reasonably declined to pursue the procedures in section 1677m(d) to apply adverse facts available.

VII.    Commerce's Acceptance Of Koehler's Home Market Post-Sale Price Adjustments Is Supported By Substantial Evidence And In Accordance With Law

In the final determination, Commerce continued to include certain home market post-sale price adjustments based on rebates reported in field REBATE2H. IDM at 19-22. This finding is supported by substantial evidence and in accordance with law.

In calculating export price, constructed export price, and normal value (where normal value is based on price), Commerce normally uses "a price that is net of price adjustments . . . that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable)." *See* IDM at 21 (quoting 19 C.F.R. § 351.401(c)). A rebate is one form of price adjustment. *See* 19 C.F.R. § 351.102(b)(38) (citing 19 C.F.R. § 351.401(c)).[6] In the underlying investigation, Koehler reported "two categories of rebates": (1) in REBATE1H, Koehler reported "[███████████████████████████████████]," and (2) in REBATE2H, Koehler reported "[███████████████████████████████ ████████████████████████████████████]." Koehler Pre-Prelim. Br., at 14 (C.R. 286, P.R. 198) (citing Koehler's Section B Questionnaire Resp. at 31 (C.R. 75, P.R. 114). In the preliminary determination, Commerce deducted both rebate types when calculating the normal value. *See* IDM at 19; *see also* Prelim. Margin Calc. Mem. (C.R. 296, P.R. 209).

---

[6] A "price adjustment" means "a change in the price charged for subject merchandise or the foreign like product, such as a discount, *rebate*, or other adjustment, including, under certain circumstances, a change that is made after the time of sale, that is reflected in the purchaser's net outlay." *See* 19 C.F.R. § 351.102(b)(38) (citing 19 C.F.R. § 351.401(c)) (emphasis added).

In the final determination, Commerce addressed Petitioners' argument that REBATE2H should not be deducted from the calculation of the home market price because "the terms and conditions of Koehler's REBATE2H amounts were not known to the customer prior to the time of sale." IDM at 19-20 (citing Petitioners Case Brief at 2-4 (C.R. 350, P.R. 271)). By regulation, Commerce "will not accept a price adjustment that is made after the time of sale *unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment.*" 19 C.F.R. § 351.401(c) (emphasis added). "In determining whether a party has demonstrated its entitlement to such an adjustment," Commerce may consider the following five factors, detailed in the regulatory preamble:

> (1) Whether the terms and conditions of the adjustment were established and/or known to the customer at the time of sale, and whether this can be demonstrated through documentation;
>
> (2) how common such post-sale price adjustments are for the company and/or industry;
>
> (3) the timing of the adjustment;
>
> (4) the number of such adjustments in the proceeding; and
>
> (5) any other factors tending to reflect on the legitimacy of the claimed adjustment.

*Final Modification*, 81 Fed. Reg. at 15,644-45. As explained in the *Final Modification*, "{Commerce} may consider any one or a combination of these factors in making its determination, which will be made on a case-by-case basis and in light of the evidence and arguments on each record." *Id.* at 15,645. Thus, through the *Final Modification*, Commerce established a series of factors that may be considered together, and transitioned away from a categorical rule requiring the terms and conditions of the price adjustment to be established and known to the customer at the time of sale. *Id.*

Applying these standards to the REBATE2H field reported by Koehler, Commerce found that the adjustments were "not uncommon for Koehler," and were "limited" in number. IDM at 22. After considering the five factors in the *Final Modification*, Commerce determined that the adjustment was "appropriate," and "continued to adjust Koehler's home market price for REBATE2H in {the} calculations for the final determination." IDM at 22; Further Analysis Mem. at 6-7 (C.R. 359, P.R 294).

The Petitioners assert error in Commerce's determination based on the mistaken claim that Commerce's practice is to categorically disallow all retroactive home market rebates not "known to the customer at the time of sale." Petitioners Br. at 13; *see also id.* at 13-17. In support of this claim, Petitioners quote the *Final Modification* as stating that "Commerce 'generally will not consider a price adjustment that reduces or eliminates dumping margins unless the party claiming such price adjustment demonstrates that the terms and conditions of the adjustment were established and known to the customer at the time of sale.'" Petitioners Br. at 13 (quoting *Final Modification*, 81 Fed. Reg. 15,642). This quotation, however, refers to language in the *proposed* rule, not the adopted rule. *See Final Modification*, 81 Fed. Reg. 15,642. Commerce explicitly declined to adopt this proposed rule, citing "concerns that the modification in the Proposed Rule may have the unintended consequence of being overly restrictive and limiting the Department's discretion to accept certain post-sale price adjustments which it has previously accepted." *Id.* at 15,644; *see also Uncoated Paper from Portugal 2018-2019*, 86 Fed. Reg. 7,269 (Dep't of Commerce Jan. 27, 2021), and accompanying IDM at Comment 2 (describing regulatory history). To preserve its discretion, Commerce instead adopted the approach reflected in 19 C.F.R. 351.401(c) and the multi-factor test adopted in the

*Final Modification*, which treats the knowledge "at the time of sale" as only one factor in a totality of the circumstances analysis. *Final Modification*, 81 Fed. Reg. 15,644-45.

