## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| Koehler Paper SE and Koehler Oberkirch GmbH (collectively, "Koehler") and Matra Americas, LLC and Matra Atlantic GmbH (collectively, "Matra"), | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| United States, | ) ) | |
| *Defendant*, | ) ) | |
| and | ) ) | Consol. Court No. 21-00632 |
| Appvion LLC, | ) ) | |
| *Defendant-Intervenor*, | ) ) | |
| and | ) ) | |
| Domtar Corporation, | ) ) | |
| *Defendant-Intervenor* | ) ) | |

**REPLY BRIEF OF KOEHLER PAPER SE AND KOEHLER OBERKIRCH GMBH AND MATRA AMERICAS, LLC AND MATRA ATLANTIC GMBH IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

<table>
<tr><td>

Thomas J. Trendl
Zhu (Judy) Wang
Zachary Simmons
*Counsel to Koehler Paper SE and Koehler Oberkirch GmbH*

**Steptoe & Johnson LLP**
**1330 Connecticut Ave NW**
**Washington, DC 20036**

</td><td>

R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey
*Counsel to Matra Americas, LLC and Matra Atlantic GmbH*

**Morris Manning & Martin LLP**
**1401 Eye Street NW Suite 600**
**Washington, DC 20005**

</td></tr>
</table>

April 28, 2023

# TABLE OF CONTENTS

I.      **INTRODUCTION**...................................................................................................... 1

II.    **ARGUMENT** ............................................................................................................. 4

    A.    **Commerce's Application of the Cohen's *d* Test Without First Ensuring that the Requirements of Normality, Size, and Equal Variance were Satisfied was Unreasonable** ............................................................................... 4

        1.    **Respondents Did Not Fail to Exhaust Administrative Remedies with Regards to its Cohen's *d* Arguments** ........................................................ 4

        2.    **The Department's Reliance on Cohen's *d* Is Not Reasonable When the Underlying Statistical Assumptions Have Not Been Met** ....................... 7

            a.    **The Threshold of 0.8 is Rendered Meaningless When Professor Cohen's Three Preconditions Have Not been Met** ..................... 7

        3.    **The Court's Recent Decisions in *Stupp Corp. v. United States* and *Marmen Inc. v. United States* Do Nothing to Mitigate the Fundamental Flaws of Commerce's Reliance on the Cohen's *d* Test** ........................ 10

    B.    **Blue4est Paper is Excluded from the Scope of the Underlying Investigation and Resulting AD Order** ....................................................... 14

        1.    **The Plain Language of the Investigation's Scope, the Petition, and Preliminary ITC Determination, As Bolstered by Additional Record Evidence, All Support the Exclusion of Blue4est Paper from the Scope** .................................................................................................. 14

        2.    **Commerce Acted in an Arbitrary and Capricious Manner by Adopting a Wholesale Reversal of its Preliminary Determination that Blue4est Paper is Non-Subject Merchandise Based on the Exact Same Record Evidence** ................................................................................... 19

III.    **CONCLUSION** ...................................................................................................... 24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Consolo v. FMC*,
   383 U.S. 607 (1966)....................................................................................................19

*Duferco Steel, Inc. v. United States*,
   296 F.3d 1087 (Fed. Cir. 2002).................................................................................15

*Marmen Inc. v. United States*,
   Slip Op. No. 23-37, Consol. Court No. 20-00169 (Ct. Int'l Trade Mar. 20,
   2023). ..........................................................................................................................8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)...........................................21

*Nippon Steel Corp. v. United States*,
   337 F. 3d 1373 (Fed. Cir. 2003)................................................................................19

*Stanley Works (Langfang) Fastening Sys. Co. v. United States*,
   279 F. Supp. 3d 1172 (Ct. Int'l Trade 2017) ............................................................6

*Stupp Corp. v. United States*,
   5 F.4th 1341 (Fed. Cir. 2021) ......................................................................... *passim*

*Stupp Corp. v. United States*,
   Slip Op. No. 23-023, Case No. 15-0334, 2023 WL 2206548 (Ct. Int'l Trade
   February 24, 2023)............................................................................................ *passim*

*West Deptford Energy LLC v. Federal Energy Regulatory Comm'n*,
   766 F.3d 10 (Fed. Cir. 2014)..................................................................................3, 21

*Whirlpool Corp. v. United States*,
   890 F.3d 1302 (Fed. Cir. 2018)................................................................................15

**Regulations**

19 C.F.R. § 351.225(k)(1)................................................................................................15, 16

19 C.F.R. § 351.225(k)(2)....................................................................................................15

**Administrative Determinations**

*Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485 (July 15, 2008) ...................................................................................................................23

*Final Determination of Sales at Less Than Fair Value: Sodium Hexametaphosphate From the People's Republic of China*, 73 Fed. Reg. 6,479 (Feb. 4, 2008) ...................................................................................................................22

*Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Orange Juice from Brazil*, 71 Fed. Reg. 2,183 (Jan. 13, 2006) ...........................................................22

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| Koehler Paper SE and Koehler Oberkirch GmbH (collectively, "Koehler") and Matra Americas, LLC and Matra Atlantic GmbH (collectively, "Matra"), <br><br> *Plaintiffs*, <br><br> v. <br><br> United States, <br><br> *Defendant*, <br><br> and <br><br> Appvion LLC, <br><br> *Defendant-Intervenor*, <br><br> and <br><br> Domtar Corporation, <br><br> *Defendant-Intervenor* | Consol. Court No. 21-00632 |

**REPLY BRIEF OF KOEHLER PAPER SE AND KOEHLER OBERKIRCH GMBH AND MATRA AMERICAS, LLC AND MATRA ATLANTIC GMBH IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

