UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| MATRA AMERICAS, LLC and, MATRA ATLANTIC GmbH <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES <br><br> Defendant. | Consol. Court No. 21-00632 |

---

**DEFENDANT-INTERVENORS' ANSWERS TO QUESTIONS**

---

Stephen J. Orava
Daniel L. Schneiderman

KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C.  20006
(202) 737-0500

*Counsel for Domtar Corporation
and Appvion, LLC*

October 26, 2023

## DEFENDANT-INTERVENORS' ANSWERS TO QUESTIONS

Defendant-intervenors Domtar Corporation and Appvion, LLC hereby respond to the Court's October 16, 2023 "Questions for Oral Argument."

III.  **Questions to Defendant-Intervenors Domtar Corporation and Appvion, LLC ("Defendant-Intervenors")**

1. To what statutory or regulatory provision(s) does Defendant-Intervenor's use of the term "partial adverse facts available," Def.-Inters.' Br. at 35, specifically refer?

**Answer:**

**The relevant provisions are at 19 U.S.C. § 1677e and 19 C.F.R. § 351.308.  The specific paragraph governing when "facts available" may be applied is at 19 U.S.C. § 1677e(a), and the paragraph addressing when "adverse inferences" may be applied is at 19 U.S.C. § 1677e(b).  Neither the statute nor the regulation addresses the concepts of "partial" facts available (employed to fill gaps in an otherwise usable response) or "total" facts available (employed when the response is unreliable or unusable in its entirety).  *See Mukand, Ltd. v. United States*, 37 C.I.T. 443, 452 (2013).  There is, however, extensive caselaw regarding the circumstances under which Commerce may apply total, rather than partial, facts available.  *Id.***

**In this instance, we are seeking only partial, rather than total, facts**

available.  **Partial facts available can be applied with or without an adverse inference.  For the reasons set forth in our briefs, an adverse inference pursuant to 19 U.S.C. § 1677e(b) is appropriate here.**

    2. Could Commerce have determined Koehler's static sensitivity submissions to be incomplete and declined nevertheless to apply an adverse inference against Koehler? Or would such an action be beyond Commerce's discretion?

        a. If this court finds that Commerce failed to address your argument that Koehler's static sensitivity submissions were incomplete, could Commerce reconsider and reverse its decision on the issue of completeness but continue to decline to apply an adverse inference on remand?

**<u>Answer</u>:**

      **Commerce must follow two steps in the "facts available" analysis.  The first step involves determining whether there exists a gap in the record under 19 U.S.C. § 1677e(a).  If there is such a gap, the second step involves determining whether to fill that gap with neutral facts available or with an adverse inference under 19 U.S.C. § 1677e(b).  In this case, Commerce never reached the second step, because it erroneously found there to be no gap in the record.  *See* IDM at 16 (P.R. 291).  If the Court agrees with us that Commerce should reverse its decision and find that Koehler's static sensitivity reporting was incomplete because certain products were not tested at sufficiently high temperatures, that finding would resolve only the first step of the analysis.  On**

remand, Commerce would have to consider whether Koehler failed to cooperate by not acting to the best of its ability to report this characteristic for the products at issue.

If Commerce finds such non-cooperation, which we believe it should, Commerce would have the discretion to apply an adverse inference. *See* 19 U.S.C. § 1677e(b)(1). Although Commerce would not necessarily be required to draw an adverse inference, Commerce must exercise its discretion reasonably, and its explanation must be supported by substantial evidence. *See Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1376-1378 (CIT 2023) (remanding Commerce's decision not to apply an adverse inference). If, on the other hand, Commerce finds that Koehler acted to the best of its ability to provide all requested information, Commerce would lack the discretion under the statute to apply an adverse inference. In any case, Commerce's findings regarding Koehler's cooperation (or lack thereof) would have to be supported by substantial evidence.

      b. If this court finds that Commerce failed to address your argument that Koehler's static sensitivity submissions were incomplete, may Commerce on remand provide Koehler "with an opportunity to remedy or explain the deficiency" pursuant to § 1677m(d)?

**Answer:**

**Throughout the investigation, Commerce provided Koehler with**

multiple opportunities to remedy or explain deficiencies in its static sensitivity reporting.  *See* Koehler's First Supplemental Response at 1-11 (C.R. 195) and Koehler's Second Supplemental Response at 1-21 (C.R. 256).  In each subsequent submission, however, more reporting errors came to light.  For the three grades now at issue, Koehler's failure to test them at sufficiently high temperatures became apparent in the second supplemental response, which was submitted shortly before the preliminary determination.

