Slip Op. 24-14

## UNITED STATES COURT OF INTERNATIONAL TRADE

MATRA AMERICAS, LLC and MATRA
ATLANTIC GmbH,

        Plaintiffs,

  and

KOEHLER PAPER SE and KOEHLER
OBERKIRCH GmbH,

        Plaintiff-Intervenors,

  v.

UNITED STATES,

        Defendant,

  and

APPVION, LLC and DOMTAR
CORPORATION,

        Defendant-Intervenors.

Before: Gary S. Katzmann, Judge
Consol. Court No. 21-00632

*PUBLIC VERSION*

## OPINION AND ORDER

[The Final Determination is sustained in part and remanded in part.  The filing of Commerce's remand redetermination will await the resolution of appellate proceedings in Stupp Corp. v. United States, No. 23-1663 (Fed. Cir. docketed Mar. 27, 2023).]

Dated: February 8, 2024

R. Will Planert, Morris, Manning & Martin, LLP, of Washington, D.C., argued for Plaintiffs Matra Americas, LLC and Matra Atlantic GmbH.  With him on the briefs were Donald B. Cameron, Julie C. Mendoza, Brady W. Mills, Mary S. Hodgins, Eugene Degnan, Edward J. Thomas III, Jordan L. Fleischer, and Nicholas C. Duffey.

Thomas J. Trendl, Zhu (Judy) Wang, and Zachary Simmons, Steptoe & Johnson LLP, of Washington, D.C., argued for Plaintiff Intervenors Koehler Paper SE and Koehler Oberkirch GmbH.

**PUBLIC VERSION**

Emma E. Bond, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was W. Mitch Purdy, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Daniel L. Schneiderman, King & Spalding LLP, of Washington, D.C., argued for Defendant-Intervenor, Domtar Corporation and Appvion, LLC. With him on the brief was Stephen J. Orava.

Katzmann, Judge: Before the court are seven consolidated challenges to the methodology

and reasoning underlying the United States Department of Commerce's ("Commerce") assessment

of antidumping duties on imports of thermal paper.

Plaintiffs Koehler Paper SE and Koehler Oberkirch GmbH (collectively, "Koehler") are

German producers of thermal paper. Together with affiliates Matra Americas, LLC and Matra

Atlantic GmbH (collectively, "Matra"),[1] Koehler brings three challenges to Commerce's final

determination of Koehler's dumping rates. See Thermal Paper from Germany: Final Affirmative

Determination of Sales at Less than Fair Value and Final Affirmative Determination of Critical

Circumstances, in Part, 86 Fed. Reg. 54152 (Dep't Com. Sept. 30, 2021), P.R. 299 ("Final

Determination") and accompanying memorandum, Mem. from J. Maeder to C. Marsh, re: Issues

and Decision Memorandum for the Final Affirmative Determination of Sales at Less than Fair

Value in the Antidumping Duty Investigation of Thermal Paper from Germany (Dep't Com. Sept.

24, 2021), P.R. 291 ("IDM"). Koehler challenges Commerce's application of the "Cohen's *d*"

methodology as a measure of variation among U.S. market prices, Commerce's refusal to consider

certain exhibits to the case brief Koehler submitted at the agency level, and Commerce's inclusion

---

[1] For ease of reference, the court in this opinion refers to Koehler and Matra collectively as "Koehler" (except where clarity demands precise specification).

Consol. Court No. 21-00632                                                                    Page 3
**PUBLIC VERSION**

of Koehler's "Blue4est" paper product within the scope of its investigation.  See Pls.' Mot. for J.

on the Agency R. at 2–6, Sept. 15, 2022, ECF No. 46 ("Koehler's Br.").

 Defendant-Intervenors Appvion Operations, Inc. and Domtar Corporation (collectively,

"Domestics") are U.S. entities that also produce thermal paper.  They bring four challenges of their

own to the Final Determination.  Domestics challenge Commerce's consideration of certain test

results for the "dynamic sensitivity" product characteristic that Koehler submitted pursuant to the

underlying investigation, Commerce's determination that Koehler's submission of certain test

results for the "static sensitivity" product characteristic was complete, Commerce's application of

price adjustments for some of Koehler's home market rebates, and Commerce's classification of

Koehler's interest expenses on previously-incurred antidumping liabilities as a cost of production.

See Def.-Inters.' Mot. for J. on the Agency R. at 3, Sept. 15, 2022, ECF No. 44 ("Domestics' Br.").

 The United States ("the Government") opposes all seven challenges.  Def.'s Mem. in

Opposition to Mots. for J. on the Agency R. at 3, Feb. 21, 2023, ECF No. 58 ("Gov't Br.").

 The court sustains the Final Determination in part with respect to Commerce's inclusion

of Blue4est paper as subject merchandise, to Commerce's coding of the dynamic sensitivity

product characteristic, and to Commerce's application of price adjustments for some of Koehler's

home market rebates.  The court denies Koehler's challenge to Commerce's rejection of exhibits

to Koehler's case brief on the ground of harmless error.  The court remands Commerce's Final

Determination in part for reconsideration or further explanation of Commerce's Cohen's $d$

methodology, of Commerce's coding of the static sensitivity product characteristic, and of

Commerce's classification of Koehler's accrued interest expenses as a cost of production.

## BACKGROUND

### I.     *Legal Background*

"Dumping occurs when a foreign company sells a product in the United States at a lower price than what it sells that same product for in its home market." Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1046 (Fed. Cir. 2012). Such sales, which permit foreign producers to undercut domestic companies by selling products below reasonable fair market value, amount to unfair competition with American industry. Id. To remedy this issue Congress enacted the Tariff Act of 1930, which empowers Commerce to investigate potential dumping and to issue orders imposing duties on imported merchandise as necessary. Id. at 1047.

Commerce imposes antidumping duties on imported goods if it determines that the goods are being, or are likely to be, sold at less than fair value, and the International Trade Commission ("ITC") concludes that the sale of the merchandise below fair value materially injures, threatens to materially injure, or impedes the establishment of an industry in the United States. See 19 U.S.C. § 1673; Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017). Merchandise is sold at less than fair value when its normal value is greater than the price charged for the product in the United States. See 19 U.S.C. § 1673. The amount of antidumping duties that Commerce assesses is based on Commerce's calculation of the "dumping margin," which is "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. § 1677(35)(A). Commerce must determine the "margins as accurately as possible." Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

This determination is a complex, multi-step endeavor.  The following legal background is relevant to the challenges raised in this case:

### A.      Commerce's Cohen's d Methodology

Commerce ordinarily determines normal value on the basis of market prices in the exporting country.  19 U.S.C. §§ 1677b(a)(1)(B)(i).  Once normal value is determined, Commerce calculates a weighted-average dumping margin.  In general, the agency "compar[es] . . . the weighted average of the normal values with the weighted average of the export prices (and constructed export prices) for comparable merchandise," termed the average-to-average ("A-to-A") method, "unless the Secretary determines another method is appropriate in a particular case."  19 C.F.R. § 351.414(b)(1), (c)(1); see also 19 U.S.C. § 1677f-1(d)(1)(A)(i).

"The [A-to-A] method, however, sometimes fails to detect 'targeted' or 'masked' dumping, because a respondent's sales of low-priced 'dumped' merchandise would be averaged with (and offset by) sales of higher-priced 'masking' merchandise, giving the impression that no dumping was taking place."  Stupp Corp. v. United States ("Stupp III"), 5 F.4th 1341, 1345 (Fed. Cir. 2021) (internal quotation marks and citation omitted); see also Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26720, 26721 (Dep't Com. May 9, 2014) ("Differential Pricing Analysis").  Commerce is therefore authorized to use two alternative methods to address the kind of targeted dumping that the A-to-A method may fail to detect.  Stupp III, 5 F.4th at 1345.  Relevant here,[2] Commerce may use the average-to-transaction ("A-to-T") method, which "involves a

---

[2] Commerce may also compare the normal values of individual transactions to the export prices of individual transactions, a method known as the transaction-to-transaction ("T-to-T") method.  19 U.S.C. § 1677f-1(d)(1)(A)(ii).  The T-to-T method is employed only in "unusual" situations not applicable to this case, such as "when there are very few sales of subject merchandise and the

comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise." Id. § 351.414(b)(3).  The A-to-T method is appropriate only if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and if Commerce "explains why such differences cannot be taken into account" using alternative methods.  19 U.S.C. § 1677f-1(d)(1)(B).

To determine whether to "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," such as would warrant using the A-to-T method instead of the A-to-A method, Commerce conducts a series of statistical tests that together constitute a "differential pricing analysis."  Apex Frozen Foods Priv. Ltd. v. United States, 862 F.3d 1337, 1342 & n.2 (Fed. Cir. 2017); see also Stupp III, 5 F.4th at 1346–47.  Commerce's differential pricing analysis consists of three steps:

**1. The Cohen's *d* Test.**  Commerce first segments export sales into subsets based on region, purchasers, and time periods.  See Differential Pricing Analysis, 79 Fed. Reg. at 26722.  Commerce then applies the Cohen's *d* test,[3] which measures the extent of the difference in the means between a test group and comparison group of prices ("effect size"), to each subset.  Id.  Commerce designates the subset as the "test group" and aggregates the remaining export sales into what it terms the "comparison group."  Stupp III, 5 F.4th at 1346.  Commerce calculates Cohen's

---

merchandise sold in each market is identical or very similar or is custom-made."  19 C.F.R. § 351.414(c)(2).

[3] The "Cohen's *d* test" is Commerce's version of a general-purpose effect size metric devised in 1980 by statistician Jacob Cohen.

*d* for each test group by dividing the absolute value of the difference between the mean of the

comparison group and the mean of the test group by the two groups' average standard deviation.

See id.; Mid Continent Steel & Wire, Inc. v. United States, 940 F.3d 662, 673–74 (Fed. Cir. 2019).

If the difference in average prices between the test group and the comparison group is large

compared to the average standard deviation, this indicates that the sales prices in the test group

differ significantly from the prices in the comparison group—thereby satisfying the condition

imposed by 19 U.S.C. § 1677f-1(d)(1)(B).  See Mid Continent, 940 F.3d at 673.

If the Cohen's *d* value is equal to or greater than the benchmark of 0.8 for any test group,

Commerce deems the sales prices in the test group to have "passed" the test.  Id. at 671; Stupp III,

5 F.4th at 1347.  As Commerce has explained, this benchmark "provides the strongest indication

that there is a significant difference between the means of the test and comparison groups."

Differential Pricing Analysis, 79 Fed. Reg. at 26722; see also Stupp III, 5 F.4th at 1347.  If the

Cohen's *d* coefficient for a group is 0.8 or greater, the sales in the group "pass" the Cohen's *d* test

and are subjected to the subsequent "ratio" and "meaningful difference" tests.  See Differential

Pricing Analysis, 79 Fed. Reg. at 26722.

**2. The Ratio Test.**  Commerce next applies the "ratio test" to the aggregated results of the

Cohen's *d* test on each subset to assess the extent of the significant price differences for all sales.

See id. at 26722.  If less than thirty-three percent of the value of total sales passes the Cohen's *d*

test, Commerce will use the A-to-A method to calculate the weighted-average dumping margin.

See id. at 26723.  If more than thirty-three percent but less than sixty-six percent of the value of

total sales passes the Cohen's *d* test, Commerce may apply a hybrid method wherein it applies the

A-to-A method to sales which do not pass the Cohen's *d* test, and the A-to-T method to sales which

do pass the Cohen's *d* test.  See id.  And if more than sixty-six percent of the value of total sales

passes the Cohen's *d* test, Commerce tentatively applies the A-to-T method to all sales because

the data suggests an "identified pattern of export prices that differ significantly."  See id. at 26722–

23.

**3.  The Meaningful Difference Test.**    Finally, Commerce applies a "meaningful

difference" test, which compares the antidumping margins resulting from different methodologies,

to examine whether using only the A-to-A method can appropriately account for price differences.

See 19 U.S.C. § 1677f-1(d)(1)(B)(ii); Stupp III, 5 F.4th at 1347; Differential Pricing Analysis, 79

Fed. Reg. at 26723.  Commerce compares the dumping margin that results from applying only the

A-to-A method with the dumping margin that results from applying the alternative method that is

tentatively selected based on the Cohen's *d* and ratio tests.  See Differential Pricing Analysis, 79

Fed. Reg. at 26723.   A difference in the weighted average dumping margins is considered

meaningful if (1) there is a twenty-five-percent relative change and both rates are above the de

minimis threshold of two percent, or (2) the A-to-A weighted average dumping margin is below

the de minimis threshold and the alternative margin is above that threshold.  See id.  Commerce

uses the alternative approach to calculate antidumping margin if it concludes there is a meaningful

difference; absent a meaningful difference, Commerce will apply the A-to-A method.  See id.

**B.     *Commerce's Development of the Record with Parties' Case Brief
Submissions***

At certain times during an antidumping proceeding, interested parties may submit factual

information for Commerce's consideration.   Commerce has delineated time limits for these

submissions.  See 19 C.F.R. § 351.301.  Relevant here is § 351.301(c)(5), which provides that

"[t]he deadline for filing such [factual] information will be 30 days before the scheduled date of

the preliminary determination in an investigation, or 14 days before verification, whichever is

earlier." Id.[4]   In making any antidumping determination, Commerce "will not use factual

information, written argument, or other material that the Secretary rejects." Id. § 351.104(a)(2)(i).

The court reviews Commerce's rejection of an interested party's case brief for abuse of

discretion. Stupp III, 5 F.4th at 1349.  As in other contexts, this standard of review presents a high

bar: "Commerce is entitled to broad discretion regarding the manner in which it develops the

record in an antidumping investigation." Id. (citing PSC VSMPO-Avisma Corp. v. United States,

688 F.3d 751, 760 (Fed. Cir. 2012)); see also Grobest & I-Mei Indus. (Viet.) Co. v. United States,

36 CIT 98, 122, 815 F. Supp. 2d 1342, 1365 (2012) ("The law applicable to this issue recognizes

---

[4] Commerce's regulations elsewhere define "Factual information" as comprising the following items:

(i) Evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

(ii) Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

(iii) Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;

(iv) Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by the Department; and

(v) Evidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)–(iv) of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence.

Id. § 351.102(b)(21)(i)–(v).

that Commerce has discretion both to set deadlines and to enforce those deadlines by rejecting untimely filings.").  In most circumstances, therefore, courts "will not second-guess Commerce's application of the procedural requirements governing the submission of factual information in case briefs."  Stupp III, 5 F.4th at 1350.

###  C.        *Commerce's Inclusion of Products Within the Scope of an Investigation*

Commerce is responsible for delineating the scope of its antidumping investigation to determine which products are subject to investigation—and, as the case may be, to the assessment of antidumping duties.  These products are collectively termed "subject merchandise."  19 U.S.C. § 1677(25).

When, as occurred here, Commerce initiates an antidumping investigation upon the petition of an interested party, "Commerce owes deference to the petitioner's intended scope" of the investigation.  M S Int'l, Inc. v. United States, 32 F.4th 1145, 1151 (Fed. Cir. 2022); see also 19 U.S.C. § 1673a(b) (laying out procedures for initiating an antidumping investigation by petition). Nevertheless, "when defin[ing] or clarify[ing] the scope of an antidumping investigation while staying within the bounds of the intent of the petition, Commerce retains broad discretion." M S Int'l, 32 F.4th at 1151 (internal citation and quotation marks omitted).  Further, "Commerce . . . may depart from the scope as proposed by a petition if it determines that petition to be overly broad, or insufficiently specific to allow proper investigation, or in any other way defective."  Id. (internal citation and quotation marks omitted).

