A-428-850
Remand:  Slip Op. 24-14
**Public Version**
E&C/OIX:  Team

*Matra Americas, LLC et al v. United States*, 681 F. Supp. 3d 1339 (CIT 2024)
**Thermal Paper from the Federal Republic of Germany**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.     SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of
redetermination pursuant to the opinion and remand order of the U.S. Court of International
Trade (the Court), in *Matra Americas, LLC et al v. United States*, issued on February 8, 2024.[1]
This action arises out of the *Final Determination* in the less-than-fair-value (LTFV) investigation
of thermal paper from Germany.[2]  The period of investigation (POI) is October 1, 2019, through
September 30, 2020.

The Court remanded to Commerce to reconsider or explain:  (1) its application of the
Cohen's *d* test to Koehler Paper SE's (Koehler's) U.S. sales database; (2) the coding of the static
sensitivity product characteristic; and (3) the decision not to treat Koehler's accrued interest
expenses related to unpaid antidumping duties as an indirect selling expense.[3]

As set forth in detail below, pursuant to the Court's *Remand Order*, Commerce: (1)
reconsidered its application of the Cohen's *d* test as part of its differential pricing analysis; (2)
reopened the record and provided Koehler with an opportunity to remedy its reporting of the

---

[1] *See Matra Americas, LLC et al. v. United States*, 681 F.Supp.3d 1339 (CIT 2024) (*Remand Order*).
[2] *See Thermal Paper from Germany:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 86 FR 54152 (September 30, 2021) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Order*, 681 F.Supp.3d at 1382.

static sensitivity product characteristic; and (3) provided further explanation of the inclusion of

Koehler's accrued interest expenses related to unpaid antidumping duties as part of the financial

expenses in the calculation of the cost of production, instead of as U.S. indirect selling expenses.

## II.    BACKGROUND

Commerce published the *Final Determination* on September 30, 2021.[4]  As discussed in

the *Final Determination*, Commerce applied the Cohen's *d* test as part of its differential pricing

analysis.[5]  Additionally, Commerce accepted Koehler's reporting of the static sensitivity product

characteristic in its sales and cost databases for all but one product in the final determination.[6]

Commerce also recalculated Koehler's reported financial expense ratio to include the interest

expenses accrued on Koehler's unpaid antidumping duties from the revoked *LWTP Order*.[7]

Following publication of the *Final Determination*, certain parties challenged Commerce's

findings before the Court.

First, in its opinion sustaining, in part, and remanding, in part, Commerce's final

determination, the Court concluded that Commerce did not sufficiently explain how its use of the

Cohen's *d* test was reasonable in light of the concerns raised by the U.S. Court of Appeals for the

Federal Circuit (Federal Circuit) in *Stupp III*, regarding use of the test when the data groups

being compared are small, not normally distributed, and have disparate variances (*i.e.*, the

statistical assumptions are not satisfied).[8]  According to the Court, Commerce's statement that

Koehler's U.S. sales data comprise a "complete population," did not adequately explain how

---

[4] *See Final Determination*, 86 FR at 54152.
[5] *See Final Determination* IDM at Comment 1.
[6] *Id.* at Comments 3 and 4.
[7] *Id.* at Comment 5; *see also Antidumping Duty Orders:  Lightweight Thermal Paper from Germany and the People's Republic of China*, 73 FR 70959 (November 24, 2008) (*LWTP Order*).
[8] *See Remand Order*, 681 F.Supp.3d at1362-63 (citing *Stupp Corp. v. United States*, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (*Stupp III*)).

testing an entire population obviates the need to satisfy these statistical assumptions.[9]  Therefore, the Court remanded Commerce's application of the Cohen's *d* test for reconsideration or further explanation which considers "all relevant law as interpreted by th{e} Court and by the Federal Circuit."[10]

Second, the Court held that Commerce failed to adequately address Domtar Corporation and Appvion, LLC's (collectively, the petitioners) argument that Koehler incompletely responded to Commerce's questionnaire because Koehler reported static sensitivity data based on a flawed testing methodology.[11]  The Court also stated that Commerce's determination that Koehler's reporting was complete because it was in accordance with the questionnaire instructions was conclusory.[12]  According to the Court, the agency bore the burden of explaining why it found Koehler's submissions to accord with the questionnaire instructions despite that Koehler tested static sensitivity with a device that did not emit enough heat to induce maximum optical density (ODU) for some products.[13]  The Court remanded to Commerce to explain the basis of its finding that Koehler's static sensitivity reporting is complete and, if it does not make such a finding on remand, to provide Koehler with an opportunity to remedy or explain the deficiency before determining whether to use facts otherwise available under section 776(a) of the Tariff Act of 1930 (the Act), or an adverse inference under section 776(b) of the Act.[14]

Third, the Court remanded Commerce's decision to include Koehler's accrued interest expenses related to unpaid antidumping duties as a part of the financial expenses in the calculation of the cost of production (COP), rather than as U.S. indirect selling expenses.[15]  The

---

[9] *Id.*, 681 F.Supp.3d at 1363.
[10] *Id.* at 1364.
[11] *See Stupp III,* 681 F.Supp.3d at 1375-76.
[12] *Id.* at 1375.
[13] *Id.*
[14] *Id.* at 1376.
[15] *Id.* at 1380-82.

Court stated that Commerce did not explain its reasons for including Koehler's accrued interest expenses as part of the financial expenses in the calculation of COP.[16]  Therefore, the Court remanded this issue to Commerce for reconsideration or further explanation.[17]

In its *Remand Order*, the Court set a redetermination deadline of 60 days after the conclusion of appellate proceedings in *Stupp Corp. v. United States*.[18]  The Federal Circuit's mandate issued on June 16, 2025.[19]

On remand, Commerce provided Koehler an opportunity to remedy its reporting of the static sensitivity product characteristic.[20]  Koehler submitted its revised sales and cost databases with revised static sensitivity reporting, and the petitioners filed rebuttal comments.[21]  On July 22, 2025, we released our Draft Remand to interested parties.[22]  On July 29, 2025, we received comments from the petitioners and Koehler.[23]  We respond to these comments below.

After considering the comments raised by interested parties, we made changes to the Draft Remand with regard to the treatment of Koehler's reporting of the static sensitivity product characteristic for these final results of redetermination.  Specifically, in these final results of redetermination, we applied partial facts available to Koehler's reported static sensitivity coding

---

[16] *Id*.

[17] *Id*. at 1382.

[18] *See Remand Order*, 681 F.Supp.3d at 1364 (referencing *Stupp Corp. v. United States*, No. 23-1663, 2025 WL 1178392 (Fed. Cir. 2025) (*Stupp*) (non-precedential)).

[19] *See Stupp Corp. v. United States*, No. 15-00334, ECF. No. 270 (CIT June 16, 2025) (Federal Circuit mandate); *see also Matra America LLC et al. v. United States*, No. 21-00632, ECF No. 98 (granting extension to file the redetermination to August 29, 2025).