Petitioners nevertheless claim that Commerce has since adopted the categorical and overly restrictive approach that it previously rejected in the *Final Modification*. *See* Petitioners Br. at 13-17. Although Petitioners cherry-pick several statements from prior Commerce decisions, none of these statements shows that Commerce has adopted an established practice contrary to the approach reflected in binding regulation, 19 C.F.R. 351.401(c), and the regulatory preamble in the *Final Modification*. *See* Petitioners Br. at 13-17 (citing, *e.g.*, *Certain Uncoated Paper From Portugal 2017-2018*, 84 Fed. Reg. 64,040 (November 20, 2019) (final determ.), and accompanying IDM at Comment 1; *Certain Aluminum Foil from Turkey*, 86 Fed. Reg. 52,880 (Dep't of Commerce Sept. 23, 2021) (final determ.), and accompanying IDM at Comment 6; *Certain Carbon and Alloy Steel Cut-To-Length Plate From Taiwan (Plate from Taiwan)*, 82 Fed. Reg. 16,372 (Apr. 4, 2017) (final determ.), and accompanying IDM at Comment 8; *Certain Tapered Roller Bearings From the Republic of Korea (Tapered Roller Bearings from Korea)*, 83 Fed. Reg. 29,092 (June 22, 2018) (final determ.) and accompanying IDM at Comment 5; *Certain Uncoated Paper From Portugal*, 84 Fed. Reg. 64,040 (November 20, 2019) (final results) at Comment 1; *Common Alloy Aluminum Sheet from India*, 86 Fed. Reg. 13,282 (March 8, 2021) (final determ.), and accompanying IDM at Comment 3; *Hot-Rolled Steel Flat Products from Australia*, 86 Fed. Reg. 47,054 (August 23, 2021) (final results), and accompanying IDM at Comment 4)).[7]

---

[7]  In *Hot-Rolled Steel Flat Products from Australia*, the analysis of the rebates at issue was determined to be business proprietary, and thus cannot be discussed in detail here. The public IDM made no blanket statements supporting the Petitioners' categorical rule. *See Hot-Rolled Steel Flat Products from Australia*, 86 Fed. Reg. 47,054 (Dep't of Commerce Aug. 23, 2021), and accompanying IDM at Comment 4.

For example, Petitioners' citation to *Uncoated Paper from Portugal 2017-2018*, (Petitioners Br. at 15), fails to take into account Commerce's analysis in the immediately following period of review. *See* IDM at 22 & n.109 (citing *Certain Uncoated Paper from Portugal 2018-2019*, 86 Fed. Reg. 7,269 (Dep't of Commerce Jan. 27, 2021) (final results)), and accompanying IDM at Comment 2). Although Commerce made certain generalized statements in *Uncoated Paper from Portugal 2017-2018*, Commerce provided further explanation in *Uncoated Paper from Portugal 2018-2019*, showing that, consistent with 19 C.F.R. 351.401(c) and the *Final Modification*, Commerce does not categorically disallow home market rebates when the terms and conditions were not known to the customer at the time of sale. *See Uncoated Paper from Portugal 2018-2019* IDM at Comment 2. Instead, Commerce considers that as one factor among several. *Id.*

Other decisions cited by Petitioners similarly support Commerce's discretion to weigh all of the factors in the *Final Modification* in assessing whether to make a price adjustment. For example, in *Tapered Roller Bearings from Korea*, Commerce cited all five factors in the *Final Modification* and explained why they did not support the adjustment on the facts of that record. *Tapered Roller Bearings from Korea*, 83 Fed. Reg. 29,092 (Dep't of Commerce June 6, 2018), and accompanying IDM at Comment 5. Likewise, in *Plate from Taiwan* and *Aluminum Sheet from India*, Commerce cited the five factors in the *Final Modification* in determining whether the interested party had demonstrated entitlement to a post-sale price adjustment. *See Plate from Taiwan*, 82 Fed. Reg. 16,372 (Dep't of Commerce April 4, 2017), and accompanying IDM at Comment 8; *Aluminum Sheet from India*, 86 Fed. Reg. 13,282 (Dep't of Commerce Mar. 8, 2021), and accompanying IDM at Comment 3; *see also Aluminum Foil from Turkey*, 86 Fed.