## I.   INTRODUCTION

The U.S. Department of Commerce's ("Commerce") differential pricing analysis was unreasonable given that Commerce did not first ascertain that the underlying data satisfied the explicit preconditions of the Cohen's *d* test: normality, variance, and size.  Under such conditions, the results of Cohen's *d* lose their inherent practical meaning and can have unknown levels of statistical power, robustness, or practical perceptibility.  This means is that Commerce cannot rely on the Cohen's *d* test to accurately indicate whether U.S. prices vary significantly

1

amongst themselves in the U.S. market, and any such reliance on Cohen's *d* test in Commerce's differential pricing is unreasonable. Commerce's contentions that downstream testing somehow mitigates operational and methodological testing errors upstream, among other arguments raised in *Stupp Corp. v. United States*, are unavailing and do little to cure this fundamental defect. Slip Op. No. 23-023, Case No. 15-0334, 2023 WL 2206548 (Ct. Int'l Trade February 24, 2023) ("*Stupp* IV").

In addition, Commerce's Final Determination to include Blue4est paper within the scope of the underlying investigation and resulting antidumping duty ("AD") order was not based on substantial evidence. The plain language of the investigation's scope indicates that the subject merchandise must possess "thermal active coating(s) (typically made of sensitizer, dye, and coreactant, and/or like materials)." This language makes clear that the scope only includes products that contain chemically reactive materials (*i.e.*, "sensitizer, dye, and coreactant and/or like materials") that produce an image in response to heat. This understanding is bolstered by the Petition and the Preliminary Determination of the U.S. International Trade Commission ("ITC"), both of which reference chemicals that react to heat in their description of the subject merchandise. And, this understanding is supported further by substantial evidence on the investigation record demonstrating the concept of a "thermal active coating" and how Blue4est paper simply does not possess thermal active coating. In sum, because Blue4est paper does not possess chemically reactive materials that respond to heat to form an image, but instead relies on a physical process to produce an image, it is not subject to the scope of the underlying investigation. For these reasons, Commerce's reliance on a single, unsupported statement by Petitioners concerning the meaning of "thermal active coating" to determine that Blue4est paper

is subject merchandise does not amount to a substantial evidence-based determination, and the Court should reverse Commerce's determination.

Finally, in the Final Determination, Commerce acted in an arbitrary and capricious manner by reversing its Preliminary Determination that Blue4est paper is not subject merchandise because it does "not have a thermal active coating" based on the <u>same</u> record evidence.  In doing so, Commerce also acted in an arbitrary and capricious manner by violating its own practice of not altering the scope of an investigation following the preliminary determination.  Commerce's reviewing courts have held that when an agency offers insufficient reasons for treating similar situations differently, such conduct amounts to arbitrary and capricious behavior.  *See, e.g.*, *West Deptford Energy LLC v. Federal Energy Regulatory Comm'n*, 766 F.3d 10, 21 (Fed. Cir. 2014) ("*West Deptford Energy LLC*").  Here, because Commerce made diametrically opposed determinations on Blue4est paper in the Preliminary and Final Determinations, based on the <u>same</u> record evidence, and failed to explain how its interpretation of the record evidence had changed, this amounts to arbitrary and capricious conduct under relevant court precedent.  Similarly, by expanding the scope of the investigation to include Blue4est paper following the Preliminary Determination, Commerce departed from its normal practice without sufficient explanation for doing so.  By acting in an arbitrary and capricious manner, Commerce deprived Koehler of the opportunity to meaningfully address any changes in Commerce's analysis of the record evidence before it or its interpretation of key scope language, prejudicing Koehler in the proceeding below.  For these reasons, Commerce's Final Determination on Blue4est paper reflects arbitrary and capricious agency conduct, and should be reversed by the Court.

II.   **ARGUMENT**

    A.    Commerce's Application of the Cohen's *d* Test Without First Ensuring that the Requirements of Normality, Size, and Equal Variance were Satisfied was Unreasonable

        1.    Respondents Did Not Fail to Exhaust Administrative Remedies with Regards to its Cohen's *d* Arguments

As a threshold matter, the arguments of Koehler Paper SE and Koehler Oberkirch GmbH (collectively, "Koehler") and Matra Americas, LLC and Matra Atlantic GmbH (collectively, "Matra") (collectively, "Respondents") regarding Cohen's *d* were properly placed on the record and sufficiently raised before Commerce at the administrative level.  In their principle brief, Respondents offered, for the benefit of this court's understanding of this technical concept, a primer on Cohen's *d* and the mathematical underpinnings of this statistical measure.  In this primer, Respondents first started with the algebraic formula for Cohen's *d*, an established concept in the administrative record of this case, and presented a set of mathematical hypotheticals using different numerical conditions (*i.e.*, where the datasets have equal versus unequal variances or normal versus not normal distributions).  This was done purely to illustrate that the underlying practically of the *d* metric differs dramatically based on the conditions of the data evaluated.  The numbers and graphics presented as part of this exercise are mathematical computations calculated from the algebraic measure of Cohen's *d*.  They are derived based on established algebraic formulas and therefore need not be cited with references to external documents.

Thus, with regard to Defendant's complaint that the "detailed percentages" were not supported by citations, no citation is needed because, algebraically, two population-scale normal distributions (bell curves) with homoscedastic population variances (equal variances) separated by a $d = 0.8$ will always yield the result that 78.81% of the observations of one distribution fall

below the mean of the second distribution.  Similarly, the percentage overlap between two distributions cited on pages 19 to 24 of Respondents' opening brief can be calculated based on the underlying statistical formulas and likewise have no external citations.  As this Court specifically noted in *Stupp Corp. v. United States*, "the court may recognize the basic statistical principles discussed in these texts.  The idea, for example, that a skewed statistical sample may yield inaccurate results is inductive reasoning – not an assertion of fact."  *Stupp* IV at *5. Therefore, the court is allowed to "consider{} Commerce's Cohen's *d* methodology in the same way it would review any other methodology, and may make logical inferences without taking judicial notice of {} literature."  *Id*.