Commerce, by providing two opportunities for Koehler to correct its static sensitivity reporting, already has satisfied the requirements of 19 U.S.C. § 1677m(d).  Nothing in the statute required Commerce to give Koehler yet another opportunity to provide a complete and accurate response.  Moreover, Commerce must provide an opportunity to "remedy or explain" only "to the extent practicable … in light of the time limits established for the completion of investigations."  As explained in our reply brief, this specific problem in Koehler's second supplemental response was only discovered very late in the investigation, and it was not practicable at that point for Koehler to conduct new testing and reconstruct its CONNUM reporting.

Because Commerce was not bound by 19 U.S.C. § 1677m(d) to provide further opportunities for Koehler to "remedy or explain" during the underlying proceeding, there is no requirement that it do so now on remand.

Although Commerce would not necessarily be legally precluded from doing so if it wishes, reopening the record on remand to provide yet another opportunity for Koehler to correct its reporting would undermine effective enforcement of U.S. law.  It would signal to future respondents that they may repeatedly submit incorrect responses (and perhaps even attempt to manipulate their dumping margin) without negative consequences should the errors eventually be discovered, because Commerce would simply continue to offer opportunities to correct the data, including upon remand.

3. Defendant-Intervenors argue that Commerce should have relied on Koehler's earlier product specification sheets because Koehler's dynamic sensitivity test results "lacked credibility." Def.-Inters.' Mot. for J. on the Agency R. at 27, Sept. 15, 2022, ECF No. 44 ("Def.-Inters.' Br."). What is the difference between assessing the credibility of record evidence and weighing (or, as the case may be, reweighing) that evidence? See Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1376 (Fed. Cir. 2015).

**Answer:**

The probative value of each piece of evidence can be assessed in terms of its credibility, relevance, reliability, persuasiveness, and other factors.  All of the evidence can then be weighed to determine whether, on balance, a particular finding is warranted.  Thus, credibility assessments are simply part of the process of weighing the evidence.  Commerce, in its role as factfinder, is charged with making credibility determinations and weighing the evidence.

We are not asking this Court to usurp that role.  Commerce, however, is not free to disregard evidence detracting from its conclusions.  *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) (Commerce "must take into account whatever in the record fairly detracts from" the weight of the evidence).  And when a party makes arguments specifically regarding how certain evidence should be weighed, Commerce does not necessarily have to agree, but it is obliged at the very least to explain its reasoning.  *See Suzano S.A. v. United States*, 589 F. Supp. 3d 1225, 1233 (CIT 2022).

In this case, Commerce stated that it relied on Koehler's test results rather than its product specification sheets.  IDM at 14 (P.R. 291).  There is no indication, however, as to how Commerce weighed the evidence.  Petitioners had argued in their agency briefing that the specification sheets were more reliable and credible because they predated the litigation, whereas the testing was performed for purposes of the litigation.  (P.R. 271).  Perhaps there were countervailing reasons why, on balance, Commerce preferred the testing results.  But it is also possible that Commerce simply ran short on time and neglected to weigh the relative merits of the specification sheets against the testing results.  There is no way to tell from this record, because Commerce did not explain its reasoning.

We are not asking the Court to instruct Commerce how to assess the credibility of any piece of evidence or how to weigh the totality of the evidence.  Rather, we are asking for a remand for Commerce to explain its reasoning and ensure that it did not overlook evidence detracting from its conclusion.

4. Defendant-Intervenors quote the preamble to Commerce's 2016 Final Modification to 19 C.F.R. § 351.401(c) as follows: "However, Commerce 'generally will not consider a price adjustment that reduces or eliminates dumping margins unless the party claiming such price adjustment demonstrates that the terms and conditions of the adjustment were established and known to the customer at the time of sale.'" Def.-Inters.' Br. at 13 (quoting Modification of Regulations Regarding Price Adjustments in Antidumping Duty Proceedings, 81 Fed. Reg. 15641, 15642 (Dep't Com. Mar. 24, 2016) ("Final Modification"). Without considering subsequent agency practice, do you consider this quote to reflect Commerce's actual position at the time of the Final Modification's promulgation?