When Commerce modifies or interprets the scope of an investigation "before any final determination or order issue[s], . . . Commerce enjoy[s] greater discretion."  Id. at 1152; see also Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1096–97 (Fed. Cir. 2002) ("The critical

question is not whether the petition covered the merchandise or whether it was at some point within the scope of the investigation.").

The purpose of the petition is to propose an investigation. <u>Duferco</u>, 296 F.3d at 1096 (citing 19 U.S.C. §§ 1671a(b)(1), 1673a(b)(1) (2000)).  "A purpose of the investigation is to determine what merchandise should be included in the final order," and thus it is "Commerce's final determination" that "reflects the decision . . . as to which merchandise is within the final scope of the investigation and is subject to the order."  <u>Id.</u>  Thus, while "[t]he petition initially determines the scope of the investigation, . . . Commerce has inherent power to establish the parameters of the investigation, so that it would not be tied to an initial scope definition that may not make sense in light of the information available to Commerce or subsequently obtained in the investigation." <u>M S Int'l</u>, 32 F.4th at 1151 (quoting <u>Duferco</u>, 296 F.3d at 1089).

Even after Commerce issues the final order, Commerce may determine whether a particular product constitutes subject merchandise by issuing a Scope Ruling.  19 C.F.R. § 351.225(a).  In issuing this ruling Commerce will, as a starting point, "consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive." <u>Id.</u> § 351.225(k)(1).

### D.   *Commerce's Assignment of Control Numbers on the Basis of Product Characteristics*

Before calculating dumping margins for subject merchandise, Commerce matches the U.S.-market products that are used to calculate export price with similar home-country market products ("foreign like product[s]") that are used to calculate normal value.  19 U.S.C §§ 1677(16), 1677b(a).  Commerce matches products by assigning them "control numbers" ("CONNUMs"),

which are strings of digits that denote a product's characteristics in descending order of importance.  "In other words, the CONNUM is a number designed to reflect the 'hierarchy of certain characteristics used to sort subject merchandise into groups' and allow Commerce to match identical and similar products across markets."  Manchester Tank & Equip. Co. v. United States, 44 CIT __, __ n.3, 483 F. Supp. 3d 1309, 1312 n.3 (2020) (quoting Bohler Bleche GmbH & Co. KG v. United States, 42 CIT __, __, 324 F. Supp. 3d 1344, 1347 (2018)).  Under this system, Commerce will assign the same CONNUM to products that are materially identical.  SeAH Steel Corp. v. United States, 34 CIT 605, 613 n.12, 704 F. Supp. 2d 1353, 1359 n.12 (2010) (citing Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1375–76 (Fed. Cir. 2001)).

In this investigation, as is typical, see, e.g., GODACO Seafood Joint Stock Co. v. United States, 44 CIT __, __, 435 F. Supp. 3d 1342, 1352 (2020), Commerce assigned CONNUMs based on information it solicited from respondents.  See IDM at 14.  Respondents to an investigation bear the burden of submitting this information.  See NTN Bearing Corp. of Am. v. United States, 997 F.2d 1453, 1458 (Fed. Cir. 1993).  When Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce]," the agency "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  19 U.S.C. § 1677e(b)(1).[5]  As Congress's

---

[5] The practice of making such an inference is often referred to as applying "adverse facts available" or its acronym "AFA."  Despite its common usage, including by Domestics in this case, this phrase is not in the text of any particular statutory or regulatory provision.  See Hyundai Elec. & Energy Sys. Co. v. United States, 47 CIT __, __ & n.2, 617 F. Supp. 3d 1253, 1255 & n.2 (2023); see also Risen Energy Co. v. United States, 44 CIT __, __ & n.4, 477 F. Supp. 3d 1332, 1337 & n.4 (2020).  19 U.S.C. § 1677e(a) provides for the agency's use of "the facts otherwise available" on the record.  And § 1677e(b) permits Commerce to "use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."  Neither provision contains the complete

use of the word "may" connotes, this is a discretionary power.  Tianjin Magnesium Int'l Co. v.
United States, 36 CIT 683, 687–88, 844 F. Supp. 2d 1342, 1346 (2012) ("It is well-established that
Commerce enjoys broad discretion when considering whether to apply adverse facts available in
antidumping proceedings."); see also PAM, S.p.A. v. United States, 582 F.3d 1336, 1340 (Fed.
Cir. 2009).  Where Commerce applies an adverse inference, it must first determine (and make a
showing on the record) that a respondent has complied to the "best of its ability" by "examin[ing]
[the] respondent's actions and assess[ing] the extent of [the] respondent's abilities, efforts, and
cooperation in responding to Commerce's requests for information."  Nippon Steel Corp. v. United
States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

Conversely, when Commerce declines to make an adverse inference, 19 U.S.C. § 1677e(b)
imposes no express mandate for Commerce to demonstrate a respondent's compliance with
requests for information.  Tianjin Magnesium, 36 CIT at 688; see also Assan Alumniyum Sanayi
ve Ticaret A.S. v. United States, 47 CIT __, __, 624 F. Supp. 3d 1343, 1377 (2023) (observing that
"Commerce could have declined to apply adverse facts available even if it had affirmatively found
that [the respondent] failed to act to the best of its ability").  When Commerce declines to make an
adverse inference, Commerce's burden is instead merely to show that this action is not
"unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19
U.S.C. § 1516a(b)(1)(B)(i).

---

phrase "adverse facts available."  The court nevertheless construes Domestics' use of the phrase
"adverse facts available" to refer to § 1677e(b), because the relief Domestics seek (as reflected in
their pre-consolidation complaint) is Commerce's application of an adverse inference.  See
Domestics' Compl. ¶ 18, Appvion, LLC. v. United States, No. 21-634 (CIT filed Jan. 12, 2022),
ECF No. 12 ("Domestics' Compl."); see also infra p. 24 (recounting procedural background).

Commerce's conduct with respect to deficient submissions by parties is subject to 19

U.S.C. § 1677m(d), which provides in relevant part as follows:

> If the administering authority or the Commission determines that a response to a
> request for information under this subtitle does not comply with the request, the
> administering authority or the Commission (as the case may be) shall promptly
> inform the person submitting the response of the nature of the deficiency and shall,
> to the extent practicable, provide that person with an opportunity to remedy or
> explain the deficiency in light of the time limits established for the completion of
> investigations or reviews under this subtitle.

Id.

This provision impliedly leaves to Commerce's discretion the initial question of whether a

party's response to a request for information is deficient.  See Hyundai Steel Co. v. United States,

45 CIT __, __, 518 F. Supp. 3d 1309, 1322 (2021) (stating that § 1677m's provisions apply "if

Commerce finds a deficiency in a response to its request for information"); see also ABB Inc. v.

United States, 42 CIT __, __, 355 F. Supp. 3d 1206, 1223 (2018) ("Inherent in the requirement of

§ 1677m(d) is a finding that Commerce was or should have been aware of the deficiency in the

questionnaire response.").  Instead, as with Commerce's discretion under 19 U.S.C. § 1677e(b) to

decline to apply an adverse inference, Commerce's burden is only to avoid acting in a manner that

is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."

19 U.S.C. § 1516a(b)(1)(B)(i).

> ### E.   *Commerce's Authority to Grant Price Adjustments for Home Market Sales*

The Tariff Act of 1930 provides for the application of certain adjustments to Commerce's

calculation of subject merchandise's Export Price and Constructed Export Price.  19 U.S.C.

§ 1677a(c), (d).  Commerce's regulations implementing this statute provide the following

regarding the use of these price adjustments:

> In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable). The Secretary will not accept a price adjustment that is made after the time of sale unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such an adjustment.

19 C.F.R. § 351.401(c) (2021). The term "price adjustment" is defined elsewhere in Commerce's

regulations as follows:

> "Price adjustment" means a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale (see § 351.401(c)), that is reflected in the purchaser's net outlay.

19 C.F.R. § 351.102(b) (2021) (emphasis added).

As Commerce explained in the regulatory preamble to a recent Final Rule modifying these

regulations, Commerce considered but ultimately declined to promulgate language in its Proposed

Rule that stated: "the Department generally will not consider a price adjustment that reduces or

eliminates dumping margins unless the party claiming such price adjustment demonstrates that the

terms and conditions of the adjustment were established and known to the customer at the time of

sale." Modification of Regulations Regarding Price Adjustments in Antidumping Duty

Proceedings, 81 Fed. Reg. 15641 (Dep't Com. Mar. 24, 2016) ("Final Modification"). In the same

preamble, Commerce acknowledged that:

> Since enacting these regulations, [Commerce] has consistently applied its practice of not granting price adjustments where the terms and conditions were not established and known to the customer at the time of sale (sometimes referred to as determining the "legitimacy" of a price adjustment) because of the potential for manipulation of the dumping margins through so-called "after-the-fact", or post-sale, adjustments.

Consol. Court No. 21-00632                                                    Page 16
**PUBLIC VERSION**

Id. at 15642.  Commerce nevertheless declined to codify this practice through a modification to its

regulations.  The agency explained its reasoning as follows:

> With respect to 19 CFR [§] 351.401(c), in light of concerns that the modifications
> in the Proposed Rule may have the unintended consequence of being overly
> restrictive and limiting the Department's discretion to accept certain post-sale
> price adjustments which it has previously accepted, the Department is modifying 19 CFR
> [§] 351.401(c) to clarify that the Department generally will not accept a price
> adjustment that is made after the time of sale unless the interested party
> demonstrates, to the satisfaction of the Department, its entitlement to such an
> adjustment.

Id. at 15644.  Instead, Commerce modified 19 C.F.R. § 351.401(c) to include the more modest

provision that "[t]he Secretary will not accept a price adjustment that is made after the time of sale

unless the interested party demonstrates, to the satisfaction of the Secretary, its entitlement to such

an adjustment."  In its preamble to the Final Modification, Commerce explained the meaning of

"entitlement to such an adjustment" as follows:

> In determining whether a party has demonstrated its entitlement to such an
> adjustment, the Department may consider: (1) Whether the terms and conditions of
> the adjustment were established and/or known to the customer at the time of sale,
> and whether this can be demonstrated through documentation; (2) how common
> such post-sale price adjustments are for the company and/or industry; (3) the timing
> of the adjustment; (4) the number of such adjustments in the proceeding; and (5)
> any other factors tending to reflect on the legitimacy of the claimed adjustment.
> The Department may consider any one or a combination of these factors in making
> its determination, which will be made on a case-by-case basis and in light of the
> evidence and arguments on each record.

Final Modification, 81 Fed. Reg. at 15644–45.

### F. Commerce's Classification of Financial Interest Expenses and U.S. Selling Expenses

Commerce is instructed by statute to classify certain expenses as part of the "cost of production" for subject merchandise. 19 U.S.C. § 1677b(b)(3).[6] In determining Normal Value, Commerce may also disregard any home market sales made at less than this cost of production. 19 U.S.C. § 1677b(b)(1). Thus, when Commerce classifies an expense as a cost of production, the effect is to raise Normal Value—and thereby increase a respondent's calculated dumping margin—by increasing the likelihood that a lower-priced home market sale will be disregarded.

Commerce is also instructed by statute to classify certain expenses as selling expenses for the purpose of adjusting constructed export price. 19 U.S.C. § 1677a(d) provides as follows:

> For purposes of this section, the price used to establish constructed export price shall also be reduced by—
>
> > (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)—

---

[6] This provision defines "cost of production" as the sum of the following costs:

> (A) the cost of materials and of fabrication or other processing of any kind employed in producing the foreign like product, during a period which would ordinarily permit the production of that foreign like product in the ordinary course of business;
>
> (B) an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question; and
>
> (C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the foreign like product in condition packed ready for shipment.

Id.

Consol. Court No. 21-00632                                                    Page 18
**PUBLIC VERSION**

       (A) commissions for selling the subject merchandise in the United States;

       (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

       (C) any selling expenses that the seller pays on behalf of the purchaser; and

       (D) any selling expenses not deducted under subparagraph (A), (B), or (C) . . . .

<u>Id.</u>

       Meanwhile, 19 U.S.C. § 1677a(c)(2)(A) directs Commerce to reduce the price it uses to establish constructed export price by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."

       To carry out these statutory directives, Commerce's regulations provide that "the Secretary will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid." 19 C.F.R. § 351.402(b).

       Like cost-of-production classifications under § 1677b(b), selling-expense classifications under § 1677a have the general effect of increasing the calculated dumping margin for subject merchandise. Selling-expense classifications induce this effect by lowering Commerce's calculation of subject merchandise's export price, which in turn increases the difference between that export price and Normal Value.

Consol. Court No. 21-00632                                                                Page 19
*PUBLIC VERSION*

> ## II.        *Factual and Procedural Background*

Before the investigation underlying the determination under review here began, Koehler

was a respondent in a separate antidumping proceeding.   See Lightweight Thermal Paper from

the People's Republic of China and Germany: Continuation of the Antidumping and

Countervailing Duty Orders on the People's Republic of China, Revocation of the Antidumping

Duty Order on Germany, 80 Fed. Reg. 5083 (Dep't Com. Jan. 30, 2015).  At the conclusion of that

proceeding (and all related litigation, see Papierfabrik August Koehler SE v. United States, 843

F.3d 1373 (Fed. Cir. 2016), cert. denied, 138 S. Ct. 555 (2017)), Commerce assessed Koehler with

nearly $200 million in antidumping duties.  Pet. for Writ of Certiorari at 8, Papierfabrik August

Koehler SE v. United States, No. 17-171 (U.S. July 31, 2017).  Koehler did not timely pay these

duties, see IDM at 18, and Customs and Border Protection ("Customs") accordingly assessed

interest on Koehler's outstanding liability.  Some of this interest accrued during a period which

included the investigation at issue in this case.  Id. at 19.

On October 7, 2020, Domestics filed a petition with Commerce alleging that imports of

thermal paper from Germany, Japan, Korea, and Spain, were being, or were likely to be, sold in

the United States at less than fair value.  See Thermal Paper from Germany, Japan, the Republic

of Korea, and Spain: Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 69580, 69580

(Dep't Com. Nov. 3, 2020); see also Thermal Paper from Germany: Preliminary Affirmative

Determination, 86 Fed. Reg. 26001 (Dep't Com. May 12, 2021), P.R. 216 ("Preliminary

Determination") and accompanying memorandum, Mem. from J. Maeder to C. Marsh re: Decision

Mem. for the Prelim. Determ. in the Less-Than-Fair-Value Investigation of Thermal Paper from

Germany at 1 (Dep't Com. May 5, 2021), P.R. 205 ("PDM").  On October 27, 2020, Commerce

initiated an antidumping duty investigation into thermal paper from Germany.  PDM at 1.  On November 27, 2020, Commerce selected Koehler as a mandatory respondent for individual examination regarding the investigation of thermal paper from Germany.  PDM at 1; see also Mem. from D. Goldberger to J. Maeder, re: Less-Than-Fair-Value Investigation of Thermal Paper from Germany: Respondent Selection at 1 (Dep't Com. Nov. 27, 2020), P.R. 80.