[20] *See* Commerce's Letter, "Request for Information," dated May 30, 2025 (Commerce's May 30 Letter), at 4; *see also* Memorandum, "Exchange with Counsel for Koehler Paper SE," dated June 18, 2025 (Commerce's June 18 Memorandum).

[21] *See* Koehler's Letter, "Response to the Department's June 18, 2025 Memorandum," dated June 27, 2025 (Koehler's June 27 SRQR), at 2 and Exhibits R-1a, R-1b, R-2, and R-3; *see also* Petitioners' Letter, "Comments on Koehler's Supplemental Questionnaire Response," dated July 2, 2025 (Petitioners' Comments).

[22] *See* Draft Results of Redetermination Pursuant to Court Remand, *Matra Americas, LLC et al v. United States*, 681 F.Supp.3d 1339 (CIT 2024), dated July 22, 2025 (Draft Remand).

[23] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination," dated July 29, 2025 (Petitioners' Draft Remand Comments); *see also* Koehler's Letter, "Koehler Paper SE's Letter in Lieu of Comments on Draft Remand Redetermination," dated July 29, 2025 (Koehler's Letter on Draft Remand).

for certain products sold during the POI. For further analysis, *see* the "Analysis" and "Interested Party Comments on the Draft Results of Redetermination," sections below. We made no changes to the Draft Remand with regard to Commerce's differential pricing analysis and treatment of accrued interest expenses for unpaid antidumping duties for these final results of redetermination. As a result, the final estimated weighted-average dumping margin for Koehler is 6.27 percent.[24] Additionally, the all-others rate is also 6.27 percent.[25]

## III.    ANALYSIS

### I.    Commerce's Application of the Cohen's *d* Test

As discussed above, in its *Remand Order*, the Court held that Commerce did not sufficiently explain how its use of the Cohen's *d* test was reasonable in light of concerns raised by the Federal Circuit in *Stupp III*, when the data groups being compared are small, not normally distributed, and have disparate variances (*i.e.*, certain statistical criteria are not satisfied).[26] Specifically, the Court remanded Commerce's application of the Cohen's *d* test for reconsideration or further explanation which considers "all relevant law as interpreted by th{e} Court and by the Federal Circuit."[27] Recently, in *Marmen*, the Federal Circuit held that it is unreasonable for Commerce to use the current Cohen's *d* test as part of its differential pricing analysis when the test is applied to data that do not satisfy the statistical criteria of normal distribution, equal variability, and sufficiently numerous data.[28] In doing so, the Federal Circuit held that "Commerce may re-perform a differential pricing analysis, and *that analysis may not rely on Cohen's d test* for data sets like those here {*i.e.*, the data underlying the differential

---

[24] *See* Memorandum, "Calculation Memorandum for the Final Results of Redetermination," dated concurrently with these Final Results of Redetermination.
[25] *Id*.
[26] *See Remand Order*, 681 F.Supp.3d at 1362-63 (citing *Stupp III*, 5 F.4th at 1345).
[27] *Id.* at 1364.
[28] *See Marmen Inc., et al. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*); *see also Stupp*, No. 23-1663, 2025 WL 1178392 (non-precedential).

pricing analysis in the *Marmen* investigation that the Federal Circuit found do not conform to the three statistical criteria}," but it also held that Commerce may develop and justify a different analytical approach for evaluating whether price differences among purchasers, regions, or time periods are significant.[29]

Following the Federal Circuit's decision in *Marmen*,[30] Commerce sought information and public comment on alternatives to the Cohen's *d* test as part of its differential pricing analysis under section 777A(d)(1)(B)(i) of the Act, to identify whether prices for comparable merchandise differ significantly among purchasers, regions, and time periods.[31]  In an effort to comply with the Federal Circuit's holding, Commerce discontinued the use of the Cohen's *d* test in administrative proceedings and adopted a new test for evaluating whether price differences among purchasers, regions, or time periods are significant.[32]  Additionally, and concurrent with this change, Commerce also discontinued the use of the "mixed method" in administrative proceedings.  In its revised differential pricing analysis, Commerce adopted the "price difference test" as part of its differential pricing analysis to determine whether prices differ significantly. Accordingly, for these final results of redetermination, in light of Commerce's revised approach in administrative proceedings pursuant to "all relevant law," including the Federal Circuit's decision in *Marmen*, and in accordance with this Court's *Remand Order*, Commerce

---

[29] *See Marmen*, 134 F.4th at 1334 (emphasis added); *see also Stupp*, No. 23-1663, 2025 WL 1178392.
[30] *See Marmen*, 134 F.4th at 1348; *see also Stupp*, No. 23-1663, 2025 WL 1178392.
[31] *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025).
[32] *See, e.g., Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2022–2023*, 90 FR 30050 (July 8, 2025), and accompanying IDM at 2-5.

reconsidered and discontinued its application of the Cohen's *d* test to Koehler's U.S. sales data, and, in the alternative, applied the "price difference test," as detailed below.

### i.    Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Koehler's sales of the subject merchandise from Germany to the United States were made at less than normal value (NV), Commerce compared the constructed export price (CEP) to the NV as described in the "Constructed Export Price" and "Normal Value" sections of the *Preliminary Determination*.[33]

### 1.    Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average NVs to weighted-average export prices (EPs) (or CEPs) (*i.e.*, the average-to-average method) unless the Secretary determines that another method is appropriate in a particular situation. In a LTFV investigation, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the average-to-transaction method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act. Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method here. Commerce will

---

[33] *See Thermal Paper from Germany: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 86 FR 26001 (May 12, 2021) (*Preliminary Determination*), and accompanying Preliminary Determination Memorandum at 10-15.

continue to evaluate its approach in this area based on comments received and the application of the differential pricing analysis on a case-by-case basis, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the average-to-average method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used here examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region, and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise. Purchasers are based on the reported consolidated customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POI based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region and time period, comparable merchandise is defined using the product control number (CONNUM) and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly. For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser,

region or time period is within two percent of the weighted average net price to all other

purchasers, regions or time periods.  If the weighted-average net price to the given purchaser,

region or time period falls outside of the plus or minus two percent band around the weighted-

average net price to all other purchasers, regions or time periods, then the prices to that given

purchaser, region or time period are found to differ significantly and those sales to the given

purchaser, region or time period pass the price difference test.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S.

sales as measured by the price difference test.  The ratio test calculates the ratio of the total value

of sales that pass the price difference test to the total value of sales by the respondent in the

United States during the POI.  If 33 percent or less of the total value of sales passes the price

difference test, then the results of the price difference and ratio tests do not support consideration

of the average-to-transaction method.  If more than 33 percent of the total value of U.S. sales

passes the price difference test, then Commerce will find that a pattern of prices existed during

the POI.  Consequently, Commerce will examine whether there is a meaningful difference in the

weighted-average dumping margins calculated using the standard average-to-average method

and using the alternative average-to-transaction method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate

the existence of a pattern of prices that differ significantly such that the average-to-transaction

method could be considered, then in the second stage of the differential pricing analysis,

Commerce examines whether using only the average-to-average method can account for such

differences.  In considering this question, Commerce examines whether using the average-to-

transaction method yields a meaningful difference in the weighted-average dumping margin as

compared to that resulting from the use of the average-to-average method.  If the difference

between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the average-to-transaction method may be appropriate.  A difference in the weighted-average dumping margins is considered meaningful if:  (1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the average-to-transaction method where both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the average-to-transaction method move across the *de minimis* threshold.