Reg. 52,880 (Dep't of Commerce Sept. 23, 2021), and accompanying IDM at Comment 6 (citing the five factors).[8]

The cited decisions are also distinguishable on their facts. The *Final Modification* states that Commerce considers price adjustments on a case-by-case basis. *See Final Modification,* 81 Fed. Reg. at 15,645; *Uncoated Paper from Portugal 2018-2019* IDM at Comment 2. Commerce's focus on a particular factor in one case does not bind Commerce in other cases that present different evidence and arguments. In applying the factors outlined in the *Final Modification* in this investigation, Commerce found that the challenged post-sale rebates (reflected in REBATE2H) demonstrated that the "adjustment is appropriate." IDM at 22; *see also* Further Analysis Mem. at 6-7 (C.R. 359, P.R 294). Based on its analysis, Commerce determined that, although the terms and conditions of these rebates were not known to Koehler's customers at the time of sale, an analysis of the other factors outlined in the *Final Modification* supported making the price adjustment. IDM at 22.

Petitioners challenge Commerce's findings as unsupported by substantial evidence. Petitioners Br. at 17-20. In challenging these findings, however, Petitioners reference only the *summary* of Commerce's analysis in the public IDM. Petitioners Br. at 17-20 (citing IDM at 22) (challenging, among other things, Commerce's findings that the challenged rebates were "not uncommon" and were "limited {in} number"). Because of the confidential nature of the

---

[8]   Although Commerce has stated that it "has not" granted adjustments when the terms were unknown to customers at the time of sale, *Aluminum Foil from Turkey* 86 Fed. Reg. 52,880, and accompanying IDM at Comment 6 & n.192 (citations omitted), this statement does not show that Commerce has departed from 19 C.F.R. § 351.401(c) and the *Final Modification*, in which Commerce preserved its discretion to weigh all five factors. To the contrary, in the same decision, Commerce explained that it "considers a number of factors" in weighing the propriety of an adjustment, and listed all five factors from the *Final Modification*. *See Aluminum Foil from Turkey* IDM at Comment 6.

information, Commerce completed its full analysis in a separate document.  *See* Further Analysis Mem. at 6-7 (C.R. 359, P.R 294).  In that confidential analysis, Commerce provided further analysis and citations to the record.

For example, Commerce described the circumstances in which Koehler granted REBATE2H, including [███████████████████████████████████████ ███████████████████]."  Further Analysis Mem. at 6 (C.R. 359, P.R 294) (citing Koehler Questionnaire In Lieu Of Verification at 9 (C.R. 323, P.R. 257)).  This supports Commerce's finding that the rebates reflected in REBATE2H were not "uncommon."  IDM at 22.

Next, Commerce found that the rebates "were granted within [████████████] following the sale," and before the filing of the petition.  Further Analysis Mem. at 6 (C.R. 359, P.R 294) (citing Koehler Supplemental Section B Questionnaire at Exhibit SB-6 (C.R. 143, 144, P.R. 149, 150); Koehler Verification Ltr. Pt. 2 (C.R 324, P.R. 258) (Exhibit Sales 1.1); Koehler Verification Ltr. Pt. 3 (C.R. 325, P.R. 259) (Exhibit Sales 1.2, 3.c.1); Koehler Verification Ltr. Pt. 4 (C.R. 326) (Exhibit Sales 3.c.1, 3.c.2)).  On this basis, Commerce reasonably found that the "timing of these rebates (before the filing of the petition)" supports the appropriateness of the adjustment.  IDM at 22.

As to the "number of such adjustments in the proceeding," Commerce found that Koehler reported REBATE2H for [████] out of [████] sales transactions, in comparison with [████] sales transactions for its other rebates in REBATE1H.  Further Analysis Mem. at 7 (C.R. 359, P.R 294) (citing Second Supplemental Section B Questionnaire, at Ex. S2B-5.8 (C.R. 256, P.R. 187) (Home Market Sales Database Print)).  This supports Commerce's finding relating to the "limited number" of the rebates.  IDM at 22.

Considering all these factors together, Commerce reasonably exercised its discretion—based on its factual findings—to weigh the factors and to find that "this adjustment is appropriate pursuant to the factors outlined in the *Final Modification*." IDM at 22. Accordingly, Commerce's decision to adjust Koehler's home market price for rebates in the field REBATE2H is supported by substantial evidence and in accordance with law.