Defendant also questioned Koehler's citation to the academic articles discussed in *Stupp Corp. v. United States*, 5 F.4th 1341 (Fed. Cir. 2021) ("*Stupp* III"), arguing that those academic articles had not been placed on the record in this case and are therefore somehow off-limits to Respondents.  Defendant's Response Brief at 27.  This is a perplexing position, as quotes from those academic articles were included in the CAFC's legal determination as part of the "extensive literature describing the problems associated with apply the Cohen's *d* test to data that are not normally distributed or that are lacking equal variances."  *Stupp* III, 5 F.4th 1341, 1358 (Fed. Cir. 2021).  To the extent that Respondents cited to these academic articles, it was in the context of analyzing the CAFC's holding in relation to Commerce's Cohen's *d* methodology. Commerce cannot reasonably argue that language used by the CAFC in its opinion is not available to Respondents in a brief before the Court.

Defendant then took issue with Respondents' citation to the graphic from *Scientifically Sound*, but this graphic was included as a visual aid for this Court's understanding of Professor Cohen's thresholds.  Defendant's Response Brief at 22-23.  These data are a graphical

representation of the measure of effect size offered by Cohen's *d*, demonstrating the degree of overlap of two groups given certain Cohen's *d* values.  These graphics can be derived from the algebraic model for Cohen's *d* which, again, as a theoretical concept, has been introduced on the administrative record in this case.  They do not require additional or external academic support, and thus are such that they "can be accurately and readily determined from sources who accuracy cannot reasonably be questioned."  Fed.R.Evid. 201(b).

Finally, Defendant's allegation that Respondents failed to raise any arguments regarding percent differences associated with the 0.8 Cohen's *d* coefficient is also erroneous.  In the administrative proceeding, Respondents challenged the Commerce's calculation of the dumping margin on the basis that Commerce's "application of the Cohen's *d* test to the data in this case violated the assumptions of normality, sufficient observation size, and roughly equal variances associated with that test."  Thermal Paper from Germany: Case Brief of Koehler and Matra (August 17, 2021) ("Respondents' Case Brief Brief") at 3, P.R. 277, C.R. 352.  Respondents then discussed the CAFC's guidance as to the three assumptions, citing *Stupp Corp*. as noting the importance of a "rigorous mathematical analysis" required in order to apply the Cohen's *d* test. Joint Case Brief at 4, citing *Stupp* III at 1341.  This is the exact issue that Respondents now raise on appeal, along with mathematical explanations demonstrating precisely how Cohen's *d* lacks inherent and consistent validity when the underlying data being compared do not have normality, equal variance, and equal numerosity.  Thus, entirely unlike in *Stanley Works (Langfang) Fastening Sys. Co. v. United States*, 279 F. Supp. 3d 1172, 1189 (Ct. Int'l Trade 2017), where an entire argument regarding the meaningful difference test element had not been raised before Commerce in the administrative proceeding, here Respondents are merely providing an "illustration of the same scenario" already briefed before Commerce.  *Stupp* IV at *6.

2.      The Department's Reliance on Cohen's *d* Is Not Reasonable When the
        Underlying Statistical Assumptions Have Not Been Met

   a.      The Threshold of 0.8 is Rendered Meaningless When Professor
           Cohen's Three Preconditions Have Not been Met

As argued in Koehler's opening brief, the fundamental flaw in Commerce's application

of the Cohen's *d* test is that Professor Cohen's interpretative cutoffs are all predicated on

satisfying the assumptions of normality, equal variance, and numerosity, and such assumptions

have not been proven for the underlying data reviewed here.  Specifically, Professor Cohen

formulated his interpretative cutoffs by stating that "we maintain the assumption that the

populations being compared are normal and with equal variability, and conceive them further as

equally numerous."  *Stupp* III at 1357 (citing Jacob Cohen, Statistical Power Analysis for the

Behavioral Sciences 21 (3d ed. 1988)).  When these assumptions have been met, then the values

of $d = 0.2$, $d = 0.5$, and $d = 0.8$ are considered to be indicative of small, medium, and large

effects, respectively.

Professor Cohen identified the threshold of 0.8 as being grossly perceptible when his

assumptions were met.  In other words, where the underlying data contain two population-scale

normal distributions (bell curves) with homoscedastic population variances (equal variances), a

0.8 cutoff will always yield the result that 78.81% of the observations of one distribution fall

below the mean of the second distribution.  In two identical distributions with identical means

and variance, 50% of the data of one distribution would fall below the mean of the other

distribution.  In Cohen's "large" scenarios, 28.81 (or 78.81 – 50.00) percent more of the data

would sit below the average.  It is precisely this concept which underpins Cohen's concept of a

"large" effect, or that differences are practically, or grossly, perceptible.  That is, it is not the 0.8

itself that distinguishes a "large" effect size, but rather, what that 0.8 is a measure of that can be

considered large.  In Cohen's case, this was specifically when 78.81% of the data of one distribution falls below the mean of the second distribution.