**Answer:**

Yes, that quotation reflects Commerce's position and practice since at least 1997.  As explained in the "background" section of the *Final Modification*, that position can be traced back to a discussion in the *Preamble* to the 1997 regulations, and it represented agency practice ever since the 1997 rules were promulgated.  *See Final Modification* at 15642 ("since enacting these regulations, the Department has consistently applied its practice of not granting price adjustments where the terms and conditions were not

established and known to the customer at the time of sale").

There is no indication in the *Final Modification* that Commerce ever intended to alter that practice.  So why did Commerce modify the regulations in 2016?  Ironically enough, it was because of litigation involving Koehler under the prior thermal paper order.  In *Papierfabrik August Koehler AG v. United States*, 971 F. Supp. 2d 1246 (Ct. Int'l Trade 2014) ("*Koehler AG*"), the Court acknowledged Commerce's then-established practice, but it found the practice inconsistent with the plain language of the 1997 regulations, which the Court interpreted as requiring the acceptance of all such price adjustments.  *See Koehler AG,* 971 F. Supp. 2d at 1255.  In order to reinstate its preexisting practice, therefore, Commerce was forced to make its regulations more flexible.  *See Final Modification* at 15642.  And as explained at length in our case and reply briefs, Commerce's established practice in every other case since 2016 has been to disregard rebates the terms of which the customer was unaware at the time of sale.

This does not necessarily mean, of course, that Commerce's established practice is required by the plain language of the current 19 C.F.R. § 351.401(c).  There is sufficient flexibility in the regulatory language for Commerce to change its practice and allow post-sale price adjustments.  But the agency cannot arbitrarily depart from established practice in a particular

case without explaining why such a departure is warranted (or even acknowledging the existence of the practice), as was done here.

5. What is the practical significance of Commerce's decision to classify Koehler's interest expenses as a cost of production rather than as an indirect selling expense?

**Answer:**

At first blush, it may seem inconsequential as to whether this item is added to the normal value side of the equation (as a cost component) or deducted from the export price side of the equation (as an indirect selling expense). But, in fact, there are significant practical differences. First, cost adjustments, unlike price adjustments, do not directly affect the price-to-price dumping margin calculations. Rather, they affect the margin calculations only indirectly, by causing certain home market transactions to drop out of the comparisons when they fall below cost. In many instances, even large cost adjustments can have virtually no impact on the dumping margin.

Second, treating the adjustment here as part of the financial expense component of cost means that it gets allocated across Koehler's production of all products sold in all markets. That is because the denominator of the financial expense ratio is comprised of the respondent's total cost of goods sold at the highest level of consolidation. Although some portion of the

expense gets attributed to the subject merchandise, it is diluted.  If the same amount were treated as a price deduction, by contrast, it would be allocated solely to U.S. sales of the subject merchandise, which would have greater impact on the dumping calculations.

6.  What authorities best support your overall argument?

**Answer:**

With respect to the Cohen's *d* issue, the authorities best supporting our argument are *Stupp Corporation v. United States*, 619 F. Supp. 3d 1314 (CIT 2023) ("*Stupp IV*") and *Marmen Inc. v. United States*, 627 F. Supp. 3d 1312 (CIT 2023) ("*Marmen II*").  Both cases uphold Commerce's practice as applied in the underlying investigation.  Neither *Stupp IV* nor *Marmen II* had been published at the time we filed our response brief.

7.  Are there any recent or pending Federal Circuit or CIT cases that may affect the court's analysis?

**Answer:**

As the Court already mentioned in questions to Koehler and the government, *Stupp IV* has been appealed to the Federal Circuit in case number 2023-1663.  In addition, *Marmen II*, which involves the same Cohen's *d* issues, also has been appealed to the Federal Circuit in case number 2023-1877.

Respectfully submitted,

*/s/ Daniel L. Schneiderman*
Stephen J. Orava
Daniel L. Schneiderman

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 737-0500

*Counsel For Domtar Corporation and Appvion, LLC*

October 26, 2023

## CERTIFICATE OF COMPLIANCE
## WITH WORD COUNT LIMITATIONS

The undersigned certifies that this submission complies with the word count limitations set forth in the Court's letter dated October 16, 2023.  This submission includes 2,167 words.  In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.

/s/ Daniel L. Schneiderman
Daniel L. Schneiderman

KING & SPALDING LLP
1700 Pennsylvania Avenue, NW,
Washington, DC 20006
(202) 737-0500

*Counsel For Domtar Corporation and
Appvion, LLC*

October 26, 2023