In January 2021, Koehler and Matra submitted timely responses to Commerce's antidumping duty questionnaire on topics relating to general information, comparison market sales, U.S. sales, cost of production, and constructed value.  PDM at 2.  From January through April 2021, Commerce issued supplemental questionnaires, and both Koehler and Matra submitted timely responses.  Id. at 2–3.

On May 6, 2021, Commerce announced a preliminary dumping margin of 2.78 percent. Preliminary Determination, 86 Fed. Reg. at 26002.  Commerce also preliminarily determined that Koehler's "Blue4est" paper product was not within the meaning of the scope of the investigation. Mem. from D. Goldberger to the File, re: Less-Than-Fair-Value Investigation of Thermal Paper from Germany: Prelim. Determ. Margin Calculation for Papierfabrik August Koehler SE at 1–2 (Dep't Com. May 5, 2021), P.R. 209, C.R. 296 ("Prelim. Calculation Mem.").  Commerce preliminarily applied its differential pricing analysis in determining which method to use in comparing the normal value to the expert price or constructed export price.  PDM at 7–9.  To determine whether to use the default A-to-A method or the A-to-T method, Commerce applied the Cohen's *d* test as the first step in assessing whether Koehler's U.S. market prices differed significantly among purchasers, regions, or time periods.  Id. at 8.  Commerce next applied the ratio test to determine whether the value of sales that passed the Cohen's *d* test supports the

consideration of the A-T method for some or all of the sales.  Id.  Based on the results from these

tests, Commerce preliminarily found that "54.17 percent of the value of U.S. sales passes the

Cohen's d test and confirms the existence of a pattern of prices that differ significantly among

purchasers, regions, or time periods," and accordingly used the A-to-T method to compare the

normal value and constructed export price for the 54.17 percent of sales in the U.S. market.  Id. at

9.

In August, 2021, Commerce received case briefs from all interested parties.  IDM at 2.

Commerce accepted Domestics' case brief in its entirety.  See Letter from King & Spalding to G.

Raimondo, Sec'y of Com., re: Thermal Paper from Germany: Petitioners' Case Brief (Aug. 16,

2021) ("Domestics' Case Br."), P.R. 271, C.R. 350.

Koehler's case brief included, as Exhibits 4.1.1, 4.1.2, 4.2, and 4.3, "normal distribution

analysis summaries or printouts of Commerce's sales margin program subjected to a basic standard

deviation analysis."  Koehler's Br. at 35; see also Letter from Dechert LLP and Morris, Manning

& Martin, LLP to G. Raimondo, Sec'y of Com., re: Thermal Paper from Germany: Case Brief of

Koehler and Matra (Aug. 17, 2021) (rejected and retained) ("Rejected Case Brief"), P.R. 270, C.R.

345.  Koehler had subjected Commerce's SAS[7] computer program log, which recorded the

agency's Cohen's $d$ calculations for all test groups within Koehler's sales data, to Koehler's own

computer analysis that purportedly showed how Commerce's calculations of Cohen's $d$ violated

what Koehler argued (and now continues to argue) are necessary conditions of normal distribution,

sample size, and equal variance.  The input SAS program log that Koehler used for the purpose of

---

[7] SAS is the name of a computer program and is not an acronym.

its exhibit were first issued by Commerce in conjunction with the agency's <u>Preliminary</u>

<u>Determination</u> on May 5, 2021.  <u>See</u> Prelim. Calculation Mem. attach. 1.

Commerce rejected these exhibits to Koehler's case brief on August 24, 2021, and stated

(in relevant part) as follows:

> Pursuant to 19 CFR 251.301(c)(5), the deadline for the submission of new factual information not described in paragraphs (c)(1) through (c)(4) of Commerce's regulations is 30 days before the scheduled date of the preliminary determination (or 14 days before verification, whichever is earlier).  Commerce issued its preliminary determination on May 5, 2021; therefore, the deadline for new factual information was no later than April 5, 2021.  As a result, the revised SAS program, log, and resulting data was untimely filed and must be rejected.

Letter from E. Eastwood to Dechert LLP, re: Less-Than-Fair-Value Investigation of Thermal

Paper from Germany (Aug. 24, 2021), P.R. 278.

Koehler submitted a revised case brief on August 27, 2021, which Commerce accepted.

<u>See</u> Letter from Dechert LLP and Morris, Manning & Martin, LLP to G. Raimondo, Sec'y of

Com., re: Thermal Paper from Germany: Resubmission of Case Brief of Koehler and Matra (Aug.

27, 2021), P.R. 280–81, C.R. 354 ("Koehler's Case Br.").

On September 30, 2021, Commerce published the final results of its investigation.  <u>See</u>

<u>Final Determination</u>, 86 Fed. Reg. 54152; IDM; Mem. from A. Elouaradia to J. Maeder, re:

Thermal Paper from Germany: Final Scope Decision (Dep't Com. Sept. 24, 2021), P.R. 297, C.R.

363 ("Final Scope Decision").  The <u>Final Determination</u> reflected no change to Commerce's

Cohen's *d* methodology, and reflected Commerce's continued practice of making price

adjustments to account for rebates that Koehler applied to certain home market sales.  IDM at 4,

21.  However, Commerce also made changes to several aspects of the <u>Preliminary Determination</u>.

In the Final Scope Decision that Commerce issued concurrently with the <u>Final Determination</u>,

**PUBLIC VERSION**

Commerce explained that it included Koehler's "Blue4est" paper product in the scope of the investigation because it deemed the physical "thermal sensitive layer" in Koehler's Blu4est paper product to qualify as a "thermal active coating" within the meaning of the investigation's scope. Final Scope Decision at 5–8.   Commerce also revised the reported static sensitivity product characteristic for one reported CONNUM but continued to accept Koehler's reporting of dynamic sensitivity codes.   IDM at 14.   Commerce rejected Domestics' request to apply an adverse inference based on allegations of incomplete documentation of the static product characteristic. Id.

Matra filed a summons on December 22, 2021, and a complaint against the United States on January 21, 2022, to challenge certain aspects of Commerce's Final Determination.  See Matra Summons, ECF No. 1; Matra Compl., ECF No. 11.  Domestics filed a consent motion to intervene as Defendant-Intervenors on February 3, 2022, and the court granted the motion on February 7, 2022.  See Domestics' Mot. to Intervene, ECF No. 13; Order Granting Mot., ECF No. 18.   On February 22, 2022, Koehler filed a motion to intervene as Plaintiffs-Intervenors, and on March 15, 2022, the Government filed a response withdrawing its opposition to the motion.  See Koehler's Mot. to Intervene, ECF No. 19; Gov't Resp. to Koehler's Mot. to Intervene, ECF No. 25.  The court granted the motion on March 15, 2022.  See Order Granting Mot., ECF No. 26.

Koehler commenced a separate action against the United States, challenging similar aspects of Commerce's final determination.  Koehler filed a summons on December 22, 2021, and a complaint on January 21, 2022.  See Koehler's Summons, Koehler Paper SE et al. v. United States, No. 21-633 (CIT filed Dec. 22, 2021), ECF No. 1; Koehler's Compl., Koehler, No. 21-633 (CIT filed Jan. 21, 2022), ECF No. 10.  On February 3, 2022, Domestics filed a consent motion to

**PUBLIC VERSION**

intervene as defendant-intervenors in the <u>Koehler</u> action, which the court granted on February 7,

2022.  <u>See</u> Domestics' Mot. to Intervene, <u>Koehler</u>, No. 21-633 (CIT filed Feb. 3, 2022), ECF No.

15; Order Granting Mot., <u>Koehler</u>, No. 21-633 (CIT Feb. 7, 2022), ECF No. 20.  Matra also filed

a consent motion to intervene as plaintiffs-intervenors on February 9, 2022, which the court

granted the same day.  <u>See</u> Matra's Mot. to Intervene, <u>Koehler</u>, No. 21-633 (CIT Feb. 9, 2022),

ECF No. 21; Order Granting Mot., <u>Koehler</u>, No. 21-633 (CIT Feb. 9, 2022), ECF No. 25.

Domestics also brought a separate action against the Government to challenge certain other

aspects of the <u>Final Determination</u>, filing a summons on December 22, 2021 and a complaint on

January 21, 2022.  <u>See</u> Domestics' Summons, <u>Appvion</u>, No. 21-634 (CIT filed Dec. 22, 2021),

ECF No. 1; Domestics' Compl.  Matra filed a consent motion to intervene as a defendant-

intervenor on February 9, 2022, and the court granted the motion on the same day.  <u>See</u> Matra's

Mot. to Intervene, <u>Appvion</u>, No. 21-634 (CIT filed Feb. 9, 2022), ECF No. 16; Order Granting

Mot., <u>Appvion</u>, No. 21-634 (CIT filed Feb. 9, 2022), ECF No. 20.  On February 22, 2022, Koehler

filed a motion to intervene a defendant-intervenor.  <u>See</u> Koehler's Mot. to Intervene, <u>Appvion</u>, No.

21-634 (CIT filed Feb. 22, 2022), ECF No. 21.  The court granted Koehler's motion on March 15,

2022.  <u>See</u> Order Granting Mot., <u>Appvion</u>, No. 21-634 (CIT filed Feb. 9, 2022), ECF No. 20.

On April 1, 2022, the parties submitted joint status reports in the three actions pending

before the court.  <u>See</u> Joint Status Report, ECF No. 28; Joint Status Report, <u>Koehler</u>, No. 21-633

(CIT filed Apr. 1, 2022), ECF No. 32; Joint Status Report, <u>Appvion</u>, No. 21-634 (CIT filed Apr.

1, 2022), ECF No. 29.  In the reports, the parties indicated that all parties agreed the two separate

actions should be consolidated under the lead case brought by Matra (No. 21-632).  Joint Status

Report at 3; Joint Status Report at 3, <u>Koehler</u>, No. 21-633; Joint Status Report at 3, <u>Appvion</u>, No.

21-634.  On the same day, the court issued orders consolidating the actions brought by Koehler

and the Domestics under Consolidated Court Number 21-632.  <u>See</u> Order, <u>Koehler</u>, No. 21-633

(CIT filed Apr. 1, 2022), ECF No. 33; Order, <u>Appvion</u>, No. 21-634 (CIT filed Apr. 1, 2022), ECF

No. 30.

      Also on the same day, Koehler moved to stay proceedings in this case pending the final

resolution of proceedings in litigation involving a similar challenge to Commerce's Cohen's *d*

methodology.  <u>See</u> <u>Stupp Corp. v. United States</u> ("<u>Stupp IV</u>"), 47 CIT __, 619 F. Supp. 1314

(2023); Mot. to Stay Proceedings, Apr. 1, 2022, ECF No. 27.  The Government opposed the

motion, and the court denied it on May 20, 2022.  <u>See</u> Gov't Resp. to Pls.' Mot. to Stay, Apr. 21,

2022, ECF No. 32; Order Denying Mot. to Stay Proceedings, ECF No 37.  (The <u>Stupp</u> litigation is

still ongoing, and an appeal from <u>Stupp IV</u> is now pending before the U.S. Court of Appeals for

the Federal Circuit ("Federal Circuit").  <u>See</u> <u>Stupp Corp. v. United States</u> ("<u>Stupp V</u>"), No. 23-

1663 (Fed. Cir. docketed Mar. 27, 2023)).

      On September 15, 2022, Koehler and Matra filed their Motion for Judgment on the Agency

Record.  <u>See</u> Koehler's Mot. for J. on the Agency R., ECF No. 46 ("Koehler's Br.").  On the same

day, Domestics filed their Motion for Judgment on the Agency Record.  <u>See</u> Domestics' Mot. for

J. on the Agency R., ECF No. 44 ("Domestics' Br.").

      On February 21, 2023, Domestics filed their response brief to Koehler's Motion.  <u>See</u>

Domestics' Resp. to Koehler's Mot. J. Agency R., ECF No. 54 ("Domestics' Resp.").  Koehler

and Matra filed their response to Domestics' Motion on the same day.  <u>See</u> Koehler's Resp. to

Domestics' Mot. J. Agency R., Feb. 21, 2023, ECF No. 57 ("Koehler's Resp.").  Also on the same

day, the Government filed its response brief to both motions.  See Gov't Resp. to Mot. J. Agency

R., Feb. 21, 2023, ECF No. 58 ("Gov't Br.").

On April 28, 2023, Koehler and Matra submitted a reply to the Government's response.

Koehler's Reply Br., ECF No. 64 ("Koehler's Reply").  Domestics filed their reply brief on the

same day.  Domestics' Reply Br., Apr. 28, 2023, ECF No. 65 ("Domestics' Reply").

Oral argument was held on November 1, 2023.  The court issued questions in advance of

oral argument, see Letter to Parties, Oct. 16, 2023, ECF No. 75, and the parties filed responses.

See Pls.' Resp. to Ct.'s Qs. for Oral Arg., Oct. 26, 2023, ECF No. 77 ("Pls.' OAQ Resp."); Def.'s

Resp. to Ct.'s Qs. for Oral Arg., Oct. 26, 2023, ECF No. 78 ("Def.'s OAQ Resp."); Def.-Inters.'

Resp. to Ct.'s Qs. for Oral Arg., Oct 26, 2023, ECF No. 76 ("Def.-Inters.' OAQ Resp.").  The

court invited the parties to submit post-argument briefing, and all parties did so.  See Def.'s Post-

Oral Arg. Subm., Nov. 20, 2023, ECF No. 82; Def.-Inters.' Post-Oral Arg. Subm., Nov. 20, 2023,

ECF No. 83; Pl.'s Post-Hr'g Subm., Nov. 20, 2023, ECF No. 84.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19

U.S.C. § 1516a(a)(2)(A)(i)(II) and (B); see also NEC Corp. v. United States, 151 F.3d 1361, 1374

(Fed. Cir. 1998) (Under 28 U.S.C. § 1581(c), "[a]n importer may appeal from Commerce's final

determination to the United States Court of International Trade.").  19 U.S.C. § 1516a(a)(2)(B)(i)

empowers the court to review final affirmative determinations by Commerce; § 1516a(a)(2)(B)(vi)

empowers the court to review decisions by Commerce concerning "whether a particular type of

merchandise is within the class or kind of merchandise described in an . . . antidumping or

countervailing duty order."  Id.

In reviewing antidumping determinations, the court will sustain "'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

Substantial evidence refers to "such evidence that a reasonable mind might accept as adequate to support a conclusion." SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 840 (Fed. Cir. 2020) (internal quotation marks and citation omitted).

An agency acts contrary to law if its decision-making is arbitrary or unreasoned. Burlington Truck Lines v. United States, 371 U.S. 156, 167–68 (1962)). Commerce must establish a "rational connection between the facts found and the choice[s] made." Id. at 168; see also Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1378 (Fed. Cir. 2013). In reviewing Commerce's determinations, the court "must judge the propriety of [agency] action solely by the grounds invoked by the agency," SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)), but may uphold an agency's action even where "the agency's decisional path" is merely "reasonably discernable." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998) (citing Ceramica Regiomontana, S.A. v. United States, 810 F.2d 1137, 1139 (Fed. Cir. 1987)).