## 2.  Results of the Differential Pricing Analysis

For Koehler, based on the results of the differential pricing analysis, Commerce finds that 98.19 percent of the value of U.S. sales pass the price difference test,[34] and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce determines that there is no meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using the average-to-transaction method.  Thus, for these final results of redetermination, Commerce is applying the average-to-average method to calculate the weighted-average dumping margin for Koehler.

## II.    Static Sensitivity

After considering the comments raised by interested parties,[35] we have made changes to the Draft Remand with regard to the treatment of Koehler's reporting of the static sensitivity

---

[34] *See* Memorandum, "Calculation Memorandum for the Final Results of Redetermination," dated August 29, 2025 (Koehler Final Remand Analysis Memorandum), at 2-3.
[35] *See* Petitioners' Draft Remand Comments at 4-9.

product characteristic.[36]  Specifically, for these final results of redetermination, we have applied

partial facts available to Koehler's reported static sensitivity coding for certain products sold

during the POI.

Section 776(a)(1) of the Act provides that, if the necessary information is not available on

the record Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in

reaching the applicable determination.  Where Commerce determines that a response to a request

for information does not comply with the request, section 782(d) of the Act provides that

Commerce will inform the party submitting the response and will, to the extent practicable,

provide that party an opportunity to remedy or explain the deficiency.  If the party fails to

remedy or satisfactorily explain the deficiency within the applicable time limits, subject to

section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent

responses, as appropriate.

Moreover, section 776(b) of the Act provides that, if Commerce finds that an interested

party has failed to cooperate by not acting to the best of its ability to comply with a request for

information, Commerce may use an inference adverse to the interests of that party in selecting

from the facts otherwise available.[37]  In *Nippon Steel*, the Federal Circuit provided an

explanation of the meaning of failure to act to "the best of its ability," stating that the ordinary

meaning of "best" means "one's maximum effort," and that "ability" refers to "the quality or

state of being able."[38]  Thus, the statutory mandate that a respondent act to the "best of its

ability" requires the respondent to do the maximum that it is able to do.[39]  Notably, the Federal

---

[36] *See* Draft Remand at 10-14.
[37] *See also* 19 CFR 351.308; *Notice of Final Results of Antidumping Duty Administrative Review:  Stainless Steel Bar from India*, 70 FR 54023, 54025-26 (September 13, 2005); and *Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances:  Carbon and Certain Alloy Steel Wire Rod from Brazil*, 67 FR 55792, 55794-96 (August 30, 2002).
[38] *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*).
[39] *Id*.

Circuit also explained that the "best of its ability" standard does not require perfection.[40]  Hence, compliance with the "best of its ability" standard is determined by assessing whether a respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in a segment of a proceeding.[41]

In light of the Court's *Remand Order*, we find that Koehler's reporting of the static sensitivity product characteristic was deficient based on reconsideration of Koehler's responses in the LTFV investigation.  In the LTFV investigation, Commerce instructed that Koehler measure static sensitivity in terms of the temperature required to induce thermal paper to display its maximum ODU.[42]  In response, Koehler reported the static sensitivity product characteristic based on the testing methodology it used to measure static sensitivity in the normal course of business.[43]  In using this testing methodology, we find that Koehler did not test its thermal paper products for static sensitivity at sufficiently high temperatures, as requested by Commerce's instructions.[44]  Therefore, we find that Koehler's reporting of this product characteristic during the LTFV investigation was deficient.

As noted above, the Court instructed Commerce to provide Koehler with an opportunity to remedy or explain the deficiency in its reporting of the static sensitivity product characteristic if we found that Koehler's reporting was incomplete during the LTFV investigation.[45]  Accordingly, on May 30, 2025, we issued a questionnaire to Koehler requesting that it retest the

---

[40] *Id*.
[41] *Id*.
[42] *See* Commerce's Letter, "Request for Information," dated December 1, 2020; *see also* Memorandum, "Product Characteristics to be Used for Reporting Purposes," dated December 1, 2020 (Product Characteristic Memorandum).
[43] *See* Koehler's Letter, "Koehler's Section B Questionnaire Response," dated January 26, 2021 (Koehler's IQR), at 13; *see also* Koehler's Letter, "Koehler's Section B Supplemental Questionnaire Response Part Two," dated March 9, 2021, at 1; and Koehler's Letter, "Koehler's Second Supplemental Section B Questionnaire Response Part Two," dated April 12, 2021 (Koehler's April 12 SQR), at 2.
[44] *See* Product Characteristic Memorandum at 5; *see also* Koehler's April 12 SQR at 5.
[45] *See Remand Order*, 681 F.Supp.3d at 1376.

static sensitivity reported for all products sold in the United States and home market during the POI, revise its reporting of the static sensitivity product characteristic in its sales and cost databases accordingly, or otherwise explain why it could not provide the requested information.[46] On June 16, 2025, Koehler responded, explaining that it could not retest the static sensitivity of the products sold during the POI because "these products are no longer in Koehler's possession," as it does not keep samples of thermal paper after [        ] years.[47]  Further, Koehler explained that thermal paper deteriorates over time, which would likely produce inaccurate static sensitivity testing results even if Koehler were able to perform testing on product samples produced during the POI.[48]  Therefore, on June 18, 2025, we clarified our request, noting that it did not entail the testing of the specific products produced during the POI and Koehler should revise its reporting in a manner that allows for the reporting of the full range of temperatures available for the static sensitivity product characteristic.[49]  On June 27, 2025, Koehler submitted revised sales and cost databases with revised reporting of the static sensitivity product characteristic for [            ] CONNUMs using values from the 2021-2022 administrative review.[50]

For the final results of redetermination, we find that using Koehler's static sensitivity reporting from the 2021-2022 administrative review is a reasonable alternative.  However, after