VIII. Commerce's Inclusion Of Koehler's Accrued Interest On Unpaid Antidumping Duties In The Cost Of Production Calculation Is Supported By Substantial Evidence And In Accordance With Law

Commerce's inclusion of Koehler's accrued interest on unpaid antidumping duties in the cost of production calculation is supported by substantial evidence and in accordance with law. As Commerce stated in the underlying determination, the facts of this case present "an unusual set of circumstances." IDM at 19. Koehler's repeated refusal to pay antidumping duties owed to the U.S. Government resulted in the accumulation of interest owed, some of which accrued during the period of investigation. *Id.* In its final determination, Commerce included the interest accrued during the period of investigation as an interest expense in Koehler's consolidated total financial interest expense in calculating Koehler's financial interest expense ratio. *See* Final Determ. Calc. Mem. at I.3 (C.R. 360, P.R. 295).

This determination is reasonable. As Commerce explained, Koehler "failed to demonstrate for the record whether it recognized and recorded the interest expense accrued on its unpaid duty liability during fiscal year 2020." IDM at 19. Accordingly, Commerce "added this expense to Koehler's consolidated total financial interest expense, as adjusted in the *Preliminary Determination*, to recalculate Koehler's financial interest expense ratio." IDM at 19; *see also* Final Determ. Calc. Mem. at 2 (C.R. 360, P.R. 295).

This treatment of Koehler's interest on unpaid antidumping duties is consistent with Commerce's treatment of other interest expenses incurred by Koehler. As part of the calculation

of normal value in the PDM, Commerce calculated Koehler's cost of production "based on the sum of the cost of material and fabrication for the foreign like product, plus amounts for general and administrative (G&A) expenses *and interest expenses*." *see* PDM 14 (citing 19 U.S.C. § 1677b(b)(1) (emphasis added).[9]  This analysis includes a calculation of Koehler's "revised financial expense ratio."  Prelim. Cost of Production Calculation at 2, 4 (C.R. 297, P.R. 210).  In the final determination, Commerce "recalculated the financial expense ratio to include the interest accrued during the period of investigation . . . on unpaid antidumping duties from the antidumping duty order on lightweight thermal paper from Germany," as discussed in the IDM.  Final Determ. Calc. Mem. at 2 & Att. 3 (C.R. 360, P.R. 295).

Petitioners nonetheless claim that Commerce should have included the interest on unpaid antidumping duties "as a U.S. indirect selling expense pursuant to 19 U.S.C. § 1677a(d))(1)(D) and 19 C.F.R. § 351.402(b)."  Petitioners Br. at 9.  Petitioners claim that Commerce did not "explain why the adjustment was more appropriately made as an increase to {cost of production} rather than a decrease to {constructed export price}," and that any explanation proffered in the response brief would qualify as improper *post hoc* rationalization.  *Id.* at 10-11.

This claim is incorrect.  Commerce did "examine the record and articulate a satisfactory explanation for its action." *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013); *see also Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (stating an agency decision will be upheld "if the agency's path may reasonably be discerned").  As discussed above, Commerce explained that the "unusual" interest

---

[9]  Based on this analysis Commerce found that, "for certain products, more than 20 percent of Koehler's home market sales were at prices less than the {cost of production} and, in addition, such sales did not provide for the recovery of costs within a reasonable period of time."  PDM at 15.  Accordingly, consistent with 19 U.S.C. § 1677b(b)(1), Commerce "disregarded these sales and used the remaining sales as the basis for determining {normal value.}"  PDM at 15.

expenses in this investigation should be treated as part of Koehler's overall interest expense. IDM at 19.  As to its reasoning for not including such interest expenses as indirect selling expenses, Commerce explained that "the expenses associated with commercial activity in the United States . . . *do not include any financial interest expenses*."  Final Determ. Calc. Mem. at 2 (C.R. 360, P.R. 295) (emphasis added).  Commerce does not include financial interest expenses as part of the constructed export price expenses associated with commercial activity in the United States, and thus also excluded the financial expenses from the cost of production used to calculate the constructed export price profit ratio. *Id.*  This is not post-hoc rationalization, as the Petitioners argue, but is explained in Commerce's Final Margin Calculation Memorandum. *Id.*

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final affirmative determination in the investigation of thermal paper from Germany.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

OF COUNSEL:

/s/ Emma E. Bond
EMMA E. BOND
Trial Attorney
W. MITCH PURDY                          Commercial Litigation Branch
Attorney                                U.S. Department of Justice
Office of the Chief Counsel             P.O. Box 480
   for Trade Enforcement & Compliance   Washington, DC 20044
U.S. Department of Commerce             (202) 305-2034
                                        Email: emma.e.bond@usdoj.gov

February 21, 2023                       Attorneys for Defendant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 17,073 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>/s/ Emma E. Bond</u>

February 21, 2023