When Professor Cohen's explicit assumptions have not been satisfied, the results of Cohen's $d$ lose their inherent practical meaning and have unknown levels of statistical power, robustness, or practical perceptibility.  This means that it is not that the 0.8 threshold itself that is wrong; it is that the 0.8 no longer communicates a concrete meaning – practical, statistical, or otherwise.  As shown in the graphical visuals in Respondents' opening brief, when the assumptions of normality, variance, or numerosity have been violated, a 0.8 cutoff could equate a 74% or even 72% difference in distributions; the possibilities are essentially endless.  If so, the percentage of data of the test distribution that can be expected to be below the average of the control distribution is no longer 78.81%, as Professor Cohen had implicitly posited, and the "reliability" of $d = 0.8$ resulting in a "large" effect size is mitigated.  Professor Cohen's heuristic guidelines thus would no longer have any inherent meaning, and any inferences drawn from his cutoffs would be invalid.  Consequently, Commerce's choice to "employ{} the 0.8 threshold to identify where prices differ significantly," because the 0.8 measurement "represents a difference which is 'grossly perceptible,'" is no longer reasonable.  *Stupp* IV at *11.  "Grossly perceptible" is intrinsically tied to this 78.81% difference when Cohen's assumptions are not met – and not to the |0.8| threshold, which can take on various levels of practical significance depending on precisely what data is being tested and how far those distributions are from Cohen's stated standards.

The debate over whether samples or entire populations are tested is irrelevant to the question at hand.  *Marmen Inc. v. United States*, Slip Op. No. 23-37, Consol. Court No. 20-00169 (Ct. Int'l Trade Mar. 20, 2023).  Professor Cohen formulated his interpretative cutoffs by

stating that "we maintain the assumption that the populations being compared are normal and with equal variability, and conceive them further as equally numerous." *Stupp* III at 1357. Thus, when any underlying data is tested using Professor Cohen's mathematical calculation – whether samples or entire populations – the assumptions of normality, variance, and size must be met for the measurement of *d* to have a standard meaning. This means that regardless of whether the mean or variance in Professor Cohen's algebraic equation refers to a population or sample, when they violate the explicit preconditions of normality, variance, and size, the resulting effect size measures lose Professor Cohen's ascribed meaning. Defendant's explanation that "concerns regarding statistical significance do not apply when measuring an entire population rather than a sample size" wholly misses the point; statistical significance is not in question here. The actual practical meaning of "grossly perceptible" or "large" loses inherent meaning and consistency when Cohen's assumptions are not met. Defendant's Response Brief at 21.

As to Defendant's argument that Koehler failed to support its position that there is no "large" difference between two data groups when 72 or 74 percent of the data points in the first group fall below the mean in the second group, this too misses the point. Defendant's Response Brief at 25. Koehler need not define "large" separate and distinct from Commerce's existing definition of "large." Commerce's use of "large" is predicated entirely on the Cohen's $d = |0.8|$ threshold. That threshold is set on the practical and grossly perceptible nature of 78.81% of the data of one distribution being below the average of the second distribution. And, under Cohen's assumptions of normality and equal variance, a Cohen's $d = |0.8|$ threshold is equivalent to one distribution falling 78.81% below the mean of the second distribution. Any value *less than* 78.81% is mathematical equivalent to a value of *d less than* $|0.8|$ under Cohen's assumptions of

normality and equal variance.  As $d = |0.8|$ is the Department's definition of large, any value *less than $d = |0.8|$* is necessarily less than large.

The ultimate impact of this mathematical reality is that Commerce cannot rely on the Cohen's *d* test to accurately indicate whether U.S. prices vary significantly amongst themselves in the U.S. market.  As discussed above, when the threshold of 0.8 no longer means that 78.81% of the observations of one distribution falls below the mean of the second distribution, Commerce can no longer infer that a Cohen's *d* of 0.8 means there is a "large" effect size in the difference between prices.  Instead, Commerce should retest the investigation results by using a threshold of 78.81% of the quantity of any test group price falling below (or above) the associated base group mean for any given control number.  This would ensure that the Department's results retain the same "gross perceptibility" as the $|0.8|$ threshold intrinsically contains under ideal conditions (that is, normality and equal variances).

3.   The Court's Recent Decisions in *Stupp Corp. v. United States* and *Marmen Inc. v. United States* Do Nothing to Mitigate the Fundamental Flaws of Commerce's Reliance on the Cohen's *d* Test

In providing the Court with notice of supplemental authority concerning the recent decision in *Stupp Corp. v. United States*, Defendant notes that the Court addressed the argument that "Commerce application of Cohen's *d* test is flawed because it fails to take into account assumptions of sample size, distribution and variance underlying the test," but ultimately concluded that "Commerce has adequately explained how its methodology is reasonable," *Stupp IV* at *5, *10.  The inference is that the Court should reach the same conclusion here.

When reviewing Commerce's explanation in detail, however, it becomes apparent that the discussions contained therein do little to cure the underlying fallacies discussed in this appeal.  Namely, the Court in *Stupp IV* reached its conclusion largely on the basis of the

following reasons: 1) that Commerce's Cohen's *d* analysis does not stand alone but instead operates together with the ratio test and meaningful difference test, both of which would "compensate for inaccuracies" caused by the Cohen's *d* test, 2) that small fluctuations in price will not lead to "false positives" in Cohen's *d* test, and 3) that use of the 0.8 threshold results in reasonably infrequent application of alternative methodologies. *Stupp* IV at *7-8. As reviewed in turn below, none of these lines of reasoning address Commerce's core error of relying on the Cohen's *d* threshold of 0.8 when the statistical assumptions of normality, variance, and size have not been proven.

First, Respondents disagree with Commerce's contention that its Cohen's *d* analysis "operates together" with the ratio test and meaningful difference test such that the latter two tests "compensate for inaccuracies" caused by the former. *Stupp* IV at *7. While Commerce is correct in some sense that Cohen's *d* does not "stand alone," it is mistaken in its view that the three tests operate "together" in the sense that errors in one test would tend to eliminate or offset the results of the others. Rather, these three tests are administered sequentially, and the ratio test and meaningful difference tests are conducted on the *results* of the Cohen's *d* analysis. As the court in *Stupp* aptly summarized,

> *First*, Commerce applies to respondent's sales what it refers to as the 'Cohen's *d* test"…Commerce *then* counts the percentage of sales by value which 'pass' the Cohen's *d* test, and applies its 'ratio' test. *Finally*, if Commerce has not selected the A-to-A method for all sales, it applies the "meaningful difference" test to determine whether the A-to-A method could nevertheless account for the disparate pricing. *Stupp* IV at *6.