## DISCUSSION

As noted above, seven challenges to Commerce's Final Determination are before the court. Koehler and Matra challenge (1) Commerce's application of its "Cohen's $d$" methodology as a measure of variation among U.S. market prices, (2) Commerce's refusal to consider exhibits to the case brief that Koehler submitted at the agency level, and (3) Commerce's inclusion of Koehler's

**PUBLIC VERSION**

"Blue4est" paper product within the scope of its investigation.  Koehler's Br. at 2–6.  Domestics

challenge (4) Commerce's consideration of certain test results for the "dynamic sensitivity"

product characteristic that Koehler submitted pursuant to underlying investigation, (5)

Commerce's determination that Koehler's submission of certain test results for the "static

sensitivity" product characteristics was complete, (6) Commerce's application of price to some of

Koehler's home market sales, and (7) Commerce's classification of Koehler's debt service on

previously-incurred antidumping liabilities as a cost of production.  Domestics' Br. at 3.

     For the reasons explained below, the court (1) remands Commerce's application of its

Cohen's *d* methodology for further explanation, (2) denies Koehler's challenge to Commerce's

rejection of its case briefs on the ground of harmless error, (3) sustains Commerce's inclusion of

Blue4est paper within the scope of the investigation, (4) sustains Commerce's CONNUM

determination as to the dynamic sensitivity product characteristic, (5) remands Commerce's

determination that Koehler's static sensitivity reporting was complete, (6) sustains Commerce's

grant of price adjustments for home market rebates, and (7) remands Commerce's classification of

Koehler's interest expenses as costs of production for reconsideration or further explanation

consistent with this opinion.

     **I.    Commerce Must Further Explain Its Cohen's d Methodology**

        **A.    Overview**

     Commerce used the "Cohen's *d*" statistical test in the underlying investigation as a means

of fulfilling its statutory mandate to determine the existence of significant price differences within

the U.S. market for Koehler's products before using the A-to-T method to calculate Koehler's

dumping margin.  See PDM at 7–9; 19 U.S.C. § 1677f-1(d)(1)(B)(i).  Commerce applied the A-

Consol. Court No. 21-00632                                                                      Page 29
**PUBLIC VERSION**

to-T method and explained its underlying Cohen's *d* methodology in the memo accompanying its

<u>Preliminary Determination</u>.  <u>See</u> PDM at 7–9.  Commerce applied the same methodology to the

<u>Final Determination</u>.  <u>See</u> IDM at 3–8.  Between Commerce's issuance of its <u>Preliminary</u> and <u>Final</u>

<u>Determinations</u>,[8] however, the Federal Circuit held in <u>Stupp III</u>, 5 F.4th 1341, that Commerce's

application of the Cohen's *d* test in that case warranted remand for further explanation as to the

methodology's statistical reliability.  At issue here is whether Commerce's application of Cohen's

*d* in this case—and its explanation thereof on the agency record—similarly warrant remand for

further explanation.

Against the standard laid out by the Federal Circuit in <u>Stupp III</u>, Commerce has not

sufficiently explained how its use of the Cohen's *d* test was a reasonable means of determining the

existence of a "pattern of export prices . . . for comparable merchandise that differ significantly

among purchasers, regions, or periods of time."  19 U.S.C. § 1677f-1(d)(1)(B)(i).  Commerce's

brief discussion of <u>Stupp III</u> in its IDM does not directly address the Federal Circuit's concerns

regarding Commerce's use of the test where "the data groups being compared are small, are not

normally distributed, and have disparate variances."  <u>Stupp III</u>, 5 F.4th at 1357.  The court

accordingly remands for Commerce to provide additional explanation.[9]  For the sake of judicial

---

[8] Commerce issued its PDM on May 5, 2021, and its IDM on September 24, 2021.  The Federal Circuit decided Stupp III on July 15, 2021.

[9] In so doing, the court does not reach the Government's argument that Koehler, in relying on "detailed arguments regarding the percentage differences associated with the Cohen's d coefficient under various assumptions of normality, variance, and numerosity," failed to exhaust administrative remedies because it did not raise those arguments in the agency proceeding below. Gov't. Br. at 23 (citing Koehler's Br. at 19–24).  As explained below, the court does not conclude that Commerce's Cohen's d methodology was unreasonable.  The court concludes only that

and administrative economy, however, Commerce's formulation of this explanation should await the Federal Circuit's potentially controlling disposition in a pending appeal from this court's judgment sustaining Commerce's remand redetermination following <u>Stupp III</u>. <u>See</u> <u>Stupp IV</u>, 619 F. Supp. 1314; <u>Stupp V</u>, No. 23-1663.

### B.    *Commerce's Discussion of <u>Stupp III</u>*

Koehler urges the court to remand Commerce's determination on the ground that the agency's application of its Cohen's *d* test was unreasonable.  <u>See</u> Koehler's Br. at 16.  The Government and Domestics take the contrary position, arguing that Commerce's application of the test was reasonable and should accordingly be sustained.  <u>See</u> Gov't Br. at 13; Domestics' Resp. at 2.

But before the court can determine whether Commerce has reasonably applied its Cohen's *d* methodology in this case, the court must first ensure that the administrative record permits such review.  <u>See</u> <u>CS Wind Viet. Co. v. United States</u>, 832 F.3d 1367, 1380–81 (Fed. Cir. 2016) (explaining that "[w]e are remanding because we conclude that Commerce has not explained its determination sufficiently to allow us to conduct the judicial review to which [the appellant] is entitled to ensure that the agency's exercise of power adheres to the authorizing law").  To serve as a basis for sustaining agency action, the record must contain an explanation from Commerce that its "methodology was a reasonable exercise of its agency discretion in light of the statutory constraints and policies."  <u>Mid Continent</u>, 940 F.3d at 674.  This requirement stems in part from a statutory directive that Commerce provide "an explanation of the basis for its determination that

---

Commerce failed to adequately explain its application of that methodology—and the court does not consider the hypotheticals set forth in Koehler's (CIT) brief in reaching that conclusion.

addresses relevant arguments, made by interested parties who are parties to the investigation or review (as the case may be), concerning the establishment of dumping or a countervailable subsidy." 19 U.S.C. § 1677f(i)(3)(A). If no explanation appears that allows the "agency's path" to be "reasonably . . . discerned," Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974), then Commerce must supply one on remand, see Mid Continent, 940 F.3d at 675.

At issue here is Commerce's responsiveness to the concerns raised by the Federal Circuit in Stupp III and raised by Koehler at the agency level in its case brief. See IDM at 3–4. In Stupp III the Federal Circuit shed light on the "statutory constraints and policies" against which the reasonableness of Commerce's Cohen's $d$ methodology must be measured. Stupp III, 5 F.4th at 1360. Without directly holding that Commerce's use of Cohen's $d$ in that case was per se unreasonable, the Federal Circuit nevertheless expressed serious doubt as to the statutory basis of Commerce's Cohen's $d$ methodology as applied. Stupp III, 5 F.4th at 1360.[10]

In particular, the Federal Circuit in Stupp III took issue with the fact that Commerce had applied the Cohen's $d$ test without first ensuring that the input data were normally distributed, comprised an adequate number of observations, and had similar variance despite warnings by academic authorities (including Professor Cohen himself) that ignoring these considerations would produce an unreliable measure of effect size. Id. This unreliability, the Federal Circuit opined, introduced a risk that Commerce's application of Cohen's $d$ would not be a reasonable means of carrying out the statutory directive to ascertain whether there exists "a pattern of export prices for

---

[10] Id. ("It seems likely that Commerce's application of the Cohen's $d$ test had a material impact on the results of the less-than-fair-value investigation in this case, particularly given that the dumping margin assigned to [the respondent] was only slightly above the de minimis threshold, below which no antidumping duties would be assessed.").

comparable merchandise . . . that differ significantly among purchasers, regions, or periods of time." Id. at 1352, 1360 (quoting 19 U.S.C. § 1677f-1(d)(1)(B)(i)).

Koehler's case brief cited Stupp III and raised the Federal Circuit's concerns with respect to Commerce's use here of the Cohen's *d* test without first ensuring that the test and comparison groups used were of sufficiently normal distribution, numerosity, and equivalent variance between the test and comparison groups. See IDM at 3–4.

Commerce provided a three-and-a-half-page response in its IDM, stating at the outset that "[w]e disagree with Koehler that the [Federal Circuit]'s finding in [Stupp III] requires Commerce to change its application of the Cohen's *d* test." IDM at 4. Commerce downplayed the bearing of Stupp III on its determination, pointing out that "the [Federal Circuit] remanded the underlying administrative review to Commerce to provide further explanation; the [Federal Circuit] did not find Commerce's use of the Cohen's *d* test unlawful." Id. Stupp III, Commerce explained, "is not a final and conclusive Court decision, but rather is a ruling issued as part of ongoing litigation." Id. at 5.

Following a discussion of how Cohen's *d* purportedly facilitates the measurement of "practical significance" as opposed to "statistical significance," as well as an explanation supporting the use of the 0.8 benchmark for determining that an effect size is "large," Commerce concluded its response as follows:

> As a general matter, Commerce finds that the U.S. sales data which Koehler reported to Commerce constitutes a complete population. As such, sample size, sample distribution, and the statistical significance of the sample are not relevant to Commerce's analysis. As the Courts have previously stated, "'[S]tatistical significance' is irrelevant where, as here, the agency has a complete set of data to consider . . . [I]f Congress wanted ITA to measure 'statistical significance,' it would have included the word 'statistical' [when it drafted the statute]." Thus, we have

continued to employ the Cohen's d test in our margin calculations for the final determination.

IDM at 8 (footnotes omitted) (alterations in original) (quoting Xi'an Metals & Materials Imp. & Exp. Co. v. United States, 41 CIT __, __, 256 F. Supp. 3d 1346, 1364–65 (2017)).

The Government argues that "Commerce's explanation in this investigation clarifies the same issues" as were raised by the Federal Circuit in Stupp III and reasserts that explanation in greater detail in its brief. Gov't Br. at 19–22. But the court reviews only Commerce's explanation on the agency record as the grounds for Commerce's determination. See Chenery, 332 U.S. at 196 (explaining that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency"). For the reasons set forth below, the court concludes that Commerce's explanation is deficient.

First, Commerce's characterization of the Federal Circuit's holding in Stupp III as a mere "ruling issued as part of ongoing litigation," IDM at 5, does not account for the fact that Stupp III is a published, precedential decision with holdings that clarify (and indeed shape) the background law against which Commerce's actions are to be found either reasonable or unreasonable. Even if Commerce was correct to point out that the Federal Circuit in Stupp III did not squarely hold that Commerce's application of Cohen's $d$ in that case was unreasonable, Commerce's explanation does not address what the Federal Circuit did in fact hold: that absent a fuller explanation than what Commerce provided on the agency record in Stupp as to calculations of Cohen's $d$ that do not ensure normal distribution, sufficient sample size, and roughly equal variance across the test and comparison groups, the appropriate remedy is remand. See Stupp III, 5 F.4th at 1360.

Second, Commerce's statement that Koehler's U.S. sales data comprise a "complete population," rather than an incomplete sample, was not responsive to Koehler's argument incorporating the Federal Circuit's holding that applications of Cohen's *d* raise "significant concerns" where "the test groups and the comparison groups [are not] normally distributed, of sufficient size, and of roughly equal variances." Stupp III, 5 F.4th at 1357 (emphasis added). As the Federal Circuit made clear in Stupp III, the reliability of a Cohen's *d* calculation (including, for example, the usefulness of a 0.8 benchmark for a "large" effect size) depends on the satisfaction of Professor Cohen's assumptions of normality, numerosity, and roughly equal variability between the test group and the comparison group. Id. Seemingly irrelevant to this inquiry, however, is whether the set of all sales included in test and comparison groups represents the entirety of a company's U.S. sales. That fact was relevant in Xi'an Metals only because the consolidated plaintiffs in that case argued that 19 U.S.C. § 1677f–1(d)(1)(B)(i) requires Commerce to determine the "statistical significance" of price differences. 256 F. Supp. 3d at 1364–65.[11] By contrast, no party in this case (besides the Government) has raised a statistical significance–related challenge.

It is precisely the questionable relevance of the Government's suggested completeness factor that formed the basis of the Federal Circuit's remand in Stupp III for Commerce's additional explanation. Stupp III, 5 F.4th at 1360 ("[W]e invite Commerce to clarify its argument that having

---

[11] That challenge failed—the court pointed out that statistical significance gauges sample data's representativeness of an incompletely measured larger population, which means that measuring statistical significance is "inappropriate" where the sample is the larger population. Id. at 1365. The court rejected a similar challenge in Stanley Works (Langfang) Fastening Sys. Co. v. United States, holding that "[b]ecause the Cohen's *d* test, as used by Commerce, employs the entire universe of data, there is no need to test for statistical significance" and that "no inference is being made from a sample." 42 CIT __, __, 333 F. Supp. 3d 1329, 1346 (2018).

Consol. Court No. 21-00632                                                           Page 35
**PUBLIC VERSION**

the entire universe of data rather than a sample makes it permissible to disregard the otherwise-applicable limitations on the use of the Cohen's *d* test."). In light of this "invitation," which Koehler raised at the agency level, <u>see</u> Koehler's Case Br. at 2–7, Commerce was required to explain how testing an entire population mitigates otherwise suspect aspects of Commerce's testing protocol. Without such an explanation, the court cannot assess whether Commerce's methodology is a reasonable means of ascertaining the existence of "a pattern of export prices . . . that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B); <u>Mid Continent Steel & Wire, Inc. v. United States</u>, 31 F.4th 1367, 1380–81 (Fed. Cir. 2022) (citing the same statutory provision as grounds for remanding Commerce's explanation of a different aspect of its Cohen's *d* methodology). And without that preliminary assessment, the court cannot proceed to evaluate whether Commerce has fulfilled its statutory obligation to calculate dumping margins "as accurately as possible." <u>Rhone Poulenc</u>, 899 F.2d at 1191.

Commerce has not adequately addressed Koehler's argument, which bears directly on the reasonableness of Commerce's Cohen's *d* methodology, by stating that "sample size, sample distribution, and the statistical significance of the sample are not relevant to Commerce's analysis" because "the U.S. sales data which Koehler reported to Commerce constitutes a complete population." IDM at 8. The logical link between these two propositions is not so reasonably discernable as to obviate the need for explanation. See <u>Wheatland Tube</u>, 161 F.3d at 1369–70. Accordingly, the court cannot reach the issue of the underlying reasonableness of Commerce's use of the Cohen's *d* test without further development of this point on the agency record.[12] Remand

---

[12] In this regard, this case differs from <u>Stupp IV</u>, in which the court sustained the remand redetermination that Commerce undertook pursuant to the Federal Circuit's opinion in <u>Stupp III</u>.

Consol. Court No. 21-00632                                                     Page 36
*PUBLIC VERSION*

is necessary to allow Commerce to reconsider its position or provide further explanation that

considers all relevant law as interpreted by this court and by the Federal Circuit.