---

[46] *See* Commerce's May 30 Letter at Attachment 1.
[47] *See* Koehler's Letter, "Response to the Request for Information for Remand Redetermination," June 16, 2025 (Koehler's June 16 RQR), at 2.
[48] *Id*. at 2-4.
[49] *See* Commerce's June 18 Memorandum.
[50] *See* Koehler's June 27 SRQR at 2 and Exhibits R-1a, R-1b, R-2, and R-3 (Exhibit SB-4).  On July 2, 2025, we received comments from the petitioners regarding Koehler's June 27 SRQR arguing that Commerce should not rely on Koehler's revised sales and cost data for the following reasons:  (1) Koehler continued to report the static sensitivity product characteristic using its reporting from the LTFV investigation for certain products; (2) the static sensitivity product characteristic reporting from the 2021-2022 administrative review may not reflect the thermal paper Koehler produced during the POI; (3) Koehler's static sensitivity testing for the 2021-2022 administrative review for specific products was done on "[                    ]," which could have deteriorated and distorted the testing results; and (4) Koehler failed to provide worksheets or documentation to support the changes made to its revised cost database as a result of the changes to the CONNUMs.  *See* Petitioners' Comments.

considering comments by interested parties,[51] we also find that gaps remain on the record regarding the Koehler's static sensitivity product characteristic coding for certain products that it sold during the POI.  Specifically, we find that there are issues with Koehler's revised reporting for those products where:  (1) the changes to the static sensitivity product coding for certain products cannot be explained by Koehler's implementation of its revised testing methodology between the POI and the period of the 2021-2022 administrative review; and (2) Koehler continued to report the static sensitivity product characteristic coding based on testing results from the LTFV investigation because these products were not sold during the 2021-2022 administrative review.  As a result, we determine that Commerce must rely on facts otherwise available, in part, under section 776(a)(1) of the Act to Koehler's reporting of these products in our calculations for these final results of redetermination.

First, we find that, for certain products, Koehler's revised testing methodology cannot explain the changes in the static sensitivity testing results between the two reporting periods. Koehler explained in Koehler's June 27 SRQR, "changes to the reporting for {static sensitivity} from the investigation to the first administrative review can be attributed to the updated testing methodology" that it implemented between the two segments.[52]  Specifically, at the time of the first administrative review, Koehler implemented an updated testing regime where it regularly collected and tested more samples of thermal paper at the full range of temperatures required for the static sensitivity product characteristic listed in Commerce's initial questionnaire.[53] However, Koehler also explained that variability in static sensitivity testing results over time is to be expected and can be attributed to many variables, including changes in the coating

---

[51] *See* "Interested Party Comments" section at Comment 1, *infra*; *see also* Petitioners' Draft Remand Comments at 4-9.
[52] *See* Koehler's June 27 SRQR at 2.
[53] *Id*. at 2 and Exhibit R-3.

formulations of the products, as well as the testing methodologies.[54]  Koehler stated that in the

normal course of business it [

].[55]  In

Koehler's April 12 SQR, Koehler provided information about the formulation changes for two

products sold during the POI:  [       ] and [      ].[56]  Specifically, Koehler reported that the

formulations for these two products changed [   ] times between [            ] and [  ] times

between [            ], respectively.[57]  Further, we note that [


].[58]

     While we only have detailed information on the number of formulation changes during

the relevant period for the two above-mentioned products, we find that changes in the static

sensitivity product coding between the POI and the period of the 2021-2022 administrative

review for several products cannot be explained by the fact that Koehler conducted its testing at

higher temperatures as a part of its revised testing methodology.  For example, the static

sensitivity product characteristic coding for the product [       ] changed from a code of "[  ]" to

a code of "[  ]" between the POI and the period of the 2021-2022 administrative review.[59]  We

observed similar changes in the static sensitivity product coding for the following product

grades:  [                               ].[60]  Thus, we find the evidence

supports that the change in the static sensitivity codes between the two reporting periods for

---

[54] *See* Koehler's April 12 SQR at 12.
[55] *See* Koehler's IQR at 13.
[56] *See* Koehler's April 12 SQR at 12-13.
[57] *Id*.
[58] *Id*.  We note that Commerce did not request that Koehler provide information regarding the formulation changes for any other products during either the underlying LTFV investigation or as a part of this remand.
[59] *See* Koehler's April 12 SQR at Exhibit S2B-5.8; *see also* Koehler's June 27 SRQR at Exhibit R-3 (Exhibit SB-4).
[60] *Id*.

these products cannot be attributed to changes to Koehler's testing methodology but are likely the result of other factors, such as changes to the coating formulations of the products. As a result, we determine that, for these products, the static sensitivity testing results from the period of the 2021-2022 administrative review are unrepresentative of the products Koehler sold during the POI, and, therefore, a gap in the record exists with respect to the reporting of the static sensitivity product characteristic for these products.

Additionally, we find that there is a gap on the record with regard to certain products for which Koehler did not revise its reporting from the LTFV investigation.[61] As explained above, we determined that Koehler's reporting of the static sensitivity product characteristic during the LTFV investigation was deficient; therefore, we instructed Koehler to revise its reporting of the static sensitivity product characteristic for "all products sold in the United States and home market," during the POI.[62] In Koehler's June 27 SRQR, Koehler explained that it continued to report the static sensitivity codes from the investigation for certain products (*i.e.*, [

]), products for which no testing results from the 2021-2022 administrative review were available.[63] Because Koehler's reporting of the static sensitivity product characteristic during the LTFV investigation was deficient, *i.e.*, Koehler did not test for static sensitivity at high enough temperatures, we find that Koehler's continued reporting of the testing results for products [

] from the investigation does not cure the deficiency.

Based on the above discussion, we find that there are gaps in the record with respect to Koehler's reporting of the static sensitivity product characteristic for certain products, and, therefore, that certain necessary information is not available of the record. As a result, pursuant

---

[61] *See* Koehler's June 27 SRQR at 2.
[62] *See* Commerce's June 18 Memorandum.
[63] *See* Koehler's June 27 SRQR at 2.

to section 776(a)(1) of the Act, Commerce must use facts otherwise available for the static sensitivity product characteristic reporting for certain products.

However, we do not find that the application of adverse facts available (AFA) is warranted in this case. As stated above, under section 776(b)(1) of the Act, Commerce may apply an adverse inference when it finds that a party has failed to cooperate by not acting to the best of its ability to comply with a request for information. The "best of its ability" standard of section 776(b) of the Act means to put forth maximum effort to provide full and complete answers to all inquiries.[64]

In this remand redetermination, we find that Koehler's static sensitivity product characteristic reporting during the investigation was deficient and, as a result, we requested that Koehler retest the static sensitivity of all the products sold during the POI or otherwise explain why it could not provide the requested information.[65] Koehler provided timely responses to our questionnaire, explaining that it could not provide the requested information because it cannot retest the thermal paper products produced and sold during the POI (*i.e.*, 2019-2020), as those products no longer exist.[66] Koehler further explained that, even if it had retained samples of the products it produced and sold during the 2019-2020 period of investigation, testing performed on these samples in 2025 would be unreliable because of the degradation that occurs to thermal paper over time. Specifically, Koehler explained that:

---

[64] *See Nippon Steel*, 337 F.3d at 1382-83.
[65] *See* Commerce's May 30 Letter at Attachment 1.
[66] *See* Koehler's June 16 RQR at 2 ("Thermal paper is a perishable product, meaning that the thermal active coating of thermal paper and the paper itself deteriorates or degrades over time… {T}he thermosensitive layer that is coated onto the base paper provides the product with its intended functionality. In general terms, thermal paper contains a thermosensitive layer comprised of two key components: (1) a dye, which is initially colorless, and (2) a developer that chemically activates the dye upon the application of heat, resulting in a print onto the base paper. In unprinted thermal paper, these two components are spatially separated within the thermosensitive layer to prevent premature interaction… {I}n unprinted paper, the thermosensitive layer may degrade or deteriorate over time due to physical and chemical processes.").