Thus, the results of the Cohen's *d* test serve as inputs for subsequent tests, and any errors from the Cohen's *d* test are compounded downstream. Where, as explained above, $d = |0.8|$ indicates nothing of implicit value, the number of observations within the group that are said to have

"passed" the Cohen's *d* test loses meaning, and the results of the ratio test and meaningful difference tests also lose significance.  This is a quintessential example of the axiom, "garbage in, garbage out:" less accurate results in *d* necessarily leads to less accurate results in subsequent tests.  Commerce's position that downstream testing somehow mitigates operational and methodological testing errors upstream is thus simply not accurate.

Commerce itself admits that Cohen's test can "produce positive results under unusual circumstances," but again argues that this is solved by "combining" Cohen's test with the ratio test and meaningful difference tests.  *Stupp* IV at *8.  First, Commerce should define "unusual circumstances," as it is Respondents' position that these circumstances are the very ones under which Cohen's assumptions have not been met.  Second, and more fundamentally, Commerce again misunderstands the nature of the relationship between the Cohen's *d* test and ratio test and meaningful difference tests.  The ratio test is conducted on the *results* of the Cohen's *d* test: it does not somehow further test the pass/fail nature of Cohen's test itself.  Thus, as explained above, any fundamental errors with the first test will be further compounded with later, iterative tests.  The notion that these tests somehow function as checks and balances operating together is simply incorrect.

Commerce also misses the point when it contends that small fluctuations in price are less likely lead to "false positives" in Cohen's test.  *Stupp* IV at *5.  In fact, the entire concept of "false positives" or "false negatives" only makes sense in context of sample data, which Commerce has explicitly stated it does not have.  Commerce cannot calculate a "false positive" when it has *all the data*.  It is nearly incoherent to defend a false positive rate, which can only stem from taking samples, when the Department has stated it is in control of the full universe of sales.  Commerce cannot simultaneously argue that it is estimating means while also stating that

it has full population data.  If Commerce believes that it is using full population data, then there is nothing to estimate: the mean of population data is not an estimate with inherent error, but instead a precise measurement and statement about the nature of the values on the record.  If it is sampling data, then that data could be subject to sampling errors.

Commerce's argument is therefore a red herring, as the question of false positive or false negative rates is not relevant to the data which Commerce is testing.  Instead, as stated above, the fundamental fallacy is that $d = |0.8|$ is commonly understood, and understood by the Department, as being a "large" difference that is "grossly perceptible," but this assumption is <u>no longer true</u> when the assumptions underlying Cohen's measure of effect size have not been met.  This is because a "grossly perceptible" result hinges on 78.81% of one distribution falling below the average (mean) of the second distribution, and this result can no longer be expected when the underlying data are not normal, with equal variances and sizes.  Thus, the assumption of $d = 0.8$ relied on by Commerce loses its inherent meaning and is no longer reasonable.

Finally, Commerce attempts to sidestep the consequence of these errors in application of the Cohen's $d$ test by arguing that its use of the Cohen's $d$ test only results in the application of an alternative comparison methodology for a relatively small number of respondents.  *Stupp* IV at *9.  The number of respondents affected by Commerce's faulty reliance on Cohen's $d$ is entirely irrelevant.  What matters in this case is that the test was applied by Commerce to Koehler, that it adversely affected Koehler by creating a dumping margin, and that the threshold of 0.8 is rendered meaningless when Professor Cohen's three preconditions are not satisfied, and thus Commerce's reliance on $d = 0.8$ for "large" effect size is not reasonable here.

13

For these reasons, Court should remand the issue so Commerce can retest the investigation results using a threshold of 78.81% of the quantity of any test group price falling below (or above) the associated base group mean for any given control number.

      B.      Blue4est Paper is Excluded from the Scope of the Underlying Investigation and Resulting AD Order

            1.      The Plain Language of the Investigation's Scope, the Petition, and Preliminary ITC Determination, As Bolstered by Additional Record Evidence, All Support the Exclusion of Blue4est Paper from the Scope

The plain language of the investigation's scope, the Petition, and the Preliminary Determination of the U.S. International Trade Commission ("ITC"), as bolstered by additional record evidence, all support the exclusion of Blue4est paper from the scope. For this reason, Commerce's Final Determination that Blue4est paper is subject merchandise is unsupported by substantial evidence, and must be overturned.

The scope of the investigation as initiated covered: jumbo rolls and converted rolls of thermal paper with or without a base coat (typically made of clay, latex, and/or plastic pigments, and/or like materials) on one or both sides; **with thermal active coating(s) (typically made of sensitizer, dye, and coreactant, and/or like materials)** on one or both sides; with or without a top coat (typically made of pigments, polyvinyl alcohol, and/or like materials), and without an adhesive backing. *Thermal Paper From Germany, Japan, the Republic of Korea, and Spain: Initiation of Less-Than-Fair-Value Investigations*, 85 Fed. Reg. 69,580, 69,584 (Nov. 3, 2020) (emphasis added). For purposes of this case, the relevant question before the Court is the meaning of the scope language "with thermal active coating(s) (typically made of sensitizer, dye, and coreactant, and/or like materials)."

As Commerce's reviewing courts have held on numerous occasions, Commerce is confined, in the first instance, to an interpretation of the scope based on its plain language.