The court recognizes, however, that an appeal from the court's ruling on Commerce's

remand determination following Stupp III is now pending before the Federal Circuit.  See Stupp

V, No. 23-1663.[13]  To allow Commerce the benefit of reference to the Federal Circuit's anticipated

holding in Stupp V in its remand determination, the court instructs Commerce to complete its

---

In Stupp IV, the court concluded that "Commerce has adequately explained how its [Cohen's *d*]
methodology is reasonable."  619 F. Supp. 3d at 1328.   The court reached this conclusion,
however, on the basis of a much more developed explanation than what Commerce has offered in
the record underlying this case.  Compare Redetermination Pursuant to Court Remand Order at 1–
74, Stupp Corp. v. United States, Consol. Court No. 15-00334 (Dep't Com. Apr. 4, 2022), with
IDM at 4–8; see also Stupp IV, 619 F.Supp.3d at 1324 n.8.

In the more recent case of NEXTEEL Co. v. United States, the court sustained Commerce's
remand redetermination upon holding that "Commerce has adequately explained how its [Cohen's
*d*] methodology is reasonable."  47 CIT __, __, Slip Op. 23-181, at 26 (Dec. 18, 2023). As in Stupp
IV, Commerce's discussion of Stupp III in the NEXTEEL remand results was far more developed
than what Commerce provided in the IDM in this case.  Cf. NEXTEEL Co. v. United States, 47
CIT __, __, 633 F. Supp. 3d 1190, 1201 (2023) (remanding for "reconsideration or further
discussion" an earlier remand redetermination in the same litigation where Commerce's
explanation failed to "resolve the [Federal Circuit]'s concerns raised in Stupp [III]").

The reasonableness of Commerce's explanations at issue in Stupp IV and NEXTEEL is not at
issue in this case.  The court notes these cases merely by way of comparison: in this case,
Commerce responded to the Federal Circuit's concerns about normality, sample size, and variance
with (1) an attempt to minimize Stupp III's precedential effect and (2) a sparsely reasoned
pronouncement that testing an entire population mitigates those concerns.  IDM at 4–8.  By Stupp
IV's yardstick, or NEXTEEL's, that is not enough.

[13] Another case involving Commerce's responsiveness to the concerns outlined in Stupp III is also
pending before the Federal Circuit.  See Marmen Inc. v. United States, No. 23-1877 (Fed. Cir.
docketed May 11, 2023).   Briefing in Stupp V is nearer to completion than in Marmen;
nevertheless, if the Federal Circuit decides Marmen before Stupp V, the court will on a party's
motion consider expediting the deadline for Commerce's remand results in this case.

determination no sooner than, and no later than sixty days after, the conclusion of all appellate

proceedings in that case.[14]

## II.     The Harmless Error Principle Precludes Relief on Koehler's Claim that Commerce Unlawfully Rejected Koehler's Case Brief Exhibits

Koehler argues that Commerce abused its discretion in rejecting Exhibits 4.1.1, 4.1.2, 4.2,

and 4.3 to its case brief, which Koehler purports showed "that Commerce's underlying [Cohen's

*d*] data violated the precondition of normality." Pls.' OAQ Resp. at 4. These exhibits comprised

printouts of a combined sales database, a computer-generated report based on that database, and

---

[14] In a recent case involving a similar challenge to Commerce's Cohen's *d* methodology, the court did not issue a remand order but instead stayed proceedings pending the outcome of Stupp V. HiSteel Co. v. United States, 47 CIT __, 653 F. Supp. 3d 1341 (2023). The court in HiSteel did not reach the issue of whether Commerce adequately addressed Stupp III. Instead, to avoid "obliging Commerce to formulate a remand redetermination" where a decision in Stupp V might soon afterwards render that redetermination a nullity, the court simply paused litigation—in which Commerce's Cohen's *d* methodology was the only live issue—to await "updated, on-point authority." Id. at 1357.

The court's remand order in this case is consistent with HiSteel. In neither case does the court order Commerce to prepare a remand redetermination on the Cohen's *d* issue in advance of the Federal Circuit's anticipated holding in Stupp V. The cases may nevertheless appear, on the surface, to differ. In HiSteel, proceedings related to the Cohen's *d* issue are paused before the court while in this this case, Cohen's *d* proceedings are paused at the agency level. But an important prudential consideration accounts for this difference: in this case, unlike in HiSteel, the court remands additional (non-Cohen's *d*–related) issues for Commerce's reconsideration. A partial stay in this case on the Cohen's *d* issue, concurrent with a remand on other issues, would thus risk throwing an already complex multi-issue and multi-party proceeding into further disarray. Cf. Papierfabrik Aug. Koehler AG v. United States, 36 CIT 1632, 1637 (2012) ("A partial stay may necessitate multiple decisions and separate remands on the zeroing and non-zeroing issues, which would delay and extend proceedings through piecemeal litigation and appellate reviews."); see also Union Steel Mfg. Co. v. United States, 36 CIT 717, 737, 837 F. Supp. 2d 1307, 1325 (2012) (noting prudential factors militating against the issuance of a "piecemeal remand order" in favor of a broader scope of review on remand). The court's issuance of a stay in HiSteel did not implicate that risk.

printouts of the code used to generate both the database and the report.  Rejected Case Brief at 5–

6.

Koehler first disputes Commerce's characterization of the exhibits as containing "new

factual information" under 19 C.F.R. § 351.102(b)(21), claiming that "[t]he exhibits at issue only

included a printout of Commerce's own data subjected to a basic algebraic manipulation."

Koehler's Br. at 35.  In the alternative, Koehler argues that Commerce abused its discretion

because it was bound by its own regulations to accept the exhibits even if they did contain new

factual information.  Id.  This is so, Koehler argues, because Commerce's rejection of Koehler's

exhibits "constituted an inappropriate restriction of Koehler's right to provide argument on an

integral part of Commerce's determination in the underlying investigation."  Id. at 37.

The court declines to address these challenges: whether or not Commerce's rejection of

Koehler's exhibits was lawful, the harmless error principle precludes relief.

In the context of a procedural challenge, "[i]t is well settled that principles of harmless

error apply to the review of agency proceedings."  Intercargo Ins. Co. v. United States, 83 F.3d

391, 394 (Fed. Cir. 1996) (citing 5 U.S.C. § 706); see also SolarWorld Ams., Inc. v. United States,

962 F.3d 1351, 1359 n.2 (Fed. Cir. 2020) (clarifying that the Administrative Procedure Act's

harmless error standard applies to civil actions falling under non-(e) subsections of 28

U.S.C. § 2640 where "no law provides otherwise").  These principles dictate that the court will not

set aside agency action, even if procedurally erroneous, "unless the errors were prejudicial to the

party seeking to have the action declared invalid."  Sea-Land Serv., Inc. v. United States, 14 CIT

253, 257, 735 F. Supp. 1059, 1063 (internal quotation marks and citation omitted), aff'd and

adopted per curiam, 923 F.2d 838 (mem.) (Fed. Cir. 1991).  In this context, "prejudice . . . means

*PUBLIC VERSION*

injury to an interest that the statute, regulation, or rule in question was designed to protect."
Intercargo, 83 F.3d at 396.  The court has applied this standard to the precise type of procedural
challenge that Koehler brings here.  See Wuhan Bee Healthy Co. v. United States, 31 CIT 1182,
1193 (2007) (denying a challenge to Commerce's rejection of a case brief deemed to contain new
factual information on the ground that "if in error," the rejection "was harmless error").

  Koehler has made no showing that Commerce's rejection of Koehler's exhibits was
prejudicial.  Koehler identifies no argument that the rejection either precluded or materially
impaired.  Despite noting that the "rejected exhibits provided additional substantive proof that
Commerce's underlying data violated the precondition of normality," Koehler states that "even
without these exhibits, the lack of normality in Commerce's data can be demonstrably proven by
other evidence on the record," that "shortcomings with Commerce's data are more than amply
demonstrated by the evidence on the agency record," and that "the absence of . . . Koehler's
rejected exhibits from the record do not impact the relief that Koehler seeks."  Pls.' OAQ Resp. at
4.  Koehler maintains, in other words, that its ability to demonstrate flaws in Commerce's Cohen's
*d* methodology was not materially hindered by Commerce's refusal to consider Exhibits 4.1.1,
4.1.2, 4.2, and 4.3.

  It is upon Koehler to demonstrate the harm ensuing from Commerce's alleged error.  See
Shinseki v. Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful
normally falls upon the party attacking the agency's determination."); SolarWorld Ams., 962 F.3d
at 1359 ("In the antidumping context, a party challenging a purported error by Commerce must
show that it was harmed as a result of the error.").  The court need not reserve judgment on the
question of harmlessness until developments in the proceedings resolve that question with

Consol. Court No. 21-00632                                                    Page 40
*PUBLIC VERSION*

certainty—a party's burden to demonstrate harm attaches when that party alleges agency error.  5

U.S.C. § 706 (providing that "[t]o the extent necessary to decision and <u>when presented</u>, the

reviewing court shall decide all relevant questions of law  . . . the court shall review the whole

record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial

error" (emphasis added)).  Even if the ultimate harm to Koehler caused by Commerce's rejection

of the exhibits will not come about until (for example) an upcoming decision by the Federal Circuit

resolves the Cohen's *d* issue, Koehler's burden was at least to describe what this harm might be in

its Motion for Judgment on the Agency Record.  Koehler did not do this.

The court concludes that Koehler has not demonstrated any injury to an "interest that the

statute, regulation, or rule in question was designed to protect," <u>Intercargo</u>, 83 F.3d at 396, and

denies Koehler's challenge to Commerce's rejection of the case brief exhibits.   The court

accordingly does not consider at this stage whether Commerce's rejection of the exhibits was

lawful.

### III. *Commerce's Determination to Include Blue4est Within the Scope of Its Investigation Is Supported by Substantial Evidence*

The scope language that Commerce set forth at the outset of the investigation refers to

"thermal active coating(s) (typically made of sensitizer, dye, and coreactant, and/or like materials)

on one or both sides."  Thermal Paper from Germany, Japan, the Republic of Korea, and Spain:

Initiation of Less-Than-Fair-Value Investigations, 85 Fed. Reg. 69580, 69584 (Dep't Com. Nov.

3, 2020) ("Initiation Notice").  Commerce did not modify that language at any point during the

investigation.  Final Scope Decision at 2.  But as noted above, Commerce determined between the

<u>Preliminary Determination</u> and the <u>Final Determination</u> that this scope language covers Koehler's

"Blue4est" paper product.  <u>See</u> Final Scope Decision.  Koehler argues that this determination is unlawful.  <u>See</u> Koehler's Br. at 42.  Koehler marshals four arguments in support of this challenge, none of which persuade the court to disturb Commerce's Final Scope Decision with respect to Blue4est paper.

### A.    *The Scope Language's Applicability to Blue4est Is Supported by Substantial Evidence*

Koehler argues that Commerce's inclusion of Blue4est paper within the investigation's scope is unsupported by substantial evidence because the scope language is irreconcilable with the fact that Blue4est employs a mechanism whereby light-reflective bubbles collapse to selectively reveal sections of a pre-colored base layer.  <u>See</u> Koehler's Br. at 42–43.

But it appears from Commerce's explanation in its Final Scope Decision, as well as from Koehler's own representations, that the administrative record does support a conclusion that Blue4est's characteristics align with the scope language.  As Koehler's own exhibit shows, <u>see</u> Koehler's Br. at 43, Blue4est paper is coated with a layer of bubbles that collapse when exposed to heat.  <u>See also</u> Letter from King & Spalding LLP to G. Raimondo, Sec'y of Com., re: Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Petitioners' Rebuttal Comments on Product Characteristics attach. 2 (Nov. 27, 2020), P.R. 74–76.  This fact alone constitutes substantial evidence that Blue4est has a "thermal active" coating: a targeted application of heat causes a "functional" layer on the surface of Blue4est paper to undergo activity whereby an image appears to a viewer.  <u>See</u> Final Scope Decision at 5–8.

Koehler insists that Blue4est is not thermally active because it does not contain "sensitizer, dye, and coreactant, and/or like materials."  Koehler's Br. at 7 (quoting <u>Initiation Notice</u>, 85 Fed.

Reg. at 69584).  But the scope description, notably, employs the word "typically."  It does not

read, for instance, "thermal active coating(s) (<u>made exclusively</u> of sensitizer, dye, and coreactant,

and/or like materials) on one or both sides."  Even if it did, Koehler fails to persuasively explain

why the layer of bubbles that sits atop Blue4est's base layer would not constitute a "like material"

to sensitizers, dyes, and co-reactants.  Bubbles may perhaps differ in some ways from the scope

description's enumerated materials (for instance, in that they are visible physical objects rather

than smaller—though of course no less physical—chemicals that are employed directly for their

molecular properties).  But Koehler fails to explain why, if chemical activation were the relevant

limiting factor, Commerce's scope description would not have substituted narrower descriptors

like "like chemicals" or "like chemically active materials" for the general term "like materials."

> Commerce's explanation of the meaning of "like materials" is more parsimonious:
>
> Commerce requested clarification of the term "like materials" already in the
> petition.  Domestics clarified that a like material "would be any other form of
> thermal coating that serves the same function" as sensitizer, dye, and co-reactant,
> "namely, <u>to permit a thermal image to appear on the paper</u>."

Final Scope Decision at 7.  Commerce's determination that the top layer of Blue4est paper is

thermally active is thus, at the very least, based on evidence that "a reasonable mind might accept

as adequate to support a conclusion." <u>Al Ghurair Iron & Steel LLC v. United States</u>, 65 F.4th 1351

(Fed. Cir. 2023) (quoting <u>SeAH Steel VINA Corp. v. United States</u>, 950 F.3d 833, 840 (Fed. Cir.

2020)).

####    B.    The "Concept" of a Thermal Active Coating Cannot Be Adduced Through Physical Evidence

Koehler also argues that evidence it placed on the record shows that the "concept" of

thermal active coating is limited to mechanisms whereby a coating undergoes a chemical reaction

to produce a color—which Koehler claims does not, contrary to Commerce's determination, include the mechanism that Blue4est paper employs.  Koehler's Br. at 43–44.[15]

Here, Koehler presents evidence of Blue4est's physical characteristics as evidence of the semantic categories that distinguish items on the basis of such characteristics.  But this is an improperly inverted analytical approach: semantic categories like the "concept" of thermal active coating are not facts that can be discovered in the physical world; they are interpretive tools that Commerce imposes onto the physical world to classify merchandise.  Cf. Ludwig Wittgenstein, Philosophical Investigations § 131 (G.E.M. Anscombe trans., 3d ed. 1968) ("[W]e can avoid ineptness or emptiness in our assertions only by presenting the model as what it is, as an object of comparison—as, so to speak, a measuring-rod; not as a preconceived idea to which reality must correspond.").

The showing Koehler has made here is simply that Blue4est differs from ordinary thermal paper by employing a bubble-collapsing mechanism, not a chemical coating, to cause an image to appear on paper.  Koehler's Br. at 43–44.  This showing does not, and cannot, control the initial question of what defines a "thermal active coating(s) (typically made of sensitizer, dye, and coreactant, and/or like materials) on one or both sides."  Initiation Notice, 85 Fed. Reg. at 69584.

---

[15] Koehler claims to have "illustrated" the limitations of the concept with an exhibit that shows the difference in functionality between "traditional thermal paper" and Blue4est paper.  Id.  This illustration shows that traditional thermal paper has a top layer of chemicals that react with heat to produce an image in accordance with the pattern applied by a heated printhead.  Id.  Blue4est paper, by contrast, has a top layer of opaque bubbles and an invisible bottom of black-colored paper.  Id.  When a heated printhead approaches the top layer of bubbles, the bubbles physically collapse to reveal targeted sections of the black-colored bottom layer.  Id.  The effect of both mechanisms is the same:  to cause an image to appear by applying heat to the page.