> {E}ven if thermal paper products sold during the POI were available, testing
> thermal paper produced and sold during the POI will produce inaccurate or
> significantly skewed testing results {…} the thermosensitive layer on thermal paper
> and the paper itself degrade over prolonged storage. Given that testing static
> sensitivity essentially requires an analysis of optical density levels of prints made
> at various temperatures onto a piece of thermal paper, retesting thermal paper
> produced over five years ago would mean that each thermal paper product tested
> would have different results depending on the level of degradation of the
> thermosensitive layer and the physical paper of a particular sample.[67]

As detailed above, we subsequently requested that Koehler revise its reporting in a manner that allows for the reporting of the full range of temperatures available for the static sensitivity product characteristic.[68]  Koehler timely responded to our request by submitting revised sales and cost databases with revised reporting of the static sensitivity product characteristic for [

] CONNUMs using values from the 2021-2022 administrative review.[69]

Considering the limitations discussed above and based on the record evidence, we find that application of an adverse inference is not warranted here because Koehler has not failed to cooperate by not acting to the best of its ability to comply with our request for information. Indeed, Koehler complied with our request for information, explaining why it could not retest POI products and then revised its static sensitivity reporting in a manner that allowed it to report the full temperature range of the product characteristic.[70]  As noted above, since the investigation, Koehler has developed an updated testing regime for reporting the static sensitivity product characteristic to comply with Commerce's instructions regarding how to report the product characteristic, and it used that testing regime in the 2021-2022 administrative review of this order the results of which Commerce accepted, verified, and relied on for its margin

---

[67] *Id.* at 4.
[68] *See* Commerce's June 18 Memorandum.
[69] *See* Koehler's June 27 SRQR at 2 and Exhibits R-1a, R-1b, R-2, and R-3 (Exhibit SB-4).
[70] *Id.*; *see also* Koehler's June 16 RQR at 2-5.

calculations in that segment.[71]  As Koehler explained, it cannot implement this testing regime on

the products produced and sold during the POI at this time because those products no longer

exist.[72]  Subsequently, Koehler timely revised its static sensitivity product characteristic

reporting and provided an alternative reporting methodology based on the static sensitivity test

results reported in the 2021-2022 administrative review for products sold during the POI.[73]  As

this alternative allows Koehler to report the full range of temperatures for this product

characteristic, we find that using the information from the 2021-2022 administrative review is

reasonable for the purposes of calculating Koehler's final margin.  Accordingly, given that

Koehler has complied with our request for information, we find that there is no basis to apply an

adverse inference and, therefore, the application of AFA is unwarranted.

     Nonetheless, we have applied facts otherwise available, in part, to address the record gaps

for products where:  (1) Koehler's revised testing methodology cannot explain the change in the

static sensitivity coding from the POI to the 2021-2022 administrative review; and (2) Koehler

continued to report the static sensitivity product codes from the LTFV investigation.  As facts

available, because we are unable to use Koehler's static sensitivity product characteristic

reporting for these products, we excluded Koehler's home market sales of these products from

the calculation of NV.  Therefore, we are basing NV for Koehler's U.S. sales of these products

---

[71] *See* Koehler's June 27 SRQR at Exhibit R-3; *see also Thermal Paper from the Republic of Germany: Preliminary Results of Antidumping Duty Administrative Review; 2021–2022*, 88 FR 83397 (November 29, 2023), unchanged in *Thermal Paper from the Federal Republic of Germany: Final Results of Antidumping Duty Administrative Review; 2021–2022*, 89 FR 47517 (June 3, 2024).

[72] *See* Koehler's June 16 RQR at 2.

[73] *See* Commerce's June 18 Memorandum.  As explained earlier in this section, Commerce clarified that "Koehler should revise its reporting of static sensitivity for all products sold in the United States and home market during the period of investigation *in a manner that* allows Koehler to report the full range of the product characteristic according to the instructions listed in the questionnaire." (emphasis added).  *See* Koehler's June 27 SRQR at Exhibit R-1a, R-1b, and R-2.

on the most similar CONNUM sold in the home market that is not affected by these static

sensitivity product characteristic reporting issues.[74]

### III. Accrued Interest Expenses on Unpaid Antidumping Duties

We have continued to include the accrued interest expenses on Koehler's unpaid

antidumping duties as part of financial expenses in the calculation of Koehler's COP.  The

accrued interest expenses are not an indirect selling expense which can be deducted from CEP

under section 772(d)(1)(D) of the Act or 19 CFR 351.402(b).  Section 772(d)(1)(D) of the Act

states that the amount of any "selling expenses" that are "generally incurred by or for the account

of the producer or exporter, or the affiliated seller in the United States, in *selling the subject*

*merchandise*" may be deducted from CEP.[75]  Further, 19 CFR 351.402(b) establishes that

Commerce will "make adjustments for expenses associated with commercial activities in the

United States that *relate to the sale to an unaffiliated purchaser*, no matter where or when paid,"

to CEP.[76]  In fact, Congress spoke on its intent with respect to the types of expenses to be

deducted under section 772(d)(1)(D) of the Act, stating "{s}ection 772(d)(1)(D) provides for the

deduction of indirect selling expenses from constructed export price… {s}uch expenses would

be incurred by the seller regardless of whether the particular sales in question are made, *but*

*reasonably must be attributed (at least in part) to such sales*."[77]

Critical to making an adjustment related to these sections is that such expenses are

"incurred by or for the account of the producer or exporter … in selling subject merchandise,"

and that such expenses "relate to the sale to an unaffiliated purchaser" in the United States.

---

[74] *See* Koehler Final Remand Analysis Memorandum at 2.
[75] *See* section 772(d)(1) of the Act (emphasis added).
[76] *See* 19 CFR 351.402(b) (emphasis added).
[77] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994), at 824.