14

*Whirlpool Corp. v. United States*, 890 F.3d 1302, 1307-1308 (Fed. Cir. 2018).  If the plain

language of the scope is ambiguous, Commerce may develop its interpretation of the scope

language based on the enumerated sources in its regulations.  *See id.*; *see also* 19 C.F.R. §

351.225(k)(1)-(2).  Any such interpretation must be based on substantial evidence, and if

Commerce fails "to consider or discuss record evidence which, on its face, provides significant

support for an alternative conclusion{,} {its determination is} unsupported by substantial

evidence."  *See Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002) (citing

*Novosteel SA v. United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002).

  In the underlying investigation, the plain language of the scope was clear, and

definitively excluded products that do not include <u>chemically reactive materials</u> (*i.e.*, "sensitizer,

dye, and coreactant, and/or like materials") that produce an image in response to heat.  Because

Blue4est paper does not contain "sensitizer, dye, … coreactant" and/or "like materials" that

chemically react to heat to form an image, and instead relies on a <u>physical process</u> to produce an

image, a plain language reading of the investigation's scope clearly excludes Blue4est paper

from the ambit of the scope.  To boil this down to the most fundamental point, Blue4est paper

contains no sensitizers, no dyes, no coreactants, and no other "like materials" that <u>activate</u> in

response to heat to form an image.  It thus does not possess a "thermal <u>active</u> coating" (emphasis

added).  It is therefore excluded from the scope (for a description of the physical process used by

Blue4est paper, *see* Koehler's Opening Brief at 41-42).

  Although the plain language of the underlying investigation's scope was clear, Defendant

contends that "{t}he original scope language referencing 'thermal active coating' was

ambiguous."  Defendant's Response Brief at 39.  But even if such ambiguity existed, the Petition

and the ITC's Preliminary Determination – both enumerated sources under Commerce's

regulations at 19 C.F.R. § 351.225(k)(1) – clearly indicated that a product must include materials that are <u>chemically reactive</u> to heat to form an image to be considered subject merchandise.

With respect to the Petition, Commerce observed in its Final Determination that "the petitioners described thermal paper as 'a paper coated with **chemicals that react** to form images when exposed to heat.'" Final Scope Determination at 5 (emphasis added), P.R. 292. Commerce also observed that the Petition described the subject merchandise as follows:

> All thermal paper is produced with the same essential technology, wherein the base paper is **coated by applying different coating layers** to the functional (imaging) heated printer heads, the **thermal developer in the coating is activated** allowing the image to appear on the paper. *Id.* (emphasis added).

With respect to the ITC's Preliminary Determination, Commerce observed the following description of the subject merchandise:

> Thermal paper is a paper **coated with chemicals that react** to form images when exposed to heat. Thermal paper can be used in special printers to create an image without ribbons or other consumables (other than the paper itself). When imaging, the thermal paper containing the dye is passed between the thermal print head and the platen roll in the printer. The thermal head consists of tiny heating elements lying side-by-side across the width of the paper. As the paper passes under the head, the computer instructs certain heater elements to heat up. Where the heat is in contact with the paper, the **dye is activated** to produce an image. Heater elements heat up and cool down each time the paper advances forward, creating a colored or black microdot on the paper. The arrangement of elements and paper movement create flexible graphic images on the thermal paper. *Id.* (emphasis added) (citing <u>Thermal Paper from Germany, Japan, Korea, and Spain</u>, Investigation Nos. 731-TA-1546-1549 (Preliminary), Publication 5141 (December 2020) at I-7).

Based on these descriptions in the Petition and the Preliminary Determination of the ITC, the requirement of the subject merchandise to possess materials that are <u>chemically reactive</u> to heat to form an image is unmistakable. Accordingly, even if the plain language of the scope was ambiguous, these additional sources provided clarity, and further support the exclusion of Blue4est paper from the scope.

16

Importantly, the above interpretations derived from the plain language of the underlying investigation's scope, the Petition, and the ITC's Preliminary Determination are all bolstered by additional record evidence that was before Commerce.

The record of the underlying investigation included information that "{t}he concept of a 'thermal active coating' is that it **chemically activates** to **develop the color**." Koehler Scope Rebuttal Brief at 2-5 (emphasis added) (citing Koehler Section A Response, Exhibit A-22 at 1), P.R. 233. To illustrate this concept, Koehler provided a visual depiction juxtaposing "thermal active coating" with the opaque thermal sensitive coating used in Blue4est paper. *See* Koehler Section A Response, Exhibit A-22 at Attachment A, C.R. 34 – C.R. 43, P.R. 105 – P.R. 106.

As demonstrated by the above-cited visual (available on page 43 of Koehler's Opening Brief), "thermal active coating" utilizes a chemical process by which a chemical reaction occurs to activate the creation of print on paper. Koehler Scope Rebuttal Brief at 2-5, P.R. 233. Such chemical process relies on the existence of particular chemicals – color former, color developer, and sensitizer – for the desired chemical reaction to occur, leading to the creation of print on paper.

This chemical process and the chemical reaction that results in the creation of print on paper is <u>fundamentally different </u>to the physical process utilized by Koehler's Blue4est paper product. Specifically, "{f}or Blue4est®, the application of an opaque thermal sensitive coat provides for the collapse of hollow particles, known as air filled bubbles, which reveal a black color coat." *Id.* "{T}his creates a physical local 'thermal switching' from opaque to transparent. There is no chemical reaction or dye activation." *Id.* In

short, whereas subject thermal paper utilizes <u>chemicals</u> and a <u>chemical reaction</u>, Blue4est

paper utilizes <u>no reactive chemicals</u>, and relies on a process that is entirely <u>physical</u>.