Consol. Court No. 21-00632                                                                 Page 44
*PUBLIC VERSION*

Primary discretion to determine the bounds of those categories belongs to Commerce.  See

Mitsubishi Elec. Corp. v. United States, 898 F.2d 1577, 1582 (Fed. Cir. 1990) ("The responsibility

to determine the proper scope of the investigation and of the antidumping order, however, is that

of [Commerce], not of the complainant before the agency."); see also Kyocera Solar, Inc. v. United

States, 41 CIT __, __, 253 F. Supp. 3d 1294, 1315 (2017) ("Commerce has the authority to initially

determine the scope of the investigation, as well as the authority to modify the scope language

until the final order is issued, based on the agency's findings during the course of the

investigation.").

Tc     The court accordingly rejects as unsound Koehler's argument that Commerce was required

to hew its scope definition to a fixed, ascertainable "concept" of a "thermal active coating."  See

Koehler's Br. at 8.

> ### C.     Commerce's References to External Interpretative Sources Do Not Control Commerce's Interpretation of the Scope Language

Similarly unavailing is Koehler's argument that that Commerce's inclusion of Blue4est

paper within the scope of the investigation is irreconcilable with Commerce's citation in its Final

Scope Decision of external sources that characterize "thermal paper" as paper coated with

chemicals that react to form images.  Koehler's Br. at 42.  Koehler notes that Commerce

acknowledged in its Final Scope Decision that Domestics' Petition initially described the subject

merchandise as products "wherein the base paper is coated by applying different coating layers to

the functional (imaging) sides of the sheet" and wherein "[w]hen exposed to heated printer heads,

the thermal developer in the coating is activated allowing the image to appear on the paper."

Koehler's Br. at 40 (quoting Final Scope Decision at 5).  Koehler also notes Commerce's reference

to the ITC's description of "Thermal Paper" as a "paper coated with chemicals that react to form images when exposed to heat." Koehler's Br. at 41 (quoting Final Scope Decision at 5).[16] According to Koehler, Commerce's statement in its Final Scope Decision that thermal paper "can include any other type of thermal coating that permits a thermal image to appear on the paper" impermissibly contradicts the narrower language of the ITC description and the petition on which Commerce initially relied when determining the investigation's scope.  Id. (quoting Final Scope Decision at 8).  Koehler contends that because Commerce "concede[d]" that the petition and ITC's language "exist[s] on the record," Commerce was effectively locked into conforming its scope determination to that language.  Koehler's Br. at 41.

The court finds this argument unpersuasive in light of Commerce's "broad discretion to define and clarify the scope of an . . . investigation in a manner which reflects the intent of the petition."  Trans Tex. Tire, LLC v. United States, 44 CIT __, __, 519 F. Supp. 3d 1275, 1284–85 (2021) (quoting AMS Assocs. v. United States, 36 CIT 1660, 1666, 881 F. Supp. 2d 1374, 1380

---

[16] The ITC description that Commerce referenced in its Final Scope Decision reads as follows:

> Thermal paper is a paper coated with chemicals that react to form images when exposed to heat.  Thermal paper can be used in special printers to create an image without ribbons or other consumables (other than the paper itself).  When imaging, the thermal paper containing the dye is passed between the thermal print head and the platen roll in the printer.  The thermal head consists of tiny heating elements lying side-by-side across the width of the paper. As the paper passes under the head, the computer instructs certain heater elements to heat up. Where the heat is in contact with the paper, the dye is activated to produce an image.  Heater elements heat up and cool down each time the paper advances forward, creating a colored or black microdot on the paper.  The arrangement of elements and paper movement create flexible graphic images on the thermal paper.

Thermal Paper from Germany, Japan, Korea, and Spain, Inv. Nos. 731-TA-1546-1549 (Preliminary), USITC Pub. 5141, December 2020 at I-7 ("ITC Description").

(2012), aff'd, 737 F.3d 1338 (Fed. Cir. 2013), overruled on other grounds by Sunpreme Inc. v. United States, 946 F.3d 1300 (Fed. Cir. 2020)).  Unlike in the context of a post–final order Scope Ruling, where Commerce is bound by its own regulation to apply a limited set of factors in determining a product's inclusion, see 19 C.F.R. § 351.225(k)(1), Commerce here "enjoyed greater discretion" to determine scope parameters in the window between the Preliminary and Final Determinations.  M S Int'l, 32 F.4th at 1152; see also Minebea Co. v. United States, 16 CIT 20, 23, 782 F. Supp. 117, 121 (1992), aff'd, 984 F.2d 1178 (Fed. Cir. 1993) (explaining that Commerce's "discretion concerning scope clarification at the investigatory stages is extensive").[17]

---

[17] The court acknowledges that Commerce appears to have construed its determination on Blue4est paper as a Scope Ruling subject to 19 C.F.R. § 351.225(k)(1):  "In considering whether merchandise is within the scope of an investigation," Commerce explained, "Commerce will take into account the language of the scope of the investigation and the description of subject merchandise in the Petitions or in other documents on the record of the investigation, including decisions of the ITC."  Final Scope Decision at 9; but see Gov't Br. at 37 ("Many of the remaining cases cited by Koehler are distinguishable because they concern a post-order scope inquiry, rather than clarification of the scope during an ongoing investigation.").

While the Scope Ruling standard suggested by Commerce—which typically applies to post–final order proceedings—is somewhat less deferential, the Government still prevails under it.  Under § 351.225(k)(1), Commerce retains discretion over whether and how to incorporate the ITC's or a petitioner's description of merchandise when "determining whether a product is covered by the scope of the order at issue."  Id.; Duferco Steel, 296 F.3d at 1097 ("review of the petition and the investigation may provide valuable guidance as to the interpretation of the final order.  But they cannot substitute for language in the order itself.").  Citations to definitional language in the Petition and the ITC's determination can indeed be helpful, see 19 C.F.R. § 351.225(k)(1)(i)(A), (D), but the plain text of Commerce's regulations contradicts Koehler's claim that these citations carry binding force where, as here, Commerce's scope language is dispositive.  See 19 C.F.R. § 351.225(k)(1) ("[Commerce] will consider the language of the scope and may make its determination on this basis alone if the language of the scope, including the descriptions of merchandise expressly excluded from the scope, is dispositive"); see also Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1356 (Fed. Cir. 2015).  Thus, as the Government points out, the language Commerce cited in its Final Scope Decision "is merely descriptive of the majority of thermal paper products and does not limit the scope of the

Consol. Court No. 21-00632                                                        Page 47
*PUBLIC VERSION*

This discretion means that Commerce could freely depart from the Petition's initial

language and the ITC Description—regardless of those sources' presence on the record—in

determining the investigation's scope prior to the Final Determination.  "It is established that

Commerce can alter the scope of the investigation until the final order."  Trans Tex. Tire, 519 F.

Supp. 3d at 1284 (internal quotation marks and citation omitted).  Commerce did not even go that

far—rather than change the scope language, Commerce merely determined that that language

applies to a particular product.  Commerce's burden was to "exercise its discretion reasonably,"

PT Pindo Deli Pulp v. United States, 36 CIT 394, 401, 825 F. Supp. 2d 1310, 1318 (2012) (internal

quotation marks and citation omitted), as well as to adequately explain why Blue4est falls within

the scope of the investigation.  The court finds that Commerce did so.  See, e.g., Final Scope

Decision at 11 ("The thermal process that Koehler described permits an image to appear on the

paper.  We believe this is a thermal image since it is produced through a thermal process.").

> **D.     *Commerce's Inclusion of Blue4est Did Not "Expand" the Scope of the Investigation***

Koehler lastly argues that Commerce acted in an arbitrary and capricious manner by

"expanding the scope of [its] investigation" to include Blue4est paper despite the existence of an

established agency practice limiting Commerce's ability to perform such an expansion.  Koehler's

Br. at 48.

As a preliminary matter, this argument presumes that Commerce's inclusion of Blue4est

paper in the scope of the investigation represented an expansion of the investigation's scope rather

---

investigations to thermal paper coated with chemicals."  Gov't Br. at 35 (citing Final Scope
Decision at 8).

**PUBLIC VERSION**

than a clarification that Blue4est paper falls within the scope.  But this presumption requires some

explanation, as Commerce often clarifies matters of scope inclusion without going so far as to

expand the scope of an investigation.  See, e.g., PT Pindo Deli Pulp, 825 F. Supp. 2d at 1316–17;

Minebea, 782 F. Supp. at 120.  The sole explanation that Koehler offers here for its contention that

Commerce's behavior constituted a scope expansion is that "Commerce's interpretation of the

scope language is entirely devoid of connection to the record evidence that was before it."

Koehler's Br. at 46.  But as explained above, record evidence supports Commerce's construal of

"thermal active coating(s) (typically made of sensitizer, dye, and coreactant, and/or like materials)

on one or both sides" to encompass the mechanism underlying Blue4est paper.  Commerce's

determination—that "thermal active coating" applies to coatings that record evidence shows to

undergo a physical reaction upon exposure to heat—in no way reflects an expansion of the

meaning of the original scope language.  What it reflects, rather, is merely that Commerce

determined after the Notice of Initiation that the original scope language applies to Blue4est based

on record evidence of Blue4est's characteristics.

Finding no expansion of scope, the court accordingly does not consider the substance of

Koehler's argument that Commerce's purported scope expansion represents an unlawful break

with agency practice.[18]

The court therefore sustains Commerce's Final Scope Decision, as it pertains to Blue4est

paper, as supported by substantial evidence and in accordance with law.

---

[18] Even if a scope expansion did occur, this would not necessarily constitute error: as referenced
above, Commerce is generally permitted "alter the scope of the investigation until the final order."
Kyocera Solar, 41 CIT at __, 253 F. Supp. 3d at 1316 (citing Duferco, 296 F.3d at 1096).

### IV.   *Commerce's Reliance on Koehler's Dynamic Sensitivity Testing Data Is Supported by Substantial Evidence*

Domestics challenge Commerce's decision not to assign the same CONNUM to two of Koehler's thermal paper products (here termed Products "A" and "B").  Domestics' Br. at 20.  Commerce made these CONNUM assignments partly on the basis of Koehler's responses to questionnaires during the agency proceeding—these responses purported to show differing dynamic sensitivity characteristics for Products A and B.   IDM at 14.  Domestics argue that Koehler manipulated its data submissions in a deliberate attempt to induce Commerce to classify Products A and B under different CONNUMs.  Domestics' Br. at 20–29.  They claim that Koehler performed tests for the purpose of minimizing antidumping liability, and that these tests show different dynamic sensitivity[19] characteristics for Products A and B even though Koehler's earlier product data sheets, which precede the instant litigation, state that Products A and B have the same dynamic sensitivity.  Id. at 26.  Domestics argue that this contradiction renders Koehler's submitted data inherently suspect, and that Commerce's determination to uncritically accept Koehler's post-Initiation Notice data is thereby unsupported by substantial evidence.  Id.  Commerce, Domestics essentially argue, should have been more skeptical.

Domestics' argument might perhaps be more persuasive if Commerce were reviewing Koehler's data for publication in a scientific journal.  But the inquiry here is not whether

---

[19] Dynamic sensitivity is thermal paper's reactiveness to energy.  Paper with high dynamic sensitivity can produce a legible image with relatively low energy input.  In this investigation, Commerce required respondents to report dynamic sensitivity in terms of the millijoules (energy units) per square millimeter required to produce a paper product's maximum optical density—which, in rough terms, is the maximum darkness that a given thermal paper product is capable of displaying.  Koehler's Resp. at 21–22; Letter from E. Eastwood to Dechert LLP at B-11 (Dec. 1, 2020), P.R. 87 ("Antidumping Questionnaire").

Consol. Court No. 21-00632                                                          Page 50
**PUBLIC VERSION**

Commerce held Koehler to the highest possible standard of reliability.  The proper inquiry is

whether Commerce's determination was supported by substantial evidence.  And in this context,

as Domestics themselves acknowledge, the court will not disturb Commerce's weighing of the

evidence.  Domestics' Reply Br. at 15; see also Downhole Pipe & Equip., L.P. v. United States,

776 F.3d 1369, 1377 (Fed. Cir. 2015) (explaining that "[i]t is not for this court on appeal to reweigh

the evidence or to reconsider questions of fact anew" (internal quotation marks and citation

omitted)).

Domestics claim that they are not lodging an impermissible request for the court "to

reweigh the evidence" because "Commerce did not explain how it weighed the evidence in the

first place."  Domestics' Reply Br. at 19.  Commerce, Domestics assert, "never explained why it

found selected testing performed by Koehler for purposes of the litigation to be more reliable than

specification sheets predating the litigation."  Domestics' Br. at 28.

This is not so.  As Commerce explained in its IDM, the agency determined CONNUM

classification on the basis of the frequency of available test results:

> We analyzed the information Koehler provided to support its reporting of these
> product characteristics for Product A and Product B to determine the product
> characteristic coding that most closely followed our reporting instructions.  As a
> result of this analysis, we determined that the static sensitivity product
> characteristic for Product B should be revised to reflect Koehler's most frequent
> test result for this product.  However, for dynamic sensitivity, after considering the
> most frequent test result from Koehler's Product B testing, we determined that that
> Koehler properly reported this product characteristic.

IDM at 14 (citations omitted).  Domestics disagree with Commerce's choice to look to the

frequency of a test result as a means of determining whether to rely on that result.  See, e.g.,

Domestics' Br. at 26 ("[T]he [test] results . . . should have been found by Commerce to have lacked

credibility."  In Domestics' view, Commerce should have discounted the importance of frequency

and instead made its determination on the basis of assertedly more reliable record evidence.  But

this disagreement, valid or not, does not negate Commerce's reasoned explanation for why it chose

to rely on Koehler's submission.  See Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)

("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's finding from being supported by substantial evidence." (citations

omitted)).  Domestics' proposal for a different finding of credibility is rather the kind of invitation

"to reweigh the evidence or to reconsider questions of fact anew" that the court must decline.

See Downhole Pipe, 776 F.3d at 1376 (internal quotation marks and citation omitted).  The court

accordingly denies Domestics' challenge to Commerce's acceptance of Koehler's dynamic

sensitivity reporting.

> **V.     *Commerce Must Further Explain Its Determination that Koehler's Submissions of Static Sensitivity Data Were Complete***

Domestics also challenge Commerce's determination that Koehler's reporting of the static

sensitivity[20] product characteristic for certain product grades [[

]] was

complete.  See Domestics' Br. at 31; see also Mem. from D. Goldberger, re: Less-Than-Fair-Value

Investigation of Thermal Paper from Germany: Analysis of Business Proprietary Information in

the Final Determination at 1 (Dep't Com. Sept. 24, 2021), P.R. 294, C.R. 359.  Domestics claim

---

[20] Static sensitivity, in contrast to dynamic sensitivity, is the sensitivity of thermal paper to temperature.  Koehler's Resp. at 28.  In this investigation, Commerce requested respondents to measure static sensitivity in terms of the temperature required to induce thermal paper to display its maximum optical density.  Id.; Domestics' Br. at 29.  This is measured by progressively increasing the temperature of a testing device until the tested paper reaches its maximum optical density.  Domestics' Br. at 29.  Thermal paper with high static sensitivity can be printed at lower temperatures relative to thermal paper with low static sensitivity.  Koehler's Resp. at 28.

that Koehler implemented an "arbitrary testing regime" that yielded incomplete and misleading static sensitivity data, which Koehler then submitted in response to Commerce's antidumping questionnaire.  Domestics' Br. at 31.  They further claim that Commerce's decision not to make an adverse inference pursuant to 19 U.S.C. § 1677(e)(b)(1) as a substitute for considering the information allegedly missing from Koehler's submission, see IDM at 16, was unsupported by substantial evidence.  Domestics' Br. at 31.