However, this is not the case here.  As we explained in the *Final Determination*,[78] the accrued

interest expenses at issue do not relate to economic activities performed to sell subject

merchandise covered by the *Order* to the United States.[79]  Rather, they arise as a result of

Koehler's unwillingness to fulfill its obligations pertaining to antidumping duties owed on U.S.

sales of merchandise covered by the now revoked *LWTP Order*.  Thus, because they do not

relate to U.S. sales of subject merchandise covered by the *Order*,[80] we find no basis to deduct

these expenses as an adjustment to CEP, pursuant to section 772(d)(1) of the Act and 19 CFR

351.402(b).

    Moreover, Koehler will continue to accrue these interest expenses until it pays the

underlying liability, regardless of whether it continues to sell subject merchandise to the United

States.  Therefore, these accrued interest expenses were not incurred for the purpose of selling

thermal paper covered by the *Order* to the unaffiliated customer in the United States.  As a

result, it would be inappropriate to consider Koehler's accrued interest expenses an indirect

selling expense that can be deducted from CEP under section 772(d)(1)(D) of the Act or 19 CFR

351.402(b).

    Instead, we continue to find that it is appropriate to include the accrued interest expenses

on Koehler's unpaid antidumping duties as part of the financial expenses in the calculation of

COP.  According to section 773(f)(1)(A) of the Act, a respondent's costs shall normally be

calculated based on the records of the exporter or producer of the merchandise, if such records

are kept in accordance with generally accepted accounting principles and reasonably reflect the

---

[78] *See Final Determination* IDM at Comment 5.
[79] *See Thermal Paper from Germany, Japan, the Republic of Korea, and Spain: Antidumping Duty Orders*, 86 FR 66284 (November 22, 2023) (*Order*).
[80] *Id.*

costs associated with the production and sale of the merchandise.[81]  In cases where the costs recorded in a company's normal books do not reasonably reflect its costs, Commerce may revise such costs.[82]  Here, we found that Koehler did not demonstrate whether it recognized and recorded any of the accrued interest expenses related to its unpaid antidumping duties in its books and records.[83]  Therefore, we found that it was appropriate to include the accrued interest expenses on Koehler's unpaid duty liability during fiscal year 2020 in the calculation of Koehler's financial expense ratio.  Specifically, we recalculated Koehler's financial expense ratio because the accrued interest expenses on unpaid antidumping duties are liabilities that Koehler incurred as a general matter and are associated with its COP as an interest expense under section 773(b)(3) of the Act.[84]

## IV.     INTERESTED PARTY COMMENTS

On July 22, 2025, Commerce issued its Draft Remand and provided interested parties an opportunity to comment.[85]  Commerce received comments from the petitioners and Koehler.[86]  Koehler agreed with the Draft Remand regarding the issues of the static sensitivity product characteristic and the treatment of Koehler's accrued interest on unpaid antidumping duties, and it did not contest Commerce's use of the price difference test.  The petitioners also did not contest Commerce's use of the price difference test.  The petitioners' comments on the other issues are addressed below.  After considering these comments, we have made certain changes to our analysis for these final results of redetermination.

---

[81] *See* section 773(f)(1)(A) of the Act.
[82] *See Large Diameter Welded Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 84 FR 6362 (February 27, 2019), and accompanying IDM at Comment 12.
[83] *See Final Determination* IDM at Comment 5.
[84] *See* Memorandum, "Final Determination Margin Calculation for Papierfabrik August Koehler SE," dated September 24, 2021, at 2 and Attachment 3.
[85] *See* Draft Remand.
[86] *See* Petitioners' Draft Remand Comments; *see also* Koehler's Letter on Draft Remand.

**Comment 1:   Koehler's Static Sensitivity Product Characteristic Reporting**

The following is a verbatim executive summary of argument submitted by the petitioners.

For further details, *see* Petitioners Draft Remand Comments at 4-9 (internal citations omitted).

In the final redetermination, Commerce should reject Koehler's revised static sensitivity (SSENSIT) reporting based on information from a subsequent administrative review.  Koehler failed to cooperate by not acting to the best of its ability to conduct adequate testing and report accurate SSENSIT data during the original investigation, and that failure has not been remedied in this remand segment by Koehler's submission of unrepresentative, flawed, and incomplete information from the first review.

Petitioners have demonstrated that the first review data are unrepresentative of grades sold during the investigation due to formulation changes affecting sensitivity characteristics.  In its Draft Results, Commerce found insufficient evidence that revised SSENSIT characteristics resulted from formulation changes rather than from improved testing protocols (*i.e.*, testing to higher temperatures) adopted in the first review.  In so doing, Commerce inappropriately shifted the evidentiary burden to Petitioners – the party that is not in possession of the information.  Moreover, the record clearly contradicts Commerce's speculation that Koehler's revised SSENSIT reporting resulted strictly from testing to higher temperatures.  In fact, SSENSIT values for some grades have changed in ways that are inconsistent with testing to higher temperatures.  Furthermore, revised static sensitivity protocols adopted in the first review cannot explain why other physical characteristics apart from SSENSIT also changed for the same grades sold during the first review period.  All of these phenomena can only be explained by formulation changes.  The record evidence thus shows that, because of formulation changes, products sold during the first review period were not representative of the same grades sold during the investigation, and Commerce should not rely on Koehler's revised SSENSIT reporting.  Because Koehler failed to cooperate by not acting to the best of its ability to provide accurate information during the investigation, Commerce should apply AFA.

Even if the first review data were representative of products sold during the investigation (which it was not), they are incomplete, because information for certain grades is either missing or based on degraded samples.  At the very least, Commerce should apply partial AFA to sales of those particular grades.

**Commerce's Position:** As discussed above, we agree that there are certain deficiencies in Koehler's June 27 SRQR reporting of the static sensitivity product characteristic that warrant application of facts otherwise available, in part, pursuant to section 776(a)(1) of the Act.[87]

In the Draft Remand, we found that it would be inappropriate to disregard the information in Koehler's June 27 SRQR.[88] We determined that the record did not support finding that the static sensitivity testing results from the 2021-2022 administrative review were unrepresentative of the products sold during the POI.[89] Additionally, we discussed concerns the petitioners raised regarding certain products for which [

].[90] We also found that we are able to reconcile the changes Koehler made to its revised COP database to the COP database used in the margin calculations for the *Final Determination*.[91] Therefore, in the Draft Remand, we found that we could rely on the entirety of Koehler's revised static sensitivity reporting.[92]

After considering the petitioners' comments on the Draft Remand, we have reconsidered the information on the record within the context of sections 776(a) and (b) of the Act, as detailed in the "Analysis" section above. As a result of this analysis, we find that, for certain products, it is appropriate pursuant to section 782(d) of the Act to disregard the information provided in Koehler's June 27 SRQR and apply partial facts available to these products under section

---

[87] *See* "Analysis" section, *supra*.
[88] *See* Draft Remand at 10-14 (citing Petitioners' Comments).
[89] *Id*. at 12.
[90] *Id*. at 13.
[91] *Id*. at 14. In the Draft Remand, we found that the total production quantity and extended total cost of manufacturing in Koehler's revised COP database reconciles to the total production quantity and extended total cost of manufacturing in the COP database submitted during the investigation. For example, CONNUM [

].