The investigation record also included information demonstrating the treatment of

Koehler's Blue4est paper product as a distinct (for intellectual property purposes) and

environmentally-friendly alternative to subject thermal paper products by government

authorities in the United States and Germany.  As explained by Koehler in its Section A

Questionnaire Response:

> {T}he fundamental differences between Blue4est® and conventional thermal paper
> have been affirmed by U.S. and German authorities.  Blue4est® is recognized by
> government authorities as an alternative product to conventional thermal paper.  In
> January 2020, the Bundesumweltamt,  Germany's Federal  Environment Agency,
> described Blue4est® as one of the available "alternatives" to thermal paper with
> BPA.   Additionally, the U.S. Patent and Trademark Office, agreed that Blue4est®
> thermal paper was a novel and inventive compared to current examples of
> conventional thermal paper.   In 2017, the U.S.  Environmental  Protection Agency
> awarded Papierfabrik  August  Koehler  SE, in partnership with  Dow Chemical
> Company, with  the  11th U.S.  EPA  Presidential  Green  Chemistry Challenge
> Award for developing a new thermal printing product by eliminating the use  of
> chemicals  such  as  bisphenol A (BPA) or  bisphenol S (BPS).   Unlike
> conventional thermal papers that contain sensitizers, color formers (dye), and
> developers (coreactants), Blue4est®'s unique exclusion of chemical materials has
> allowed for more expansive uses of the product.  For example, in October 2020,
> ISEGA, an independent German testing and certification institute, certified
> Blue4est® as approved for direct food contact.  This is a major distinguishing feature
> from conventional thermal paper which is entirely dependent upon a chemical
> activation process.

Koehler Section A Response at Exhibit A-22, C.R. 34 – C.R. 43, P.R. 105 – P.R. 106.   Such

evidence provides significant additional weight to the conclusion that Blue4est paper is distinct

from subject thermal paper based on the lack of a thermal active coating that relies on chemical

activation.

Given the weight of the evidence before Commerce in support of the conclusion that

Blue4est paper is *not* subject merchandise, it cannot be the case that Commerce's determination

to the contrary is supported by substantial evidence.  Rather, Commerce's determination is based on a single, unsupported clarification by the Petitioners with respect to the scope language.  *See* *Final Scope Determination* at 7-8, citing Petitioners' scope clarification ("{t}typically, the thermal coating is made with the key ingredients of sensitizers, dyes, and co-reactants. A 'like material' would be any other form of thermal coating that serves the same function, namely, to permit a thermal image to appear on the paper"), P.R. 292.  Defendant's appeal to agency deference is simply insufficient to overcome this inescapable conclusion.  *See* Defendant's Response Brief at 33; *see also Consolo v. FMC*, 383 U.S. 607, 619-20 (1966) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) ("{s}ubstantial evidence is more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion");  *Nippon Steel Corp. v. United States*, 337 F. 3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F. 2d 1566, 1562 (Fed. Cir. 1984)) (in determining whether an agency has identified substantial evidence to support its determination, the Court must consider "the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence").

In light of this, the Court should rule that Commerce's Final Determination as to Blue4est paper is unsupported by substantial record evidence, and that Blue4est paper is excluded from the scope of the investigation and resulting AD order.

> 2. Commerce Acted in an Arbitrary and Capricious Manner by Adopting a Wholesale Reversal of its Preliminary Determination that Blue4est Paper is Non-Subject Merchandise Based on the Exact Same Record Evidence

Above, Koehler demonstrated that Commerce's Final Determination on Blue4est paper was unsupported by substantial record evidence, and inconsistent with the plain language of the scope, the Petition, and the Preliminary Determination of the ITC.

Equally as deserving of the Court's attention is the arbitrary and capricious conduct displayed by Commerce in reaching completely contradictory determinations in its Preliminary Determination and Final Determination based on the exact same record evidence. Such conduct violated Commerce's practice of not altering the scope of an investigation following the preliminary determination milestone, and prejudiced Koehler by providing insufficient opportunity to address any changes in Commerce's analysis on Blue4est paper following the Preliminary Determination. For this reason, the Court should overturn Commerce's determination that Blue4est paper is subject merchandise.

Since the commencement of the underlying investigation, Koehler has repeatedly and consistently taken the position that Blue4est paper is not subject merchandise. *See, e.g.,* Koehler Section A Response at 35 and Exhibit A-22, , C.R. 34 – C.R. 43, P.R. 105 – P.R. 106; Koehler Section B Response at 10, 15, C.R. 75 – C.R. 78, P.R. 114 – P.R. 116; Koehler Pre Preliminary Comments at 29-31, C.R. 286, P.R. 200. Petitioners' characterization of Koehler's acquiescence to the inclusion of Blue4est paper within the scope of the investigation until late in the proceeding is, accordingly, plainly false. Petitioners' Response Brief at 17-19. Though Koehler reported sales and cost information on Blue4est paper, Koehler made clear that this was for "transparency reasons only" and to avoid potential accusations of deficient reporting (and application of adverse facts available) had Commerce later incorrectly determined that Blue4est paper was subject to the investigation. *See* Koehler Section B Response at 10, C.R. 75 – C.R. 78, P.R. 114 – P.R. 116. And, as all parties to this case agree, Commerce initially agreed with Koehler's position on Blue4est paper, determining in the Preliminary Determination that "based on record information Koehler provided, this product {(Blue4est paper)} is outside the scope of

20

the investigation because it **does not have a thermal active coating**."  Preliminary

Determination Margin Calculation at 1-2 (emphasis added), C.R. 296, P.R. 209.

Agency action is arbitrary and capricious if "the agency offers insufficient reasons for

treating similar situations differently."  *West Deptford Energy, LLC*, 766 F.3d 10, 21 (Fed. Cir.

2014).  A determination is also arbitrary and capricious if the agency "entirely failed to consider

an important aspect of the problem, offered an explanation for its decision that runs counter to

the evidence before the agency, or is so implausible that it could not be ascribed to a difference

in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

In the underlying investigation, Commerce acted in an arbitrary and capricious manner

by completely reversing its Preliminary Determination on Blue4est paper (cited above) in the

Final Determination based on the exact same record evidence.