Domestics argue that Koehler incompletely responded to Commerce's antidumping questionnaire because the static sensitivity data it submitted for various products were based on a flawed testing methodology.  Domestics' Br. at 29.  The specific underlying flaw that Domestics allege is that "Koehler did not conduct tests at sufficiently high temperatures to determine the point at which [the tested] products reached their maximum [optical density unit]."  Id. at 32.  Instead, when measuring the static sensitivity of certain tested products, Koehler allegedly declined to increase the temperature emitted by its testing device beyond [[        ]] degrees Celsius.[21]  For those products requiring a higher temperature [[                            ]] to reach maximum optical density, Koehler allegedly reported a static sensitivity value of [[      ]] degrees Celsius.  Domestics' Br. at 32.  In other words, some of Koehler's testing allegedly failed to measure and report the actual static sensitivity of products with static sensitivity values above the maximum temperature that Koehler's testing device could detect.  Id.  Domestics argue that this testing

---

[21] This quirk in Koehler's testing procedure is apparently due to a technical limitation of the Labthink device Koehler used to measure static sensitivity.  The Labthink device can only test a certain number of temperature intervals on a single sample.  Because Koehler performed only a limited number of testing rounds to produce the data at issue here, Koehler's overall testing method was sensitive only up to the highest temperature interval of the highest-temperature testing round.  Koehler's Resp. at 31–32.

scheme rendered Koehler's submissions unresponsive to Commerce's questionnaire, which required respondents to "report in degrees Celsius the temperature required to produce the maximum ODU." Id. at 33 (quoting Antidumping Questionnaire at B-12).[22]

The Government argues that Commerce acted within its discretion when it declined to find a deficiency in Koehler's reporting of static sensitivity data.  Gov't Br. at 45–46 (stating that Domestics "wrongly assume that they can substitute their own judgment to determine whether a submission is 'deficient'" (citing Domestics' Br. at 32, 29–34)).  Insisting that there was no gap on the record and pointing out Commerce's finding that "Koehler acted in accordance with Commerce's instructions in reporting the static sensitivity product characteristic for these

---

[22] The instructions in Commerce's questionnaire for reporting static sensitivity are reproduced below:

> FIELDNAME: SENSITH
> DESCRIPTION: Static Sensitivity
> NARRATIVE: Report in degrees Celsius the temperature required to produce the maximum ODU.

| Code | |
|------|------|
| 01 | <10 |
| 02 | ≥10 but < 10 |
| 03 | ≥ 10 but < 120 |
| 04 | ≥ 120 but < 130 |
| 05 | ≥ 130 but < 140 |
| 06 | ≥ 140 but < 150 |
| 07 | ≥ 150 but < 160 |
| 08 | ≥ 160 but < 170 |
| 09 | ≥ 170 but < 180 |
| 10 | ≥ 180 |

Antidumping Questionnaire at B-10–B-11.

***PUBLIC VERSION***

products," IDM at 16,[23] the Government casts Domestics' argument as a mere quibble with how

Commerce decided to conduct its own investigation.  Gov't Br. at 44–48.

Koehler similarly characterizes Domestics' argument as a request for the court to override

Commerce's judgment on a matter that is within the agency's statutory discretion.  Koehler's Resp.

at 34–35.  Koehler cites the court's decision in Risen Energy as a rejection of a "similar attempt[]"

to "supplant Commerce's decision-making authority" and quotes the following passage from that

case:

> Here, Commerce finds that the supplemental responses it received from the six
> cooperative unaffiliated suppliers adequately address the deficiencies that
> SunPower complains of, eliminating a need to employ facts available . . . .
> SunPower, pointing to various purported deficiencies in the suppliers' factual
> submissions, contests Commerce's determination that the suppliers provided
> sufficient information, and claims that the deficiencies themselves demonstrate that
> the suppliers failed to act to the best of their ability.  Commerce addresses the
> discrepancies identified by SunPower, and concludes that the information provided
> by the six cooperative suppliers is sufficient to calculate an accurate dumping

---

[23] Commerce's full response to Domestics' case brief on the issue of Koehler's static sensitivity
reporting is as follows:

> For the products at issue, Koehler reported the static sensitivity product
> characteristic based on the temperature required to produce the maximum ODU
> according to the instructions in Commerce's questionnaire and Koehler's product
> testing in the normal course of business.  We disagree with the petitioners that
> Koehler's reporting of static sensitivity for these products is incomplete because
> Koehler did not provide the same amount of testing documentation for these
> products as it did for Product A and Product B.  Koehler provided additional testing
> documentation for Product A and Product B in response to Commerce's specific
> requests for further information regarding these products.  Commerce made no such
> request for additional static sensitivity testing for Koehler's other products.  As a
> result, we find no basis to consider Koehler's reporting of the static sensitivity
> product characteristic incomplete for its remaining sales transactions.  Thus,
> because Koehler acted in accordance with Commerce's instructions in reporting the
> static sensitivity product characteristic for these products, we find no basis to apply
> AFA to them.

IDM at 16 (footnotes omitted).

margin for Risen.  SunPower does not explain why Commerce's determination was
unreasonable, but rather, requests the court reweigh the evidence, which the court
will not do.

477 F. Supp. 3d at 1344–1346 (footnotes and citations omitted).

This comparison is inapt.  Unlike in <u>Risen Energy</u>, Commerce has failed here to address

the discrepancies in the record that Domestics have identified.  <u>See</u> <u>id.</u>  Commerce in <u>Risen Energy</u>

provided detailed responses to each of the purported discrepancies raised by the petitioner in that

case.  <u>See</u> <u>id.</u> at 1345 n.20.  Here, Domestics argued before the agency that Koehler's submissions

were incomplete because they relied on a testing protocol that was inadequate to determine the

temperature required to produce maximum optical density in certain products.  Domestics' Case

Br. at 15–18.  Commerce's response was to conclusorily state that "Koehler acted in accordance

with Commerce's instructions in reporting the static sensitivity product characteristic for these

products."  IDM at 16; <u>accord</u> Koehler's Resp. at 33.  In other words, when faced with Domestics'

challenge to Commerce's basis for finding Koehler's submissions to be complete as defined by

their compliance with Commerce's instructions, Commerce's response[24] was to restate that

Koehler's submissions were complete because Commerce found them to comply with

Commerce's instructions.

---

[24] Commerce also pointed out its IDM that Koehler's responses were supported by "Koehler's
product testing in the normal course of business."  IDM at 16.  [[



                              ]].  In any case, Commerce's reference to Koehler's business practices
is misplaced.  Commerce's instruction in its questionnaire that respondents "report in degrees
Celsius the temperature required to produce the maximum [Optical Density Unit]" does not by its
terms excuse incomplete reporting in instances where a respondent's testing in the normal course
of business does not determine the temperature required to produce a product's maximum optical
density.  Antidumping Questionnaire at B-12.

This explanation falls short of the bar that Commerce leapt in <u>Risen Energy</u>, and neglects Commerce's general duty to "address significant arguments and evidence which seriously undermines its reasoning and conclusions." <u>Altx, Inc. v. United States</u>, 25 CIT 1100, 1117–18, 167 F. Supp. 2d 1353, 1374 (2001); <u>see also</u> 19 U.S.C. § 1677f(i)(3)(A) ("[T]he administering authority shall include in a final determination . . . an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation . . . ."). In order to demonstrate that its characterization of Koehler's submissions as complete was supported by substantial evidence, Commerce bore the burden of explaining <u>why</u> it found Koehler's submissions to accord with Commerce's instructions despite the fact that Koehler tested static sensitivity with a device that did not emit enough heat to induce maximum optical density in some products. Commerce could have attempted to rebut Domestics' characterization of how Koehler tested its products. Alternatively, Commerce could have attempted to explain why the alleged flaws in Koehler's testing protocol were immaterial for the purposes of Commerce's investigative factfinding. And under the discretionary language of 19 U.S.C. § 1677e(b), Commerce could have even found Koehler's submissions to be incomplete and declined nevertheless to apply an adverse inference against Koehler. <u>See</u> <u>Assan Alumniyum</u>, 624 F. Supp. 3d at 1377–78. Whichever way Commerce ultimately chooses to proceed, the agency must in some way grapple with the substance of the argument that Domestics presented in their case brief.

The court, in the context of a substantial-evidence inquiry, will not reweigh the evidence that Commerce relied on in determining that Koehler's submission was complete. <u>Downhole Pipe</u>, 116 F.3d at 1376. But the court does look to whether Commerce's determination of completeness is supported by "evidence that a reasonable mind might accept as adequate to support a

**PUBLIC VERSION**

conclusion." SeAH Steel, 950 F.3d 833, 840 (Fed. Cir. 2020).  The court, unable at this stage to

discern such evidence on the record, remands Commerce's finding that Koehler's submissions of

static sensitivity data were complete.  Commerce is instructed on remand to explain the basis of

its finding that Koehler's static sensitivity responses were complete.  If upon reconsideration

Commerce finds these responses deficient, the court instructs Commerce to provide Koehler "with

an opportunity to remedy or explain the deficiency," 19 U.S.C. § 1677m(d) (governing the

treatment of deficient submissions), before determining whether to use the facts otherwise

available under 19 U.S.C. § 1677e(a) or else to apply an adverse inference under 19 U.S.C.

§ 1677e(b).[25]

The court, anticipating further development of the record on remand, does not reach the

issue of whether Commerce's determination not to apply an adverse inference under § 1677(e)(b)

is in accordance with law.  Immediate application of an adverse inference on remand would be

premature, as Koehler has received no notice of a deficiency pursuant to 19 U.S.C. § 1677m(d).

### VI.   *Commerce's Price Adjustments for Koehler's Rebates to Home Market Customers Are Supported by Substantial Evidence and in Accordance With Law*

When calculating Koehler's dumping margin, Commerce made downward adjustments to

Koehler's reported home market prices to account for rebates that Koehler applied to certain home

market sales.  IDM at 21.  These adjustments effectively lowered Koehler's antidumping liability,

as they brought Commerce's overall calculation of Koehler's home market pricing closer to its

calculation of Koehler's U.S. pricing.  Domestics argue that Commerce's inclusion of these rebates

---

[25] 28 U.S.C § 2643(b) empowers the court to "order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision" if, as is true here, the court is "unable to determine the correct decision on the basis of the evidence."

in its dumping margin calculations constitutes an unlawful break with past agency practice.  See Domestics' Br. at 12.

Domestics contend that Commerce's established practice is to require that the terms and conditions of a rebate were known to the customer at the time of sale as a necessary condition of applying a price adjustment on the basis of that rebate.[26]  See id. at 13–14.  Domestics further suggest that Commerce has adopted this practice in its own regulations, quoting language in the preamble to Commerce's 2016 Final Modification which states that "the Department generally will not consider a price adjustment that reduces or eliminates dumping margins unless the party claiming such price adjustment demonstrates that the terms and conditions of the adjustment were established and known to the customer at the time of sale."  Id. at 13 (quoting Final Modification, 81 Fed. Reg. at 15642).  This combination of regulation and agency practice, Domestics argue, compels Commerce to refrain from making price adjustments to account for Koehler's rebates— the terms and conditions of which were unknown to customers at the time of sale.  See Domestics' Br. at 12 (citing IDM at 19–20).

Domestics accordingly urge the court to conclude that Commerce's allegedly "unexplained" determination to apply price adjustments in this case is not in accordance with law. Id.  Domestics also challenge, as unsupported by substantial evidence, three findings that

---

[26] Domestics point to several prior Commerce determinations that purportedly establish this practice.  See id. at 13–17 (citing, inter alia, Certain Aluminum Foil from Turkey, 86 Fed. Reg. 52880 (Dep't Com. Sept. 23, 2021) & accompanying issues mem. at cmt. 6; Certain Uncoated Paper from Portugal, 84 Fed. Reg. 64040 (Dep't Com. Nov. 20, 2019) & accompanying issues mem. at cmt. 1); see also Domestics' Reply Br. at 8–14 (citing, inter alia, Large Diameter Welded Pipe from the Republic of Turkey, 84 Fed. Reg. 6362 (Dep't Com. Feb. 27, 2019) & accompanying issues mem. at cmt. 3).

Commerce invoked in determining Koehler's entitlement to price adjustments for its rebates.  See

id. at 17.  The challenged findings are that Koehler's rebates are not uncommon, that Koehler

issued them before Domestics filed their antidumping petition, and that the rebates were limited in

number.  Id. (quoting IDM at 22).

### A.    Commerce Did Not Unexplainedly Depart from Established Agency Practice

Domestics claim that "in order for a respondent to make the necessary demonstration under

19 C.F.R. § 351.401(c) per Commerce's established practice, it must show at the very least that

the terms and conditions of the price adjustment were established and known to the customer at

the time of sale." Id. at 13.  This misstates the legal background against which Commerce operates

in determining whether to apply a price adjustment.

First, Domestics mischaracterize as binding regulation Commerce's illustrative

reproduction of rejected language from an earlier proposed rule in the preamble to its Final

Modification.  Domestics' brief reads as follows:

> The preamble to the regulation states that Commerce, in making this determination,
> may consider a variety of factors, such as "(1) whether the terms and conditions of
> the adjustment were established and/or known to the customer at the time of sale,
> and whether this can be demonstrated through documentation; (2) how common
> such post-sale price adjustments are for the company and/or industry; (3) the timing
> of the adjustment; (4) the number of such adjustments in the proceeding; and (5)
> any other factors tending to reflect on the legitimacy of the claimed adjustment."
> Modification of Regulations Regarding Price Adjustments in Antidumping Duty
> Proceedings, 81 Fed. Reg. 15641, 15644–45 ("Modification") (Mar. 24, 2016).
> However, Commerce "generally will not consider a price adjustment that reduces
> or eliminates dumping margins unless the party claiming such price adjustment
> demonstrates that the terms and conditions of the adjustment were established and
> known to the customer at the time of sale." Id. at 15642.

Domestics' Br. at 13.  Domestics reiterated this line of argument in their response to the court's

oral argument questions.  See Def.-Inters.' OAQ Resp. at 7 (stating that "[y]es, that quotation

reflects Commerce's position and practice since at least 1997").

This framing places Commerce's enumeration of the five factors that Commerce may

consult in determining entitlement to a price adjustment on the same footing as Commerce's

apparent statement that the agency generally will not consider a price adjustment absent prior

customer knowledge of a rebate.  But while Commerce's five-factors language directly expresses

the agency's intent in conjunction with the agency's promulgation of its modification to 19 C.F.R.