*See* Koehler's June 27 SRQR at Exhibit R-2; *see also* Koehler's Letter, "Koehler Second Section D Supplemental Questionnaire Response," dated April 13, 2021, at Exhibit S2D-10.
[92] *Id*. at 12-14.

776(a)(1) of the Act.  Specifically, for certain products, we find that we cannot rely on Koehler's

revised reporting because: (1) the changes to the static sensitivity product coding cannot be

explained by Koehler's implementation of its revised testing methodology between the POI and

the period of the 2021-2022 administrative review; and (2) revision based on reporting in the

2021-2022 administrative review was not available for these certain products because they were

not sold during the 2021-2022 review period and, thus, Koehler continued to report the static

sensitivity product coding from the LTFV investigation.

However, we disagree that the static sensitivity testing results from the 2021-2022

administrative review are unrepresentative of all the products Koehler produced and sold during

the POI.  Koehler's updated testing regime can explain why the static sensitivity coding for

grades of thermal paper that were testing at [    ] degrees Celsius (*i.e.*, [


]) are now testing at higher temperatures.[93]  For example, for product [

], the static sensitivity increased from a code of "[   ]" (*i.e.*, [   ] degrees Celsius) to a code of

"[   ]" (*i.e.*, [   ] degrees Celsius) between the POI and the period of the 2021-2022

administrative review.[94]  Moreover, evidence on the record indicates that formulation changes do

not guarantee that the static sensitivity code of a product will change.  Specifically, for product

[     ], Commerce determined based on the testing results submitted in Koehler's April 12

SQR that this product should have a static sensitivity code of "[   ]."[95]  As discussed in the

"Analysis" section above, Koehler reported that the formulation for this product changed after

---

[93] *See* Koehler's April 12 SQR at 3.
[94] *See* Koehler's June 27 SRQR at Exhibits R-1a, R-1b, and R-3.
[95] *See* Memorandum, "Analysis of Business Proprietary Information in the Final Determination," dated September 24, 2021, at 4 ("{W}e recoded the SSENSIT product characteristic for sales of Product B from [   ] to [   ] and revised the CONNUMs accordingly for Product B in Koehler's sales and cost databases in our margin calculations for the final determination." (internal citations omitted)).

the POI.[96]  Nonetheless, despite these formulation changes, this product reached its maximum

ODU at a temperature of [    ] degrees Celsius (*i.e.*, a code of "[  ]") in the testing Koehler

performed for the 2021-2022 administrative review.[97]  For such products, we find that the

evidence on the record supports our finding that the testing results from 2021-2022

administrative review are representative of the products produced during the POI.

Further, we disagree that we should disregard Koehler's static sensitivity product

characteristic coding for products where Koehler performed its testing on "[

]" in 2021-2022 administrative review.[98]  In Koehler's June 16 RQR, Koehler explained

that the degradation of thermal paper products over time is commonly known in the industry.[99]

Koehler stated that its policy is to retain physical samples of thermal paper for a period of up to

[    ] years, which "covers when the paper is in the chain of commerce in which Koehler

might need the sample if quality issues arose in the normal course of business."[100]  According to

Koehler's testing results from the 2021-2022 administrative review, the testing for [    ] grades

of thermal paper were based on "[                    ]" that were produced anywhere from [

] prior to being tested for the purposes of reporting for the 2021-2022

administrative review.[101]  While the record shows that physical degradation of the thermal paper

can happen within three years of production,[102] we find that there is no basis to disregard testing

performed on "[                    ]" when Koehler uses these samples for commercial

purposes in the normal course of business for a period of up to [    ] years; thus, we have

relied on Koehler's reporting for these products for our margin calculations.

---

[96] *See* Koehler's April 12 SQR at 12-13.
[97] *See* Koehler's June 27 SRQR at Exhibit R-3 (Exhibit SB-4).
[98] *Id*.
[99] *See* Koehler's June 16 RQR at 3.
[100] *Id*. at 3.
[101] *See* Koehler's June 27 SRQR at Exhibit R-3 (Exhibit SB-4).
[102] *See* Koehler's June 16 RQR at Exhibit 4.

Finally, while we agree that the record is incomplete with regard to Koehler's static

sensitivity reporting for some products, we find that the application of adverse facts available

under section 776(b) of the Act is unwarranted for these final results of redetermination.  As

discussed in the "Analysis" section above, we find that Koehler has not failed to cooperate with

Commerce's request for information and, therefore, that the application of AFA is unwarranted.

**Comment 2:  Koehler's Accrued Interest Expenses on Unpaid Antidumping Duties**

The following is a verbatim executive summary of argument submitted by the petitioners.

For further details, *see* Petitioners' Draft Remand Comments at 10-13 (internal citations

omitted).

> Koehler incurred interest expenses on its substantial unpaid antidumping duty
> liabilities arising from the company's activities importing and reselling to
> unaffiliated U.S. customers thermal paper under the (now-revoked) 2008 order on
> lightweight thermal paper from Germany (the "2008 Order").  Because the expense
> arose from Koehler's commercial activities in the United States selling thermal
> paper, it should be captured as U.S. indirect selling expenses (INDIRSU) to be
> deducted from CEP, not as part of the financial expense component of COP.
> Although the Draft Results find that the expenses do not relate to sales of the
> "subject merchandise" under 19 U.S.C. § 1677a(d)(1) because the liability arose
> under a prior order, this represents a misreading of the statute.  The term "subject
> merchandise" is defined at 19 U.S.C. § 1677(25) as "the class or kind of
> merchandise that is within the scope of an investigation…."  Here, the "class or
> kind of merchandise" covered by the scope of this investigation is the same as the
> "class or kind of merchandise" covered by the scope of the 2008 Order, i.e., thermal
> paper in rolls.  All of Koehler's products that were subject to the 2008 Order (sales
> of which generated the antidumping liability at issue) also are subject to the 2021
> investigation; there are no products that were covered by the 2008 Order but that
> are not also covered by the 2021 investigation.  Because both orders cover the same
> class or kind of merchandise, entries under the 2008 Order should be considered
> "subject merchandise" as that term is used in the statute for purposes of both orders.
> The interest expenses at issue incurred during the instant POI, therefore, also relate
> to sales of "subject merchandise" in this investigation.  The statute provides no
> basis to deny the requested CEP adjustment merely because the liability arose under
> a now-revoked order covering the same class or kind of merchandise.
> The Draft Results further state that the interest cannot be treated as an indirect
> selling expense because it is a fixed expense that is incurred regardless of whether
> Koehler sells the subject merchandise.  But the Statement of Administrative Action
> ("SAA") at 824 makes clear that fixed expenses that "would be incurred by the

seller regardless of whether the particular sales in question are made" nonetheless are appropriately captured as U.S. indirect selling expenses. Here, the liability arose solely from Koehler's activities of importing thermal paper and reselling it to U.S. customers. Although it is correct that the interest expense is fixed, in the sense that accrues each year regardless of the level of Koehler's current sales, that is no impediment to deducting it as an indirect selling expense. Because the interest is related to Koehler's commercial activities selling thermal paper in the United States, it is appropriate to capture this expense in INDIRSU rather than in COP.