Petitioners attempt to downplay the importance of the Preliminary Determination,

asserting that the case analyst at Commerce was simply "unaware that scope issues were to be

separately addressed by another team overseeing all four thermal paper investigations" and that

Commerce's later Final Determination was thus a mere correction of its erroneous Preliminary

Determination.  Petitioners' Response Brief at 19-20.  Defendant similarly attempts to downplay

the importance of the Preliminary Determination, characterizing Commerce's Final

Determination as a simple "clarification" rather than an "expansion" of the scope from the

Preliminary Determination.  Defendant Response Brief at 36-39.  Neither of these presentations

is accurate.

In reaching the Preliminary Determination that Blue4est paper is not subject merchandise

based on the record evidence, Commerce established its interpretation of the scope language

21

(including the meaning of "thermal active coating(s)") and its treatment of Blue4est paper as outside the realm of the investigation (*e.g.*, non-collection of cash deposits on this product) based on the record evidence before it.  This included Petitioner's previously-submitted Petition clarification on their interpretation of the scope language, which was Commerce's sole basis for determining that Blue4est paper is subject merchandise in the Final Determination.  <u>None of this record evidence changed prior to the Final Determination</u>.

Accordingly, that Commerce reached the exact opposite determination in the Final Determination, concluding for the first time in the proceeding that Blue4est paper is subject merchandise, without explaining the evidentiary basis for its wholesale reversal, is a textbook example of arbitrary and capricious conduct.

Additionally, Commerce acted in an arbitrary and capricious manner in the underlying investigation by violating its own practice of not altering the scope of an investigation following the preliminary determination.  *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances: Certain Orange Juice from Brazil*, 71 Fed. Reg. 2,183 (Jan. 13, 2006) and accompanying Issues and Decision Memorandum at Comment 2 ("in order for the Department to consider expanding the scope of this proceeding to include companies and products which are explicitly not covered by the current scope, the petitioners would need to file an amendment to the petition"); *Final Determination of Sales at Less Than Fair Value: Sodium Hexametaphosphate From the People's Republic of China*, 73 Fed. Reg. 6,479 (Feb. 4, 2008) and accompanying Issues and Decision Memorandum at Comment 1 ("we are unable to accept the Petitioners' request as a proper amendment… Moreover, such an action would be inappropriate at this point in the proceeding, given the Department's practice, as upheld by the Courts, of not accepting petitioners' proposed

amendments to the scope after the date of the preliminary determination"); *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485 (July 15, 2008) and accompanying Issues and Decision Memorandum at Comment 20 ("the fact that a tire is used on an agricultural vehicle or implement does not place that tire within the scope of these proceedings unless that tire is a new pneumatic off-the-road tire.  Including all agricultural tires at this point in these investigations would constitute an expansion of the scope, which would be in conflict with Department practice and precedent").

Though Defendant characterizes Commerce's Final Determination as "plainly … a clarification of existing scope," such characterization fails to reflect the sequencing of events in the underlying investigation, as discussed above.  Defendant's Response Brief at 39. Specifically, because Commerce determined that Blue4est paper was outside the scope of the investigation in the Preliminary Determination, based on its interpretation of "thermal active coating" in the scope language, its later Final Determination to include Blue4est paper within the scope based on a *broader* interpretation of the same scope language constituted an <u>expansion</u> of the scope.  In this way, Commerce, without explanation, departed from its well-established practice of not altering the scope following the preliminary determination, and thus behaved in an arbitrary and capricious manner.

Finally, by acting in an arbitrary and capricious manner, Commerce deprived Koehler of the opportunity to meaningfully address any changes in Commerce's analysis of the record facts before it or its interpretation of key scope language.  Commerce's arbitrary and capricious conduct thus prejudiced Koehler within the underlying investigation.

### III.  CONCLUSION

For these reasons, the Court should rule that Commerce's Final Determination as to Blue4est paper reflects arbitrary and capricious agency conduct and that, accordingly, the Final Determination cannot stand.

Respectfully submitted,

/s/ Thomas J. Trendl
Thomas J. Trendl
Zhu (Judy) Wang
Zachary Simmons
*Counsel to Koehler Paper SE*
*And Koehler Oberkirch GmbH*

**Steptoe & Johnson LLP**
**1330 Connecticut Ave NW**
**Washington, DC 20036**

/s/ R. Will Planert
R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey
*Counsel to Matra Americas,*
*LLC and Matra Atlantic GmbH*

**Morris Manning & Martin LLP**
**1401 Eye Street NW Suite 600**
**Washington, DC 20005**

**CERTIFICATE OF COMPLIANCE WITH U.S. COURT OF INTERNATIONAL TRADE CHAMBER PROCEDURE 2(B)(1)**

Pursuant to 2(b)(1) of the U.S. Court of International Trade Chamber Procedures, the undersigned certifies that this brief complies with the word limitation requirement. The word count for this brief is 6,950 words, including headings, footnotes and quotations.

Respectfully submitted,

/s/ Thomas J. Trendl
Thomas J. Trendl
 Zhu (Judy) Wang
 Zachary Simmons
*Counsel to Koehler Paper SE*
*and Koehler Oberkirch GmbH*

**STEPTOE & JOHNSON LLP**
**1330 Connecticut Ave NW,**
**Washington, DC 20036**

*/s/ R. Will Planert*
R. Will Planert
Donald B. Cameron
Julie C. Mendoza
Brady W. Mills
Mary S. Hodgins
Eugene Degnan
Edward J. Thomas III
Jordan L. Fleischer
Nicholas C. Duffey
*Counsel to Matra Americas, LLC*
*and Matra Atlantic GmbH*

**MORRIS MANNING & MARTIN LLP**
**1401 Eye Street, NW, Suite 600**
**Washington, D.C. 20005**