§ 351.401(c), Domestics' selective quotation elides the fact that the latter statement (beginning

with the word "generally") expresses precisely the opposite of Commerce's position.  The full

sentence from which Domestics quote reads as follows:

> The Proposed Rule explained the Department's proposal, in light of the Court of
> International Trade's decision in Koehler AG, to clarify that the Department
> generally will not consider a price adjustment that reduces or eliminates dumping
> margins unless the party claiming such price adjustment demonstrates that the terms
> and conditions of the adjustment were established and known to the customer at the
> time of sale.

Final Modification, 81 Fed. Reg. at 15642 (emphasis added).

Commerce ultimately declined to promulgate a modification that incorporated the language

of Proposed Rule as described in this sentence, and instead opted for a modification that referred

only to a party's entitlement to a price adjustment.  Id. at 15644–45.  But this is not apparent from

Domestics' briefing and subsequent representations at oral argument, which give the impression

that Commerce had adopted the language it referenced from the Proposed Rule.  In fact, none of

Commerce's current regulations—or preambles describing the meaning thereof—contain a direct

Consol. Court No. 21-00632                                                                 Page 61
**PUBLIC VERSION**

statement that Commerce generally considers customer knowledge of a rebate to be a necessary

condition for entitlement to a price adjustment.

     More fundamentally, Domestics overlook the fact that Commerce may depart from its

established practice so long as it "explains the reason for its departure" and no regulation or statute

directs otherwise.  Allegheny Ludlum Corp. v. United States, 346 F.3d 1368, 1373 (Fed. Cir. 2003)

(citing Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973));

Al Ghurair Iron, 65 F.4th at 1360 (explaining that, as a general matter, "Commerce is not bound

by its prior determinations"); Hyundai Elec. & Energy Sys. Co. v. United States, 15 F.4th 1078,

1089 (Fed. Cir. 2021) (explaining that "[w]e have rejected the notion that Commerce is forever

bound by its past practices" (internal quotation marks and citations omitted)).  Here, Commerce

has thoroughly explained its rationale for determining Koehler's entitlement to a price adjustment

in accordance with controlling statutory and regulatory provisions.  See IDM at 22.[27]  Commerce's

explanation, which invokes three of the five factors that Commerce laid out in its preamble to its

Final Modification, reflects precisely the type of analysis that Commerce contemplated when it

---

[27] Commerce explained its approach as follows:

> We analyzed the factors outlined in the Final Modification related to Koehler's
> provision of [the home market rebates].    Based on this analysis, we determined
> that while the terms and conditions of these rebates were not known to Koehler's
> customers at the time of sale, such adjustments are not uncommon for Koehler.
> Moreover, the timing of these rebates (before the filing of the petition) and their
> limited number demonstrate that this adjustment is appropriate pursuant to the
> factors outlined in the Final Modification.

IDM at 22; see also Mem. from D. Goldberger, re: Less-Than-Fair-Value Investigation of Thermal
Paper from Germany: Analysis of Business Proprietary Information in the Final Determination at
6–7 (Dep't Com. Sept. 24, 2021), C.R. 359, P.R 294.

**PUBLIC VERSION**

modified 19 C.F.R. § 351.401(c).  See <u>Final Modification</u>, 81 Fed. Reg. at 15644–45 ("The

Department may consider any one or a combination of these factors in making its determination,

which will be made on a case-by-case basis and in light of the evidence and arguments on each

record.").  Accordingly, even assuming that Domestics are correct to point out that Commerce's

established practice is to condition price adjustments for rebates on customer knowledge of

rebates, <u>see</u> Domestics' Br. at 14, Commerce has met its burden for lawfully deviating from that

practice here.

       The court accordingly finds that Commerce's determination that Koehler was entitled to a

price adjustment does not constitute an unlawful break from past agency practice.

**B.      *Substantial Evidence Supports Commerce's Determination that Koehler is Entitled to Price Adjustments***

       Domestics challenge three of the purported bases on which Commerce determined Koehler

to be entitled to price adjustments for its home market rebates, alleging that they are unsupported

by substantial evidence on the record.  <u>See</u> Domestics' Br. at 17.  The Government takes the

opposite view, and responds that Commerce has indeed supported its findings on the price

adjustment issue with substantial evidence.  <u>See</u> Gov't Br. at 48.  The court agrees with the

Government's position, finding none of Domestics' challenges to be persuasive.

       Domestics first challenge Commerce's finding that "such adjustments [as the rebates at

issue] are not uncommon for Koehler."  Domestics' Br. at 17 (quoting IDM at 22).  This finding,

Domestics argue, is unsupported by substantial evidence because the record shows that Koehler

issued the rebates at issue [[                                                    ]] amid "extraordinary business

conditions arising from the COVID-19 pandemic."  <u>Id.</u> at 18 (quoting IDM at 20).  Domestics

moreover argue that even if Commerce's finding were supported by record evidence showing that the rebates at issue were common, this finding would not support a conclusion that Koehler is entitled to a price adjustment.  Id.

  This argument saps essential context from Commerce's explanation in its IDM. Commerce's full statement reads, "[b]ased on this analysis, we determined that while the terms and conditions of these rebates were not known to Koehler's customers at the time of sale, such adjustments are not uncommon for Koehler."  IDM at 22 (emphasis added).  As this complete rendering of Commerce's statement shows, Commerce brought up the commonness of Koehler's rebates as a means of qualifying Koehler's home market customers' lack of knowledge about the terms and conditions of the particular rebates at issue.  Commerce asserted, in other words, that the bearing of Koehler's customers' lack of specific knowledge on the five-factor balancing test laid out in the Final Modification is mitigated by the fact that the same customers, through familiarity with the terms and conditions of other rebates, could have reasonably expected similar terms to apply.  What Commerce did not assert, as Domestics suggest Commerce did, see Domestics' Br. at 17, is that the particular rebates at issue in this case were common.  Commerce in fact asserted the exact opposite of Domestics' interpretation no more than one sentence later in the IDM, referencing the "limited number" of rebates specifically at issue in this case.  IDM at 22.[28]

---

[28] Domestics recognize this contradiction and attribute it to Commerce's unexplained recognition of a "sweet spot for allowing rebates that are somehow of 'limited number' but still frequent enough to be 'not uncommon.'"  Domestics' Br. at 19.  As explained above, however, the rebates that Commerce stated are "not uncommon" comprise the entire set of rebates issued by Koehler. What Koehler issued in "limited number" is the much smaller set of rebates for which Commerce

Domestics' second challenge is to Commerce's finding that Koehler issued the rebates at issue before the filing of the petition.  Domestics' argument here is that "there have been other antidumping investigations where rebates were granted prior to the filing of the petition, and yet Commerce nonetheless disallowed those rebates when the terms and conditions were unknown to the customer at the time of sale."  Domestics' Br. at 17.  But as explained above, even if such a past practice exists, that practice does not compel Commerce to align its future actions thereto.  All Commerce must do when it departs from a past practice is to adequately explain its reasons for doing so.  See Allegheny Ludlum, 346 F.3d at 1373.  Commerce has done so here, invoking as its rationale a directly applicable regulation that—as Commerce expressly stated when promulgating a modification to that regulation—preserves agency discretion to weigh more factors than just customer knowledge in determining entitlement to a price adjustment.  See IDM at 21–22 (quoting 19 C.F.R. § 351.401(c); Final Modification, 81 Fed. Reg. at 15642).

Finally, Domestics challenge as unsupported by substantial evidence Commerce's finding that the rebates for which Koehler was entitled to a price adjustment were of "limited number."  Domestics' Br. at 19–20 (citing IDM at 22).  Domestics point out that Koehler applied the retroactive rebates at issue to a fraction [[                                        ]] of reported sales, a fraction that Domestics characterize as "hardly insignificant or 'limited' in number."  Id. at 20.

The court remains mindful upon reviewing this challenge that "[s]ubstantial evidence is defined as more than a mere scintilla, or such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  PAM, S.p.A., 582 F.3d at 1339 (internal quotation marks

---

specifically granted a price adjustment in this proceeding.  Again, the portion of the sentence that Domestics omitted from their brief makes this clear.  IDM at 22.

and citation omitted).  Viewed in this light, there can be little doubt that the fraction cited by

Domestics of home market sales to which Koehler applied retroactive rebates is small enough that

a reasonable mind at the very least might characterize it as "limited."  Nor do Domestics anywhere

explain their counterintuitive suggestion that this fraction does not constitute a limited number of

sales.

For these reasons, the court denies Domestics' challenge to this aspect of Commerce's

Final Determination.

### VII.    *Commerce Must Further Explain Its Classification of Koehler's Accrued Interest as a Cost of Production*

As noted above, Commerce added the interest expenses on unpaid antidumping duties that

Koehler incurred during the underlying period of investigation to Commerce's calculation of

Koehler's Cost of Production ("COP") for subject merchandise.  See PDM at 14.  Based on this

calculation, Commerce excluded certain home market sales that were made at lower prices than

this COP from Commerce's determination of Normal Value.  See id. at 15 (citing 19 U.S.C.

§ 1677b(b)(1)).  This exclusion, in turn, had the effect of driving up Commerce's calculation of

Normal Value.

Domestics argued in the agency proceeding below that Commerce should have instead

included Koehler's interest expenses as an indirect selling expense to be deducted from

Constructed Export Price ("CEP") under 19 U.S.C. § 1677a(d)(1)(D) and 19 C.F.R. § 351.402(b).

See Domestics' Case Br. at 21.  Quoting 19 C.F.R. § 351.402(b), Domestics asserted that "[t]he

antidumping duties clearly were 'associated with commercial activities in the United States,'

and—particularly for Koehler's direct sales of thermal paper to U.S. customers—they necessarily

'relate[d] to the sale to an unaffiliated purchaser.'" <u>Id.</u> Because of this, Domestics argued,

Commerce should have treated the interest accrued on these (unpaid) duties as similarly associated

with Koehler's commercial activities during the period of the investigation underlying the instant

case. <u>See id.</u>

Commerce did not do as Domestics argued it should, stating in its Calculation Memo

(which Commerce issued in conjunction with the <u>Final Determination</u>) as follows:

> We excluded all financial interest expenses from the cost of production (COP) used
> to calculate the constructed export price (CEP) profit ratio. Specifically, because
> the CEP profit ratio is applied to the expenses associated with commercial activity
> in the United States, which do not include any financial interest expenses, we
> calculated the CEP profit ratio to be on this same basis.

Mem. from D. Goldberger, re: Less-Than-Fair-Value Investigation of Thermal Paper from

Germany: Final Determination Margin Calculation for Papierfabrik August Koehler SE at 2 (Sept.

24, 2021), P.R. 295, C.R. 360 ("Calculation Mem.").

Domestics now challenge the sufficiency of this explanation, seeking remand on the basis

that Commerce failed to address the material argument that Domestics raised. <u>See</u> Domestics' Br.

at 11.

Domestics argue that Commerce failed to address Domestics' argument that Commerce

should include Koehler's interest expenses as an indirect selling expense to be deducted from

Constructed Export Price. <u>See</u> Domestics' Br. at 11; Domestics' Repl. Br. at 5. They point out

that Commerce's only response to Domestics' argument, which was to state that Koehler's

"expenses associated with commercial activity in the United States . . . do not include any financial

interest expenses," Calculation Mem. at 2, simply assumes a conclusion as to the proper

classification of the expenses.  Domestics' Repl. Br. at 4–5.[29]  Painting the Government's more

fully reasoned explanation of Commerce's actions, see Gov't Br. at 55–56, as an attempt to "supply

a reasoned basis for the agency's action that the agency itself has not given," Chenery, 332 U.S.

at 196, Domestics seek to compel Commerce to furnish a fuller explanation on remand.  See

Domestics' Br. at 11; Domestics' Reply Br. at 8.

      The Government responds that Commerce's statements in the IDM and Calculation Memo

together constitute a sufficient basis for reasonably discerning Commerce's reasoning.  Gov't Br.

at 56 (citing Bowman, 419 U.S. at 286).  Commerce, in the Government's view, "explained that

the 'unusual' interest expenses in this investigation should be treated as part of Koehler's overall

interest expense" and "explained that 'the expenses associated with commercial activity in the

United States . . . do not include any financial interest expenses.'"  Gov't Br. at 56–57 (emphasis

added) (quoting Calculation Mem. at 2).

      The court declines to adopt the Government's framing: these statements may describe what

Commerce did, but they do not "explain" Commerce's reasons for doing so.  Gov't Br. at 56–57.

---

[29] Domestics also argue that even this statement should be disregarded as an explanation of
Commerce's rationale because it appeared in a Calculation Memorandum, not the IDM.  The
Calculation Memorandum, they argue, "represents nothing more than the case analysts' notes to
the file regarding how the Assistant Secretary's decision was implemented by way of computer
programming."  Domestics' Reply Br. at 3.  The court is unpersuaded by Domestics' suggestion
that an agency may only provide an explanation for its actions on the record within the confines
of an Issues and Decision Memorandum.  In fact, Calculation Memoranda may very well form the
basis for the court's review of agency action.  See, e.g., Dongkuk S&C Co. v. United States, 45
CIT __, __, 548 F. Supp. 3d 1376, 1381 (2021) (examining a "Final Cost Calculation
Memorandum" and finding Commerce's analysis therein to be insufficient).  As a more general
matter, the court's assessment of whether an agency action is supported by substantial evidence is
based upon the record as a whole.  See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351
(Fed. Cir. 2006).

**PUBLIC VERSION**

What Domestics argued below is that Koehler's interest expenses should be considered to be associated with commercial activity in the United States.[30]  Domestics' Case Br. at 21.  Rather than rebut this argument (as Koehler has done here, see Koehler's Resp. at 6–15) with an explanation that its determination was in line with applicable statutes, regulations, and agency precedent, Commerce instead made a flat declaration to the effect of "not so."  This is not the kernel of an argument from which "the agency's decisional path" is "reasonably discernible." Wheatland Tube, 161 F.3d at 1369.  It is no argument at all.

The court cannot address the merits of Commerce's decision not to treat Koehler's interest expenses as indirect selling expenses without reference to an explanation of why Commerce so decided.  The court accordingly remands this aspect of the Final Determination to allow Commerce to reconsider its position or supply an explanation.

## CONCLUSION

For the reasons explained above, the court sustains the Final Determination in part with respect to Commerce's inclusion of Blue4est paper as subject merchandise, Commerce's CONNUM assignments for the dynamic sensitivity product characteristic, and Commerce's application of price adjustments to home market rebates.

The court further denies Koehler's challenge to Commerce's rejection of exhibits to Koehler's case brief on the grounds of harmless error.

The court further remands Commerce's Final Determination in part with respect to Commerce's Cohen's *d* methodology, Commerce's CONNUM assignments for the static

---

[30] Commerce acknowledged in its IDM that Koehler had made this argument.  See IDM at 17.

Consol. Court No. 21-00632                                                      Page 69
**PUBLIC VERSION**

sensitivity product characteristic, and Commerce's classification of Koehler's accrued interest as

a Cost of Production, for reconsideration or further explanation consistent with this opinion.

      Commerce is directed to file its remand redetermination no sooner than, and no later than

sixty days after, the conclusion of all appellate proceedings in Stupp V.

      **SO ORDERED**.

                                      /s/      *Gary S. Katzmann*
                                        Gary S. Katzmann, Judge

Dated: <u>February 8, 2024</u>
       New York, New York