**Commerce's Position:** We disagree that the interest Koehler accrued on unpaid antidumping duties owed on U.S. sales of merchandise covered by the now revoked *LWTP Order* should be deducted from U.S. price as an indirect selling expense.

Section 772(d)(1)(D) of the Act states that the amount of any "selling expenses" that are "generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in *selling the subject merchandise*" may be deducted from the CEP.[103] Section 771(25) of the Act defines subject merchandise as "the class or kind of merchandise that is within the scope of an investigation…". Additionally, 19 CFR 351.204(b)(1) states that in defining the period of investigation, "the Secretary normally will examine merchandise sold during the four most recently completed fiscal quarters… of the month preceding the month in which the petition was filed." Finally, 19 CR 351.402(b) states that in establishing the CEP, "the Secretary will adjust for expenses associated with economic activities in the United States that relate to the sale to an unaffiliated purchaser…"

The petitioners argue that Commerce was incorrect in stating that the accrued interest expenses at issue do not relate to economic activities performed to sell subject merchandise to the United States.[104] We disagree. Again, we find that the accrued interest expenses at issue do not relate to economic activities performed to sell subject merchandise covered by the *Order* to

---

[103] *See* section 772(d)(1) of the Act (emphasis added).
[104] *See* Petitioners' Draft Remand Comments at 10.

the United States.[105]  Instead, the interest expenses at issue arose as a result of Koehler's

unwillingness to fulfill its obligations pertaining to antidumping duties owed on U.S. sales of

merchandise covered by the now revoked *LWTP Order* and from transactions outside of the

period of investigation underlying this *Order.*

      As outlined above, Commerce may deduct selling expenses incurred "in selling the

subject merchandise" which is defined as the "class or kind of merchandise that is within the

scope of an investigation."[106]  In this investigation, Commerce examined merchandise sold

during the four most recently completed fiscal quarters of the month preceding the month in

which the petition was filed: October 1, 2019, through September 30, 2020.[107]  The interest

expenses at issue stem from duties assessed on merchandise under the revoked *LWTP Order*,

sold between [                                              ].[108]  Thus, the accrued interest expenses and

duties do not constitute selling expenses incurred in selling of merchandise subject to this

investigation.  As we explained in the *Final Determination*, the antidumping duties and the

corresponding accrued interest expenses at issue stem from duties that occurred under the *LWTP

Order* related to transactions that predate the POI.[109]

      We also disagree with the petitioners that Commerce should find the similarity of the

scopes between the *LWTP Order* and the *Order* evidence that it is appropriate to treat the

accrued interest expenses as indirect selling expenses.  Regardless of whether the *LWTP

Order* and the current *Order* cover similar merchandise, the accrued interest expenses at issue

relate to unpaid antidumping duties on sales of merchandise subject to the revoked *LWTP

---

[105] *See Order,* 86 FR at 66284.
[106] *See* sections 772(d)(1)(D) and 771(25) of the Act.
[107] *See Final Determination,* 86 FR at 54152; *see also* 19 CR 351.402(b).
[108] *See* Koehler's Letter, "Koehler's Section A Questionnaire Response," dated January 12, 2021, at Exhibit A-13.
[109] *See Final Determination* IDM at Comment 5.

*Order* that predate the POI.[110]  Therefore, it is inappropriate to consider them as indirect

selling expenses that should be deducted, under section 772(d)(1)(D) of the Act or 19 CFR

351.402(b), from the constructed export price of merchandise subject to the underlying

investigation.

The petitioners also contend that Commerce erred in stating that it would be

inappropriate to consider these interest expenses as indirect selling expenses because Koehler

will incur them regardless of whether it continues to sell subject merchandise to the United

States, citing both the SAA and Commerce's antidumping questionnaire as support.[111]  However,

the petitioners ignore important language in the SAA when it comes to understanding the kinds

of expenses Commerce may consider as an indirect selling expense:

> Section 772(d)(l)(D) of the Act provides for the deduction of indirect selling
> expenses from constructed export price.  *Indirect selling expenses are expenses
> which do not meet the criteria of "resulting from and bearing a direct relationship
> to" the sale of the subject merchandise*, do not qualify as assumptions, and are not
> commissions.  Such expenses would be incurred by the seller regardless of whether
> the particular sales in question are made, *but reasonably may be attributed (at least
> in part) to such sales*.[112]

The petitioners contend that Koehler's interest expenses are akin to office rent and

salesmen's salaries in that they accrue each year regardless of Koehler's sales activities during

the year.  However, this argument ignores the requirement, outlined in the SAA, that these

expenses are *attributable to sales of subject merchandise*.  As explained above, because these

interest expenses are related to sales that predate the POI and, thus, are not covered by this

*Order*, they *do not* meet the requirement of section 772(d)(1)(D) of the Act that they are

---

[110] *See Lightweight Thermal Paper from the People's Republic of China and Germany:  Continuation of the Antidumping and Countervailing Duty Orders on the People's Republic of China, Revocation of the Antidumping Duty Order on Germany*, 80 FR 5083 (January 30, 2015).
[111] The petitioners cite Commerce's questionnaire as defining indirect expenses as "fixed expenses that are incurred whether or not a sale is made."
[112] *See* SAA at 824 (emphasis added).

reasonably attributable to sales of subject merchandise. Therefore, as noted above, we find no basis under the law to treat Koehler's accrued interest expenses as U.S. indirect selling expenses and continue to include these expenses in our calculation of Koehler's financial expenses included in the COP.

## V.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have continued to use the "price difference test" as a part of our differential pricing analysis to determine whether prices differ significantly. We have continued to use the sales and cost data submitted with Koehler's June 27 SRQR, including Koehler's revised reporting of the static sensitivity product characteristic, but we have applied partial facts available to certain products to fill certain gaps in the record. Moreover, we have continued to include Koehler's accrued interest expenses on unpaid antidumping duties from the *LWTP Order* in our calculation of Koehler's financial expenses included in the COP. As a result of these changes, Koehler's estimated weighted-average dumping margin is now 6.27 percent. Moreover, because the all-others rate is based on Koehler's dumping margin, the all-others rate is also 6.27 percent.

Because Koehler's weighted-average dumping margin and the all-others rate are different from those in the *Final Determination*, we intend to issue a *Timken*[113] notice with the amended final determination should the Court sustain these final results of redetermination.

8/28/2025

X _Elouaradia_

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
  for Enforcement and Compliance

---

[113] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).